UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

GLUCO PERFECT, LLC, U.S. HEALTH & HOME
CARE, INC., and JOY MERNONE, Individually and in
her capacity as Executor of the Estate of Kevin R.
Mernone, and derivatively on behalf of PERFECT CARE,
INC.,

                               Plaintiffs,

                - against -

PERFECT GLUCO PRODUCTS, LLC, USHH
PRODUCTS, INC., FRANCINE FREIMAN, WILLIAM
J. GILLEN, ANDRE RAMNAUTH and JOHN AND
JANE DOES 1 THROUGH 10,

                               Defendants.

-------------------------------------------------------------------x

Index No.:

**AFFIDAVIT OF JOY
MERNONE IN SUPPORT OF
PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION**

STATE OF NEW YORK      )
                             ) ss.:
NEW YORK COUNTY     )

JOY MERNONE, being duly sworn, deposes and says:

I submit this affidavit in support of Plaintiffs' application for a temporary restraining order and preliminary injunction, restraining and enjoining Defendants from engaging in various activities detrimental to Plaintiffs, as described herein and in the accompanying Complaint, Memorandum of Law and other papers.

**A.    I am the 100% Owner of Plaintiffs Gluco Perfect and U.S. Health & Home Care, and 50% Owner of Plaintiff Perfect Care**

1.    Prior to his death, my husband Kevin R. Mernone was the sole member of Plaintiff Gluco Perfect, LLC ("Gluco Perfect").  Pursuant to Gluco Perfect's Operating Agreement, "[u]pon the death of a Member, the decedent Member's interest in the Company shall vest in the decedent's lawful spouse . . ."  (Exhibit 1.)  I was Kevin Mernone's lawful spouse on the date of his death.  Moreover, I acquired my husband's interests in Gluco Perfect as the sole beneficiary of his Will and as Executor of his Estate, and I have been expressly appointed the sole member of Gluco Perfect as recorded in the Amendment to the company's Operating Agreement dated November 4, 2013, and I am also the sole executor of my husband's Estate.  (Exhibit 2.)

2.    Kevin was also the sole shareholder, director and president of Plaintiff U.S. Health & Home Care, Inc. ("USH&H").  I acquired my husband's interests in USH&H as the sole beneficiary of his Will and as Executor of his Estate, and I am the sole shareholder, director and president of U.S. Health & Home Care as recorded in the Amendment to the company's Bylaws dated November 27, 2013.  (Exhibit 3.)

3.    Plaintiffs Gluco Perfect and USH&H will collectively be referred to as the "Gluco Companies."

4.    In addition, Kevin's 50% interest in Plaintiff Perfect Care Inc. ("Perfect Care") and 8927 126th Street Realty LLC (which owns the property housing the Plaintiff and Defendant companies), have vested in me, whether in my capacity as Executor of Kevin's Estate or directly as the sole beneficiary of his Will.  (*See* Exhibit 4.)

5.    Defendant Freiman is aware of my ownership interest in the aforementioned companies.

**B.    Plaintiffs Gluco Perfect LLC and U.S. Health & Home
Care, Inc. Establish their Trade Names and Trademarks**

6.    Plaintiff Gluco Perfect first used the trade name "Gluco Perfect" when the company was created in December 2005.

7.    On January 17, 2006, Gluco Perfect applied to register the trademark "Gluco Perfect" with the United States Patent and Trademark Office (the "USPTO").  On February 24, 2009, the USPTO registered the trademark "Gluco Perfect" and issued registration number 3580539.  The "Gluco Perfect" trademark is valid and remains in full force and effect.  (Exhibit 5.)

8.    On October 20, 2009, Gluco Perfect applied to register the trademark "Perfect" with the USPTO.  On August 20, 2013, the USPTO registered the trademark "Perfect" and issued registration number 4388373.  The "Perfect" trademark is valid and remains in full force and effect.  (Exhibit 6.)

9.    On January 24, 2007, Gluco Perfect applied to register the trademark "Perfect 2" with the USPTO.  On March 30, 2010, the USPTO registered the trademark "Perfect 2" and issued registration number 3767837.  The "Perfect 2" trademark is valid and remains in full force and effect.  (Exhibit 7.)

10.    All three of the aforementioned trademarks held by Gluco Perfect are for "medical diagnostic test strips for the use in the field of glucose level monitoring."  Gluco Perfect markets and sells inventory bearing these trademarks, on both the products and packaging.

11.    Gluco Perfect has registered and continues to maintain the Internet domain name glucoperfect.com.  Gluco Perfect's website is identifiable by the display of its trade name and trademarked products.  (*See* Exhibit 8.)

12.    Gluco Perfect products are also available through several online retailers with national reach such as Amazon.com and Walmart.com.

13.    Plaintiff USH&H first used the trade name "U.S. Health & Home Care" when the company was formed in early 2005. U.S. Health & Home Care is primarily in the market of providing medical supplies.

14.    Over the years, the Gluco Companies have spent considerable time and money marketing, broadcasting, branding and otherwise protecting their trade names and trademarks, including at trade shows and through private label agreements.

15.    In particular, Gluco Perfect is identified by its customers and by the public by its trademarked products, including the "Gluco Perfect," "Perfect" and "Perfect 2" trademarks.

16.    The Gluco Companies have sold their products throughout the United States and internationally.

17.    Plaintiffs Perfect Care and the Gluco Companies are all headquartered and run out of the 8927 126th Street property.

18.    The Gluco Companies have made millions of dollars in revenue over the years and were, aside from Defendants' wrongdoing, positioned to continue that success for years to come.

**C.    Defendant Freiman Was an Employee and Held No
Ownership Interest in the Company Plaintiffs**

19.    Upon information and belief, Defendant Freiman has been employed by each of Kevin Mernone's companies since at least 1997. Neither Freiman nor any of the other Individual Defendants have ever held any ownership interest in any of those companies, including Perfect Care and the Gluco Companies.

20.     Defendant Freiman has been Vice-President of Perfect Care since the year 2000, and became Vice-President of the Gluco Companies by 2008 at the latest. Defendant Freiman has also admitted that she handles all of the day-to-day operations of the Gluco Companies and Perfect Care.

**D.     Our Divorce Proceedings and the Court Order
Prohibiting Disposition of Marital Assets**

21.     I married Kevin Mernone on July 28, 1990.  There is one child from our marriage, Alfred Joseph Mernone, who was born on July 18, 1995.

22.     In 2009, I commenced divorce proceedings in the matter of *Joy Mernone v. Kevin R. Mernone,* Index No. 09-201765 (N.Y. Sup. Ct. Nassau County).

23.     In the context of those proceedings, on September 29, 2009, the Nassau County Supreme Court ordered that "[b]oth parties, their attorneys, agents and assigns are enjoined, during the pendency of the action, from making any disposition of marital assets except in the ordinary course of business or living." (Exhibit 9.)  The Court has never lifted its ban against the disposition of the marital assets.

24.     The divorce was not finalized before Kevin's death in October 2013.

25.     Defendant Freiman was an active participant in our divorce proceedings. She spoke frequently with Kevin's divorce attorneys and she testified in those proceedings.  She is aware of the Court's order prohibiting any disposition of marital assets.

**E.     Defendants' Fraudulent Scheme Is Uncovered After Kevin Mernone's Death**

26.     On October 13, 2013, as Kevin was dying in the hospital, Defendants Freiman, Gillen and others acting in concert, including Glenn Mernone, traveled to Kevin Mernone's house in Oyster Bay, New York.  Defendants Freiman, Gillen and others

broke into Kevin Mernone's locked desk on the first floor of the house. Defendants then removed and hauled away a locked safe from a bedroom closet in the upstairs of the house. Defendants also took unopened mail addressed to Kevin Mernone.

27.     Upon information and belief, the desk and safe contained cash, a collection of watches and pens worth tens of thousands of dollars, and personal documents including a birth certificate, a mortgage note, a deed and social security cards.

28.     Since my husband's death, I have been established as the sole beneficiary of Kevin Mernone's Estate, the Executor of his Will, the 100% owner of the Gluco Companies and the 50% owner of Perfect Care.

29.     Accordingly, I sought information concerning my businesses.   In the course of my investigation, I learned that at least a year before my husband's death, the Individual Defendants set in motion an elaborate scheme to steal vast amounts of money, customers, inventory and goodwill from the Gluco Companies.

> 1.     Defendants Secretly Create The Mirror Image
>        Companies to Enact Their Scheme to Fleece
>        Kevin Mernone and the Gluco Companies

30.     As a key part of their scheme, the Individual Defendants surreptitiously formed Perfect Gluco Products, LLC ("Perfect Gluco") and USHH Products, Inc. ("USHH") (collectively, the "Mirror Image Companies"), using virtually identical names to the Gluco companies.

31.     On October 10, 2012, Defendant Perfect Gluco was formed by Defendants Freiman and Gillen. (Exhibit 10.)

32.     On October 17, 2012, Defendant USHH was formed by Defendants Freiman and Ramnauth. (Exhibit 11.)

33.    Adding to the confusion, the Mirror Image Companies operate out of the same location as the Gluco Companies and Perfect Care.

34.    Defendants set up the Mirror Image Companies when Kevin Mernone's alcoholism left him incapable of managing his businesses.

35.    Several of Plaintiffs' employees have been co-opted and are now employed by the Mirror Image Companies, including Defendant Ramnauth and others.

2.    Vast Sums of Plaintiffs' Money are
Diverted into Defendants' Bank Accounts

36.    Less than ten days after Defendant Perfect Gluco was created, Defendants began transferring millions of dollars from Gluco Perfect's bank account at Chase Bank into a bank account owned by Perfect Gluco.  The sole signatory on the Gluco Perfect Chase Bank account was Kevin Mernone.  Freiman thus accomplished these transfers by forging Kevin Mernon's signature on the Gluco Perfect checks.

37.    Specifically, between October 19, 2012 through October 7, 2013, Freiman signed Kevin Mernone's name to at least 72 checks totaling $2,560,180.79 from Plaintiff Gluco Perfect's account.  In each case, the checks were made payable to, and deposited in, an account owned by Defendant Perfect Gluco, for which, upon information and belief, Freiman is the sole signatory.  *See* the accompanying Affidavit of Michael Garibaldi dated March 12, 2014 ("Garibaldi Aff.") ¶ 5; Ex. B.

38.    I am very familiar with Kevin Mernone's signature, having been married to him for about 20 years.  In my opinion, having reviewed the documents, the signatures on each of the aforementioned 72 checks are not Kevin's signature.

7

39.    Similarly, at or around the same time period, Defendants diverted over $21,000 from Plaintiff USH&H's bank account to Defendant USHH's bank account. *See* Garibaldi Aff. ¶ 6; Ex. C.

40.    Gluco Perfect also held a merchant account with Fidelity Bank which is used to process customer payments. Gluco Perfect's Fidelity Bank account was closed by Freiman on or about the date of Kevin Mernone's death, and then promptly re-opened as an account for Perfect Care, an entity in which Kevin Mernone owned a 50% interest. Freiman falsely represented to Fidelity Bank that Gluco Perfect was being re-incorporated under the name "Perfect Care."

41.    Even as Kevin Mernone was dying, Defendants continued to pilfer money from Plaintiffs. For example, between October 9, 2013 and October 15, 2013, several online transfers totaling $26,800.00 were made from Kevin Mernone's personal Chase Bank account to Plaintiff Gluco Perfect's Chase Bank account. (Exhibit 12; Garibaldi Aff. ¶ 9.) Defendant Freiman caused these wire transfers to be made. It is believed that this $26,800.00 was subsequently siphoned out of Plaintiff Gluco Perfect's account into another account controlled by Defendants.

42.    Similarly, between October 3, 2013 and October 17, 2013, approximately $70,000 was transferred from an account associated with Plaintiff USH&H to Perfect Care. *See* Garibaldi Aff. ¶ 7.

43.    Freiman and the other Defendants did not have the authority to transfer any of the aforementioned funds from Plaintiffs' bank accounts.

3.    Defendants Misrepresent to the Gluco Companies' Customers that
They have been Changed into the Mirror Image Companies

44.    Defendant Freiman and the other Defendants have made repeated unauthorized misrepresentations to the Gluco Companies' customers in order to convert substantial amounts of money and property rightfully belonging to Plaintiffs.

45.    Moreover, Defendants have repeatedly misappropriated inventory belonging to the Gluco Companies, including products labeled with trademarks owned by Plaintiff Gluco Perfect, and then sold them directly to third parties under the Mirror Image Companies' names.  Indeed, there is no reason to believe that Defendants have ever manufactured or purchased any of their own products.

46.    For example, Defendant Perfect Gluco transmitted an invoice to a customer, Mercy Home Care & Medical, on October 30, 2013.  The invoice covers an order placed on October 16, 2013 for "Gluco Perfect" branded test strips and meters. Defendants simply took a Gluco Perfect invoice and stamped the name "Perfect Gluco Products LLC" over the name Gluco Perfect.  (Exhibit 13.)

47.    In another instance, Ocean Dietary & Medical Services of New Jersey, a longstanding customer of the Gluco Companies, began receiving invoices on approximately October 23, 2013 (one week after Mernone's death) from Defendants' mirror image company Perfect Gluco.  Defendant Freiman falsely represented to this customer that Gluco Perfect had simply changed its name to "Perfect Gluco," and that all future checks should be made payable to Perfect Gluco.  This customer has paid at least $6,269.25 to Perfect Gluco for trademarked products that belong to and were sold by Gluco Perfect.  (Exhibit 14.)

48.     Another customer, King's Harbor Care Center, received a letter from Freiman in October or November, 2013, stating that Gluco Perfect's name had been changed to "Perfect Gluco."

49.     On several occasions, Defendants have gone a step further and demanded that customers issue "stop payment" orders on checks that were sent to pay invoices originally issued by the Gluco Companies, and then reissue new checks payable to the Mirror Image Companies.

50.     For example, another longstanding customer of USH&H, Be Well Medical Supply, suddenly started receiving invoices from Defendants' mirror image company USHH several months ago.   Upon information and belief, this customer believed that "USHH" was an abbreviation for U.S. Health & Home Care.   Pursuant to Freiman's instructions, this customer issued a "stop payment" order on a $8,630.15 check dated November 2, 2013 directed to U.S. Health & Home Care.   (Exhibit 15.)   The customer then issued a new check for the same amount directed to Defendant USHH. This customer has paid at least an additional $13,116.00 to Defendant USHH as of December, 2013 for products that belong to and were sold by Plaintiff USH&H.   The customer was told to give the new checks directly to the delivery driver and not place them in the mail, apparently for fear that the checks would be forwarded to the Gluco Companies rather than the Mirror Image Companies.

51.     Two other customers, The New Fulton Common Co., LLC and The New River Valley Company, LLC (both of which are affiliated with Bridge View Nursing Home) similarly issued "stop payment" orders on checks to Plaintiff Gluco Perfect dated December 16, 2013 for $2,924.07 and $8,319.20, respectively, for the purchase of Gluco

Perfect branded products.  These two customers cancelled their checks at the direction of Defendant Freiman.  (Exhibit 16.)

4.    Defendants Misrepresent to the Gluco Companies'
Suppliers and other Third Parties that They have been
Changed into the Mirror Image Companies

52.    Defendants have also repeatedly contacted the Gluco Companies' suppliers and vendors in order to transfer their assets and destroy the Gluco Companies' remaining business.

53.    For example, On September 14, 2013, Gluco Perfect was invoiced by one of its main suppliers, ApexBio Taiwan ("ApexBio"), for the purchase of test strips and other products in the amount of $155,897.50.  Defendant Freiman received this invoice but purposefully failed to make payment on Gluco Perfect's behalf.  (Exhibit 17.)

54.    On or about the date of Kevin's death, October 16, 2013, Freiman told ApexBio that Kevin had "given the company" to her.  (Exhibit 18.)  Freiman also represented to ApexBio that she was transitioning Gluco Perfect into a different entity, presumably the mirror image company Perfect Gluco.

55.    Subsequently, in December 2013, a representative of ApexBio met with Freiman in New York to discuss the outstanding invoices.  At that time, Freiman stated that she would "look into" the outstanding invoices, but to date they remain unpaid.

56.    Importantly, Gluco Perfect has a five year supply contract with Apex Bio that expires in May, 2014.  As a result of Freiman's continuing failure to pay the ApexBio Taiwan invoices, the business relationship between Gluco Perfect and ApexBio is in jeopardy – ApexBio has represented that the contract will not be renewed if the invoices are not paid.

57.    Similarly, on October 27, 2013, Freiman misrepresented to another major third party supplier, Presto Absorbent Products, Inc. of Wisconsin ("Presto"), that there had been a "change in ownership of U.S. Health & Home Care," presumably to the mirror image company USHH.

58.    Presto has purportedly billed USH&H $330,531.20, but Defendant Freiman has intentionally decided not to pay Presto's invoices.  Indeed, Presto made numerous attempts to contact Freiman directly regarding the outstanding invoices, and even scheduled several meetings which she repeatedly cancelled.  As a result of Defendant Freiman's failure to respond, Presto issued a demand letter on October 21, 2013, which was directly emailed to Freiman on the same day. (Exhibit 19.)  On October 27, 2013, Freiman finally responded to Presto via email and stated that there has been a "change in ownership of U.S. Health & Home Care.  Once I receive the information, I will forward it to you." (Exhibit 20.)

59.    Because Defendant Freiman never paid the invoice, on November 12, 2013, Presto commenced a lawsuit against USH&H captioned *Presto Absorbent Products, Inc. v. U.S. Health & Home Care, Inc.*, Case No. 13. CV-669 (Wis. Circuit Court, Eau Claire Co.).   On November 19, 2013, USH&H was served with the Summons and Complaint.  Defendant Freiman has never responded in any way to the *Presto* action.  As a result, on December 19, 2013, Presto obtained a default judgment against USH&H for $346,597.34, which was entered on January 3, 2014.  (Exhibit 21.)

60.    In another instance, the accounting firm Doloboff, Nadler & Upbin LLP sent past due invoices totaling $1,312.51 to Plaintiff USH&H on or about November 27, 2013, and $2,745.00 to Plaintiff Gluco Perfect on or about January 31, 2014, reflecting

past due amounts of up to 120 days.  Freiman is aware of these invoices but has never arranged for their payment.  (Exhibit 22.)

61.    The failure to pay the aforementioned invoices has caused and continues to cause additional interest and other charges to be accrued against Plaintiffs, and represents an immediate and ongoing harm to the Gluco Companies.

62.    Plainly, Freiman has no authority to "transition" Plaintiff Gluco Perfect or effectuate a "change in ownership" of Plaintiff USH&H, and these acts are clearly designed to destroy the Gluco Companies' businesses for the benefit of the Mirror Image Companies.

63.    The Individual Defendants and others acting in concert have also represented in various publicly-available databases, including LinkedIn, that they were formerly employed by the Gluco Companies but recently began working for the Mirror Image Companies.  (*See, e.g.*, Exhibit 23.)  Indeed, even the U.S. Post Office has been confused by the relationship between the newly-created Mirror Image Companies and the Gluco Companies – it has inadvertently forwarded mail sent by a client intended for Defendant Perfect Gluco to my address.  (Exhibit 24.)

5.    Defendant Freiman Intentionally Tries to
Destroy the Gluco Companies' Businesses

64.    In addition to allowing numerous unpaid invoices and lawsuits to accrue against Plaintiffs, Defendant Freiman has intentionally run the Gluco Companies' businesses into the ground.

65.    For example, on or about October 1, 2013, Registrar Corporation sent Gluco Perfect a set of forms that were required for its U.S. Food and Drug Administration medical device registration for 2014.  In a December 1, 2013 letter

13

labeled "Urgent," Registrar Corp. reiterated its request and demanded a response by December 15, 2013.  Freiman received both of the aforementioned requests, but never returned the completed forms in a timely manner, thereby jeopardizing Gluco Perfect's business.  (Exhibit 25.)

66.    Freiman has also failed to file or pay certain taxes to the financial detriment of the Gluco Companies.  For example, Freiman failed to file USH&H's third quarter 2013 Quarterly Combined Withholding, Wage Reporting and Unemployment Insurance Return with the New York Department of Taxation and Finance.  (Exhibit 26.)

67.    The State of New Jersey's tax department has also issued a notice of delinquency to Gluco Perfect for the period ending December 2013.  Freiman deliberately failed to file these tax returns, subjecting Gluco Perfect to potential late penalties, interest and other collection fees as authorized by law.  (Exhibit 27.)

6.    <u>Defendant Freiman Incurs Significant Personal Expenses</u>

68.    Defendant Freiman also has access to a Starwood American Express credit card, which was guaranteed by Kevin Mernone, and which was to be used solely for legitimate business expenses.  Instead, Defendant Freiman has repeatedly used the corporate credit card for her unauthorized personal use and/or for the benefit of Defendants, and she has not reimbursed Plaintiffs.  Among other things, Defendant Freiman appears to have used the corporate credit card for thousands of dollars in personal expenses including a refrigerator, entertainment tickets, a mattress, Gucci shoes and veterinary care.  As Executor of the Estate of Kevin Mernone, I have received claims against the Estate relating to some of these charges.

69.     Similarly, Kevin Mernone's personal Platinum American Express card was charged $13,257.05 on October 23, 2013, well after his death, by a company called Fibematics located in Philadelphia, Pennsylvania. (Exhibit 28.) Other similar charges by the same vendor were made on a company-related MasterCard. These were purchases made by Freiman, and appear to relate to the business of Plaintiff Perfect Care, Inc. However, the charges were reversed by the credit card companies because they were incurred after the death of the cardholder, and in the interim Defendants have not paid the outstanding amounts. Fibematics subsequently filed suit for approximately $39,000 against Perfect Care for amounts outstanding.

70.     All of the aforementioned acts were clearly designed to destroy Plaintiffs' businesses and to facilitate Defendants' scheme, and have indeed caused Plaintiffs severe financial distress.

**F.    My Attempts to Gain Access to and Establish Control Over My Rightfully-Owned Businesses and Property are Continuously Thwarted by Defendants**

71.     The Gluco Companies and Perfect Care maintain their principal place of business at 8927 126th Street, Richmond Hill, NY 11418 (hereinafter the "Company Premises").

72.     Prior to the implementation of Defendants' scheme, I was generally able to access the Company Premises at will. Indeed, from time to time I worked at the Company Premises, and I have been a paid employee of Plaintiff Perfect Care for many years.

73.     As the 100% owner of the Gluco Companies and the 50% owner of Perfect Care and 8927 126th Street Realty LLC, I have the right to unrestricted access to the premises and all of the property contained therein.

74.    On November 7, 2013, I visited the Company Premises, along with a business consultant who was to assist with the transition, intending to assert control over my businesses and to access the Gluco Companies and Perfect Care's books, records and inventory. Defendant Freiman demanded that I leave immediately, and stated that Gluco Perfect is "defunct" and that there is a "$2 million lawsuit" against it.

75.    Thereafter, on December 23, 2013, my attorneys notified Freiman that I would again be visiting the Company Premises on December 27, 2013. (Exhibit 29.)

76.    On December 27, 2013, I again traveled to the Company Premises (along with a team of professionals including my attorney). As before, my intent was to review the books and records, inspect inventory and other property, and otherwise establish control over my businesses. As before, Defendants Freiman, Ramnauth and others ultimately did not permit me and my business team to access any books, records, inventory and other property at the Company Premises, and I was unable to assert control over my businesses.

77.    Following these events, my representatives and I have sent a series of letters to, and have had several phone calls with, Defendants and their associates and/or representatives in order to request access to the Company Premises and the books, records and inventory contained therein. (*See, e.g.*, Exhibit 30.)

78.    Defendants and their associates and/or representatives have steadfastly refused to comply with our requests for access to the Company Premises. Defendants have denied access to the Gluco Companies and Perfect Care's books, records and inventory, and they have denied virtually every request for information concerning the other entities in which I presently have an interest.

79.   I am ready to manage the Gluco Companies' businesses.  Access to the complete books, records and inventory is necessary to run Plaintiffs' businesses, and to fully unveil the nature and scope of the fraudulent scheme carried out by Defendants. Indeed, upon information and belief, the primary reason for Defendants' refusal to allow access is their wish to continue to conceal their wrongdoing.

**G.      Plaintiffs Will Suffer Irreparable Harm If the Court Does Not Intervene**

80.   As discussed herein, Plaintiffs have suffered, and will continue to suffer, irreparable harm which can only be remedied through a temporary restraining order and/or preliminary injunction.  There will be no recourse against Defendants once my business interests have been fully and finally destroyed.  Nor will Plaintiffs have the ability to recover quantifiable money damages from Defendants because their acts have the effect of stealing and destroying Plaintiffs' businesses and hard-earned goodwill.

81.   Among other things, Plaintiffs have been irreparably harmed by Defendants' infringement and misappropriation of the Gluco Companies' trade names and trademarks, as well as their acts constituting unfair competition.  Defendants' unauthorized use of Plaintiffs' trade names and trademarks falsely and continually indicates to consumers and others that the Mirror Image Companies are connected to or related to the Gluco Companies.

82.   Defendants are attempting to cause (and in fact are causing) widespread confusion among consumers, third party vendors and the public.  Defendants' conduct is damaging to the goodwill and reputation of Plaintiffs and is deceptive to the general public.

83.    Defendants are also continuing to steal Plaintiffs' business.  I am the 100% owner of the Gluco Companies and the 50% owner of Perfect Care, but Defendants have continual and exclusive access to Plaintiffs' money, inventory and other property, and Defendants have solicited Plaintiffs' employees.  Defendants continue to transfer assets to their newly-formed entities, and they continue to misappropriate and solicit Plaintiffs' customers, vendors and suppliers for their own benefit.

84.    Similarly, as part of their scheme to steal Plaintiffs' business, Defendants told customers to issue stop payment orders on checks directed to the Gluco Companies and reissue checks to the Mirror Image Companies, and similarly communicated with suppliers and vendors with the intent to ruin Plaintiffs' business relationships.

85.    Irreparable injury will also occur because Defendants continue to intentionally disregard the debts and other obligations of Plaintiffs.  Defendants have failed to make payment of outstanding invoices on behalf of the Gluco Companies, thereby harming their long-standing supplier relationships and causing severe financial harm, including entry of a default judgment against Plaintiff USH&H in the amount of $346,597.34.   Defendants have also failed to submit critical registration forms to maintain ongoing operations on behalf of Plaintiffs.

86.    These and other acts further harm Plaintiffs' goodwill, and interest continues to accrue on certain of these debts.

87.    Defendants also continue to deprive Plaintiffs access to the Company Premises and all of the books, records and inventory contained therein, causing further and ongoing harm to Plaintiffs.

88.    No prior action has been made by me for this or like relief.

Dated: New York, New York
      March 12, 2014

By: _____
     Joy Mernone

Sworn to before me
this 12 day of March ___, 2014

_____
Notary Public

**JACQUELINE M. DARRAGH**
Notary Public - State of New York
No. 01DA6187620
Qualified in Queens County
My Commission Expires May 27, 2016

**JACQUELINE M. DARRAGH**
Notary Public - State of New York
No. 01DA6187620
Qualified in Queens County
My Commission Expires May 27, 2016