UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Gluco Perfect, LLC et al.
                                Plaintiff


              - against -


Perfect Gluco Products, Inc. et al.

                                Defendants.

Case No.  1:14-cv-01678-KAM-RER

**Defendants Freiman, Gillen,
Perfect Gluco and USHH's
Response to Plaintiffs'
Proposed findings of fact and
conclusions of law**

Plaintiffs' Proposed Finding of Fact and Conclusions of Law fails to acknowledge to this Court that the biggest complaint upon which the temporary restraining order ("TRO") is based, is simply incorrect; that the funds alleged to have been "stolen" based on "forged checks" were used for payment to overseas suppliers for goods delivered to Plaintiffs. The Schmidberger Affidavit and testimony clearly, albeit reluctantly, demonstrate that the funds for the 72 "forged checks" were used to pay overseas suppliers on behalf of Plaintiffs for goods that were delivered to Plaintiff. As such, the supposed plan to steal millions of dollars simply has no basis.

Since the commencement of this action it has become plain to see that Plaintiff Mernone expected to inherit a group of thriving companies, but instead discovered that the family companies run by her late husband and his brother were diminishing, almost to the point of extinction. In an attempt to cast blame, which, perhaps, is an understandable reaction, Plaintiff Mernone has pointed the finger at, primarily, Defendant, Fran Freiman (and companies owned by Ms. Freiman). However, as the evidence now demonstrates, as the Plaintiff companies grew organically they developed idiosyncratic ways of doing business and managing themselves. Perhaps this is due in part to Kevin Mernone alcoholism or, in part, to Glenn Mernone's general indifference to keeping abreast of the day-to-day affairs of the companies. However, one thing is certain, the condition of the Plaintiff companies has nothing to do with the actions of Ms. Freiman, who has been unfairly attacked in this proceeding.

Therefore, in order to salvage a claim to restrain Ms. Freiman, Plaintiffs now sadly resort to distorting the evidence at hearing, and claiming there are more questions to be asked and more investigation to be done. Put simply, this is not good enough. Plaintiffs have had more than four months to show that the TRO was properly requested (the Court itself anticipated the entire case would take no longer than five months) and still are long on questions they want answered and short on sufficient proof that a TRO is warranted against Ms. Freiman.

While Plaintiffs had every opportunity to show continued harm in support of a TRO, they failed to even address the issue at the hearing. This alone, should be enough for the TRO to be lifted. In any event, the fact remains that Ms. Freiman kept the business alive and running under difficult circumstances. while Joy Mernone ("Joy") seems to have a personal vendetta against Ms. Freiman for some reason. Indeed, once Ms. Freiman was restrained under the TRO, business at the Plaintiff entities declined and dropped tremendously, with the largest creditor of Plaintiff Perfect Care refusing to provide credit. As such, any harm to Plaintiffs is simply as a result of the decision to remove Ms. Freiman who spent nights and weekends working to keep the Plaintiff companies afloat, even providing personal loans when needed, loans that were known to Glenn Mernone.

These loans are clearly evidenced by funds flowing from Freiman's companies' bank accounts to Perfect Care and it is shameful that these loans are held against Ms. Freiman, despite Ms. Frieman's obvious dedication to her employer over a number of years and her preparedness to risk her own savings for the health and greater good of the Plaintiff companies. There is no question that the funds were sent, the testimony of Glenn Mernone and Andre Ramnouth's demonstrated the loans were needed as the Plaintiff companies were chronically cash deficient. Now, we are five months removed from the TRO, and the Plaintiffs, tellingly, have produced no evidence to indicate that loans were unnecessary or should not be paid back immediately.

Having seen their initial claims - that $2.5 million was stolen by Frieman - crumble to be no more than, at best, a case about $200,000, Plaintiffs now shift their case to being one about nitpicking, blatant hearsay, questions, assumptions, presumptions, and unsupported assertions.

Plaintiffs' incendiary and unsupported preliminary statement does not warrant anything more than a short synopsis. According to Plaintiff, the claim is now hundreds of thousands and no longer millions. Ms. Freiman is faulted for simply receiving checks in the mail and not depositing them. It is undisputed that Ms. Freiman recorded the transaction of goods for exactly the amount she undertook to pay creditors, that she made a payment to a creditor and had payment plans with the others and that funds were not received under payment terms prior to the TRO such that she could pay off creditors. Plaintiff's actions in obtaining a TRO based on wrongful allegations of forgery and theft of millions of dollars, foreclosed Ms. Freiman's ability to deposit checks and pay creditors. In fact, had Mrs. Mernone simply decided to speak to Ms. Freiman back in March, she could have been apprised of this information. Instead, Mrs. Mernone decided to fire Ms. Freiman and take out the TRO. In any event, one does not steal product when leaving a clear record of the amount owed. In fact, as Plaintiff notes, had Glenn has his way, all the product would have been left to expire and nothing would have been done to pay creditors. There was no testimony of Ms. Freiman "shutting the companies down". The only person to address the issue was Schmidberger who agreed that he had no knowledge of who shut down the companies. Glenn claims he did not care, and he is happy to make Ms. Freiman his scapegoat while testifying (inconsistently) that there was no agreement in place to provide services to Kevin's companies once Kevin died. Glenn did not authorize Ms. Freiman to provide services to Kevin's companies after Kevin's death. Glenn was not told by Joy of new bank accounts for Kevin's companies even as the lawyers had back and forth discussions. Glenn refused to turn over account receivables to Joy and wanted to set an escrow account for checks that came in, because he knew that checks were being held, at his direction initially and, additionally, later when there was no bank account known for deposits. Joy ridiculously claims to believe that Kevin's companies were operating without a bank account and payroll. The myth of the checks not being deposited while Kevin was in the hospital is belied by Plaintiffs' own records showing deposits past the time of Kevin's death.

To suit Joy's unsupported assertions, the storyline now somehow includes Glenn as an "embittered brother" and "self appointed officer". Glenn's alleged lack of knowledge, albeit not very credible, did not stop him from telling Ms. Freiman that she was not fired when Joy sent a letter firing Ms. Freiman, did not stop him from arranging to have deliveries done from Woodside, and did not stop him from refusing Mrs. Mernone access to the company. Plaintiffs now allege

"fraud" but fail to plead fraud and simply rely on the "ongoing investigation". There can no dispute that Mrs. Mernone lacks any knowledge of whether Ms. Freiman was authorized to use the company names Perfect Gluco Products, and USHH to do business and the same is true for Schmidberger. Given the evidence showing Kevin's active involvement in wire activity up to the date of the new companies, there is no way to explain how Kevin did not authorize the companies to be set up by Ms. Freiman. There is certainly no writing to the contrary and Glenn, Ms. Freiman, and Mr. Ramnauth all testified that there was no change to Kevin's ability to run the business from 2009 through to the date of his hospital admission. Ms. Freiman's believes that further discovery will further prove that Kevin was aware of authorized the use of the companies. Further specific allegations are responded to in sequence with Plaintiff statements below.

**THE PARTIES**

    **A.**   **Gluco Perfect LLC**

1. Gluco Perfect LLC ("Gluco") is a New York limited liability company formed in 2006 by Kevin Mernone (hereinafter, the "Deceased" or "Kevin Mernone"). (PX 1) Gluco was solely owned by Kevin Mernone prior to his death and is solely owned by Joy Mernone today. (Affidavit of Joy Mernone, sworn to March 12, 2014 ("J. Mernone Aff") \ 1; PX 2; PX 4)

**Response:** None.

2. The Deceased ran Gluco. However, for the last four or five years of his life, Francine Freiman was running Gluco. (Trial transcript of Glenn Mernone, dated July 24, 2014 ("G. Mernone Tr.") at 259:7-12; PX 105 at 2)

**Response :** The transcript portion cited actually says that Kevin ran the company through Fran, not that Fran was running the company.

3. Gluco is in the "niche business" of selling diabetic products to customers, including Nursing Homes. (PX 105 at 2)

**Response :** PX 105 includes "buyers groups", the main clients of Gluco.

4. Gluco first used the trade name "Gluco Perfect" when the company was created in December 2005. (J. Mernone Aff. 16)

**Response:** None.

5. On January 17, 2006, Gluco Perfect applied to register the trademark "Gluco Perfect" with the United States Patent and Trademark Office (the "USPTO"). On February 24, 2009, the USPTO registered the trademark "Gluco Perfect" and issued registration number 3580539. The Gluco Perfect" trademark is valid and remains in full force and effect. (J. Mernone Aff. 1 7; PX 5)

**Response:** None.

6. On October 20, 2009, Gluco Perfect applied to register the trademark "Perfect" with the USPTO. On August 20, 2013, the USPTO registered the trademark "Perfect" and issued registration number 4388373. The "Perfect trademark" is valid and remains in full force and effect. (J. Mernone Aff. ^ 8; PX 6)

**Response:** None.

7. On January 24, 2007, Gluco Perfect applied to register the trademark "Perfect 2" with the USPTO. On March 30, 2010, the USPTO registered the trademark "Perfect 2" and issued registration number 3767837. The "Perfect 2" trademark is valid and remains in full force and effect. (J. Mernone Aff. H 9; PX 7)

**Response:** None.

8. All three of the aforementioned trademarks held by Gluco are for "medical diagnostic test strips for the use in the field of glucose level monitoring." (PX 5, PX 6, PX 7) Gluco markets and sells inventory bearing these trademarks, on both the products and packaging. (J. Mernone Aff. ¶ 10)

**Response:** None.

9.  Gluco has registered and continues to maintain the Internet domain name glucoperfect.com. Gluco Perfect's website is identifiable by the display of its trade name and trademarked products. (J. Mernone Aff. ¶ 11; PX 8)

    **Response:** None.

10. Gluco products are also available through several online retailers with national reach such as Amazon.com and Walmart.com. (J. Mernone Aff. ¶ 12)

    **Response:** None.

11. Over the years, Gluco has spent considerable time and money marketing, broadcasting, branding and otherwise protecting its trade names and trademarks, including at trade shows and through private label agreements. (J. Mernone Aff. ¶ 14)

    **Response:** None.

12. In particular, Gluco is identified by its customers and the public by its trademarked products, including the "Gluco Perfect," "Perfect" and "Perfect 2" trademarks. (J. Mernone Aff. ¶ 15)

    **Response:** None.

13. Gluco has sold its products throughout the United States and internationally. (J. Mernone Aff. ¶ 16)

    **Response:** None.

14. Gluco is headquartered and operating out of 89-27 126th Street, Richmond Hill, NY 11418 (hereinafter, the "Richmond Hill Facility" or "Richmond Hill"). (J. Mernone Aff. ¶ 17)

    **Response:** None.

**B.    U.S. Health & Home Care, Inc.**

15. U.S. Health & Home Care, Inc. ("US Health") is a New York limited liability company formed in 2005 by the Deceased. US Health was solely owned by Kevin

Mernone prior to his death and is solely owned by Joy Mernone today. (J. Mernone Aff. ¶ 2; PX 3)

**Response:** None.

16. The Deceased ran US Health. However, for the last four or five years of his life, Freiman was running US Health. (G. Mernone Tr. 249:7-12; PX 105 at 2)

**Response :** The transcript portion cited actually says that Kevin ran the company through Fran, not that Fran was running the company.

17. US Health is in the business of selling incontinence products to customers, including Nursing Homes. (J. Mernone Aff. ¶ 13)

**Response:** None.

18. US Health first used the trade name "U.S. Health & Home Care" when the company was formed in early 2005. (J. Mernone Aff. ¶ 13)

**Response:** None.

19. Over the years, US Health has spent considerable time and money marketing, broadcasting, branding and otherwise protecting its trade names, including at trade shows and through private label agreements. (J. Mernone Aff. ¶ J14)

**Response:** None.

20. US Health has sold its products throughout the United States and internationally. (J. Mernone Aff. ¶ 16)

**Response:** None.

21. US Health is headquartered and operating out of the Richmond Hill Facility. (J. Mernone Aff. ¶ 17)

**Response:** None.

22. US Health and Gluco have made millions of dollars in revenue over the years and were,

aside from Defendants' wrongdoing, positioned to continue that success for years to come. (J. Mernone Aff. ¶ 18)

**Response : Joy does not understand the meaning of revenue. (J. Mernone Tr. 383:16) When revenue is lower than expenses, there is no success. This statement, seemingly crafted by Joy's attorney, has no credibility.**

C.   **Perfect Care. Inc.**

23.  Perfect Care, Inc. ("Perfect Care") is a New York corporation formed in 1996. When Kevin Mernone was alive, he owned 50% of Perfect Care and his brother, Glenn Mernone, owned the other 50%. (Affidavit of Francine Freiman, sworn to July 17, 2014 ("Freiman Aff."), ¶ 6; G. Mernone Tr. 100:6-7) Today, Joy Mernone owns 50% of Perfect Care. (J. Mernone Aff. 173)

**Response:** None.

24.  The Deceased ran Perfect Care until his death on October 16, 2013. However, for the last four or five years of his life, Freiman was the de facto manager of Perfect Care. (G. Mernone Tr. 259:7-12; PX 105 at 1)

**Response :** The transcript cited actually says that Kevin ran the company through Fran, not that Fran was running the company. Plaintiff is now using this statement to claim Fran was running Gluco and U.S. Health, and separately that Fan was the de facto manager of perfect care. Neither statement is supported by the transcript.

25.  Perfect Care is in the "niche business" of selling incontinence and personal care products to customers, including Nursing Homes. (PX 105 at 2)

**Response:** None.

26.  Perfect Care is headquartered and operating out of the Richmond Hill Facility. (J. Mernone Aff. ¶ 17)

**Response:** None.

**D. Perfect Care Solutions, Inc.**

27. Perfect Care Solutions, Inc. is a New York corporation formed in or about November 2013. (G. Mernone Tr. 190:9-13, 207:5-12) Glenn Mernone owns 50% of Perfect Care Solutions and Freiman owns the other 50% of Perfect Care Solutions. (Freiman Aff. ¶ 84; G. Mernone Tr. 169:7-14)

    **Response:** None.

28. Perfect Care Solutions sells the same products as Perfect Care. (G. Mernone Tr. 264:19-265:23)

    **Response:** None.

29. Before the TRO was issued, Perfect Care Solutions was operating out of the Richmond Hill Facility. (Affidavit of Bibi Samad, sworn to June 17, 2014 ("Samad Aff") ¶ 20-22; PX65; PX 66; PX 67)

    **Response :** The cited transcript actually says nothing regarding where PCS operated out of, rather, this is simply Bibi Samad's unqualified opinion, that Ashton is a pass through, and that is why Glenn asked Andre to credit Ashton. The exhibits cited similarly say nothing regarding operation of Perfect Care Solutions.

    **E.     Joy Mernone**

30. Joy Mernone was married to the Deceased for over 20 years. (J. Mernone Aff. ¶ 21) Although divorce proceedings were commenced by Mrs. Mernone in 2009, the divorce was not finalized before Kevin Mernone's death. (J. Mernone Aff. ¶¶ 22-24)

    **Response :** None

    **F.     Perfect Gluco Products LLC**

31. Perfect Gluco Products, LLC ("Perfect Gluco") is a New York limited liability company

formed in October 2012 by Freiman. (PX 10) Freiman owns 100% of Perfect Gluco. (Freiman Aff. ¶¶ 5, 17 ("I am the 100% owner of [Perfect Gluco and USHH]"))

Response: None.

32. Perfect Gluco was operating out of the Richmond Hill Facility before the TRO was put in place. (See, e.g., PX 13, PX 14)

    G.    USHH Products, Inc.

33. USHH Products, Inc. ("USHH") is a New York corporation formed in October 2012 by Freiman. (PX 11) Freiman owns 100% of USHH. (Freiman Aff. ¶¶ 5, 17 ("I am the 100% owner of [Perfect Gluco and USHH]"))

**Response:** None.

31. USHH was operating out of the Richmond Hill Facility before the TRO was put in place. (Samad Aff. ¶ 15; Ramnauth Tr. 275:11-21)

**Response:** None.

    **H.**    **<u>Francine Freiman (a/k/a Francine Gillen)</u>**

35. Freiman joined Perfect Care in 1997. (Freiman Aff. ¶ 19) Freiman was responsible for the day-to-day operations of Perfect Care, Gluco and US Health. (PX 105 at 2; J. Mernone Aff. ¶ 20; PX64).

**Response:** None.

36. Freiman managed the day-to-day operations of Kevin Mernone's companies prior to his death. (G. Mernone Tr. 132:17-20)

**Response:** None.

    **I.**    **<u>William J. Gillen</u>**

37. William J. Gillen ("Gillen), Freiman's husband, is the registered agent for Perfect Gluco. (PX 10)

**Response:** None.

   **J.**   **Andre (a/k/a Antonio[1]) Ramnauth**

38.    Andre Ramnauth ("Ramnauth") joined Perfect Care in 1997. Ramnauth also worked and/or performed services for Gluco and US Health.  Ramnauth understood that Gluco and US Health were sister companies of Perfect Care. (Affidavit of Andre Ramnauth, sworn to July 17, 2014 ("Ramnauth Aff.") ¶¶ 1-2)

   **Response:** None.

39.    Ramnauth worked in many areas at Richmond Hill. He worked in the warehouse where he was responsible for inventory, shipping and the unloading of containers. Ramnauth was then promoted and put in charge of the warehouse. (Trial transcript of Andre Ramnauth ("Ramnauth Tr.") at 272:14-25) Ramnauth also worked in the office of the Richmond Hill Facility. In the office, Ramnauth was responsible for purchase orders, billing, accounts receivable, accounts payable, doing bank reconciliations, entering journal entries in the general ledger, payroll, and making bank deposits. (Ramnauth Tr. 273:7-274:12)

   **Response:** None.

40.    Ramnauth is the registered agent for USHH. (PX11)

   **Response:** None.

   **K.**   **Glenn Mernone**

41.    Glenn Mernone owns 50% of Perfect Care. (G. Mernone Tr. 100:6-7)

   **Response:** None.

42.    Since 2007, when he had a minor stroke, Glenn Mernone has only been responsible for the information technology ("I.T.") function at Perfect Care. (G. Mernone Tr. 117:4-14; 184:7-14) Glenn Mernone also signs payroll checks and accounts payable checks. (G. Mernone Tr. 202:17-23)

**Response:** None.

43.    Glenn Mernone was not responsible for the day-to-day operations of Perfect Care:
Freiman was. (G. Mernone Tr. 117:18-22, 259:7-12)

> **Response :** Glenn Mernone had full authority over PC, had been Vice President  for
> ten years, had never known Fran to disregard an order from Kevin or Glenn, was
> the only one with authority after Kevin's death, refused access to Joy, did not
> authorize anyone to let in Joy, was the one that told Joy to leave in December,
> directed the lawyer on behalf of PC and filed lawsuit on behalf of PC.

**L.    Perfect Care Employees**

1.    John Schmidberger

44.    Schmidberger is the controller of Perfect Care, responsible for overseeing the
accounting and certain operational functions of the three companies. (Affidavit of John
Schmidberger, sworn to June 17, 2014 ("Schmidberger Aff.") ¶¶ 2-3; Trial transcript of John
Schmidberger, dated July 24, 2014 ("Schmidberger Tr.") at 10:6-15) Schmidberger has more
than 20 years experience performing and supervising accounting related activities.
(Schmidberger Aff. ¶ 2)

> **Response :** Schmidberger was recently hired by Joy as controller
>
> Given that he was only hired after the TRO, he has no personal knowledge of any
> of the events that took place at Plaintiff Companies prior to that time.

2.    Cliff Bravo

45.    Cliff Bravo ("Bravo") is a truck driver at Perfect Care. He has been an employee
since October 2011. In addition to driving trucks for Perfect Care, Bravo also routes orders to
other drivers and handles other tasks, as requested of him. (Affidavit of Cliff Bravo, sworn to
June 17, 2014 ("Bravo Aff.") ¶¶ 1-2)

**Response:** None.

46.     Bravo did not meet the Deceased and did not see Glenn Mernone for more than a year after joining Perfect Care. (Bravo Aff. ¶ 3)

**Response:** None.

    3.    Alexander Rodriguez

47.     Alexander Rodriguez ("Rodriguez") is a truck driver at Perfect Care. He has been an employee for eight (8) years. (Affidavit of Alex Rodriguez sworn to June 17, 2014 ("Rodriguez Aff.) ¶¶ 1-2)

**Response:** None.

48.     Rodriguez has infrequently seen Glenn Mernone since he has been driving for Perfect Care.  (Rodriguez Aff. ¶ 3)

**Response :** Rodriguez admitted that he leaves work too early to see Glenn in the afternoon

    4.    Jose Torres

49.     Jose Torres ("Torres") works in the warehouse at Perfect Care. He was hired in January 2011. (Affidavit of Jose Torres, sworn to June 17,2014 ("Torres Aff") ¶¶ 1-2)

**Response:** None.

50.     Torres has infrequently seen Glenn Mernone since he has been working at Perfect Care.  (Torres Aff. ¶ 3)

**Response :** Torres admits that leaves work too early to see Glenn in the afternoon

    5.    Bibi Samad

51.     Samad ("Samad") works in the office at Perfect Care. She was hired in January 2008. (Samad Aff. ¶ 1)

**Response:** None.

I.        **THE DEATH OF KEVIN MERNONE**

52.     Kevin Mernone died on October 16, 2013. The cause of death was cardiopulmonary arrest, acute and chronic liver disease and alcohol abuse. (PX 31; Trial transcript of Joy Mernone, dated July 25,2014 ("J. Mernone Tr.") at 427:15-428:8)

**Response :** The cause of death included decades of alcohol abuse at including through the time that Kevin built the plaintiff companies.

III.    THE ABSENCE OF CONTROLS AT THE RICHMOND HILL FACILITY

A.      There Is No Company Email

53.     The employees at the Richmond Hill Facility use personal email to conduct company business. The employees do not use company email. (G. Mernone Tr. 184:15-185:11)

**Response:** This policy was neither caused by Fran, nor her fault.

B.      The Computer System Permitted the Backdating of Printed Checks

54.     The computer system at Richmond Hill permits the backdating of printed checks. (Ramnauth Tr. 277:5-7; Supplemental Affidavit of John Schmidberger, sworn to July 16, 2014 ("Schmidberger Supp. Aff.") ¶ 12) It is impossible to determine from the computer system whether printed checks have been backdated. (G. Mernone Tr. 128:15-129:1; 129:25-131:12; 155:6-18; *see, e.g.,* PX 52, PX 58 at 225)

**Response:** None.

55.     An unusually large number of Gluco checks were printed on October 7, 2013, the day before Kevin Mernone was admitted to the hospital. In the entire month of September 2013, only 32 Gluco checks were printed; 21 checks were printed on October 7th. It appears that some or all of these checks were backdated; it is also possible that some were printed after Kevin Mernone died. (Schmidberger Supp. Aff. ¶ 12; PX 52)

**Response :** There is no evidence of backdating and this is simply speculation.

56.     For example, Gluco check 5055, which is dated October 7, 2013, is signed by Glenn Mernone (in his own name).   He did not have the authorization or power to sign that check until October 11, 2013, when he became Kevin Mernone's Temporary Guardian. (G. Mernone Tr. 130:15-23; Schmidberger Supp. Aff. ¶ 12; PX 52; PX 53) The check was not deposited until October 23, 2013, more than a week after Kevin Mernone died. (G. Mernone Tr. 131:3-18)

**Response :** Checks are sometimes not signed the day they are cut.

C.      Printed Checks Were Signed and Not Sent

57.     Once a check is printed, the computer system immediately reflects that payment. If a check was not sent out - as Freiman often directed - the system would distort the cash position of the companies. (Ramnauth Tr. 279:16-282:9) At certain points in time, there could be more than $1 million in outstanding checks. (Ramnauth Tr. 281:13-23, 320:16-321:5; Schmidberger Supp. Aff. ¶ 19)

**Response :** No evidence was presented as to when this practice began and it has been the company practice prior to Fran taking on that responsibility.

58.     $264,653.50 in US Health checks were printed and never sent to Presto. (PX 60) The computer system showed that these payments had been made. (Ramnauth Tr. 279:17-23; Schmidberger Supp. Aff. ¶ 19)

**Response :** The computer system also tracks checks not deposited.

No evidence was presented regarding whether there were funds to pay Presto. Nobody has authority to pay Presto, as Glenn did not direct anyone at Perfect Care to service U.S. Health and it was not his concern. Also U.S. Health bank account was closed.

D.      The General Ledger Was Not Closed on a Monthly Basis

59.     Ramnauth was directed by Freiman to reclassify transactions in the general

ledger, in some cases many months after the transaction actually took place. The general ledger was not closed on a monthly basis. (Ramnauth Tr. 277:8-278:4; Schmidberger Supp. Aff. ¶ 16)

**Response:** None.

60.    Ramnauth was directed by Freiman to do various reclassifications, including the reclassification of US Health loans as accounts receivable. (Ramnauth Tr. 307:4-11)

**Response:** None.

61.    Not closing the general ledger on a monthly basis invites the manipulation of data. There are substantial reclassifications of "loans" to "receivables" months after the original transactions occurred.   Despite the fact that enormous sums were involved, it is difficult to determine from the books and records of the companies what these original transactions were. (Schmidberger Supp. Aff. ¶ 16; PX 56; PX 57; PX 58).

**Response :** There is no allegation of wrongdoing, just that something is difficult to determine.

### E.    Freiman's Expenses Were Unsupported

62.    Ramnauth prepared an expense spreadsheet, which would reflect reimbursements that Freiman would make for certain expenses she charged to company credit cards. Freiman did not provide Ramnauth with receipts, and he was unable to determine from the information that he was provided which expenses were personal and which were not. All of Freiman's expenses were coded as "sales promotion". (Ramnauth Tr. 325:15-326:2, 331:2-332:10) Only Freiman decided how much she was going to reimburse the companies. (Ramnauth Tr. 333:14-20)

**Response :** This is the method used for both Kevin and Fran for years. There was never an accusation that Fran was incorrectly stating expenses by anyone with personal

knowledge. No specific expenses or a dollar value of expense alleged not have been repaid were discussed at the Hearing.

**F.    No Physical Inventories Were Taken**

63.    The inventory tracking in Macola was unreliable. (Schmidberger Tr. 44:7-19)

**Response:** None.

64.    A physical inventory of the products in the warehouse at Richmond Hill had not been conducted since 2000. (Ramnauth Tr. 284:8-285:13; Torres Aff. ¶ 6)

**Response:** None.

65.    When a physical inventory was performed after Mrs. Mernone was granted access to the Richmond Hill Facility, the computer system did not accurately reflect the physical count -the numbers "were all off. There were a few items with a positive number. Most of them were negative." (Ramnauth Tr. 285:15-286:4)

**Response:** None.

**G.    The Undocumented and Unauthorized Loans**

66.    Ramnauth first started seeing loans from Perfect Gluco to Perfect Care in 2012. (Ramnauth Tr. 305:8-307:3) He never saw any documentation supporting the loans, and he only knew that certain transactions were "loans" because Freiman told him that those transactions were "loans". (Ramnauth Tr. 335:2-10)

**Response :** The loans are supported by checks with fund flowing to the account of the recipient (Perfect Care) from Fran's company. No evidence was presented to show that the funds were not sent. What possible detriment could there be Perfect Care receipt of funds? There is no evidence that they were anything but loans. Glenn conveniently states without any support that all 2013 loans were repaid, and fails to looks at tens of thousands of dollars loaned 2014.

67.    Glenn Mernone was aware of loans from Perfect Gluco to Perfect Care in 2013. Glenn Mernone satisfied himself that the loans made in 2013 had been paid back by Perfect Care. (G. Mernone Tr. 229:12-24) Glenn's testimony was unsupported, and the fact he claims to have satisfied himself does not mean the loans were repaid. This does show however that Glenn did acknowledge receiving the loan funds. Glenn Mernone did not review the books and records of Perfect Care or do anything else to determine whether the loans were necessary; Freiman "just t[ook] it upon herself to make a loan whenever it was necessary to cover expenses and pay it back when we had a little bit of money; it wasn't very formal." (G. Mernone Tr. 231:23-234:3)

68.    There is no loan documentation or formal agreements evidencing loans by Freiman to the plaintiff entities. (Schmidberger Tr. 37:5-38:23)

**Response :** Glenn has no reason to believe the loans were anything but legitimate. This does show however that Glenn did acknowledge receiving the loan funds. Glenn had full access to the company books and would close out the accounts each month. He had the ability to review loans and apparently was satisfied that Perfect Care needed the money. Glenn thought Fran was a great employee and, tellingly, was also not surprised that Fran was loaning personal funds to keep the company going. Glenn further testified that Kevin and Glenn had a conversation where they were concerned that Fran would be hired by a competitor, as she had no non-compete agreement, and they discussed giving her a portion of the company.

**H.    <u>No One But Freiman Knew the Daily Cash Position in the Bank Accounts</u>**

69.    Ramnauth could only determine the cash positions in the various accounts for the companies at the end of the month when he reviewed the bank statements. He did not know if there was enough money in the various accounts to cover checks

printed on the computer system unless he asked Freiman. (Ramnauth Tr. 299:15-300:8)

> **Response :** Looking at a bank statement at the end of the month would show the cash position every day of the month prior to determine whether funds were needed at that time. Andre and Glenn testified that the companies were chronically short of cash and they both saw banking records and closed the books at the end of the month.

70.    Only Freiman had access to the online banking information. (Ramnauth Tr. 320:6-11)

> **Response:** Kevin had full access to banking information. Freiman also needed access, given to her by Kevin, for her daily duties, including knowing whether there was enough cash to send out a check.

**I.    The Dearth of Supplier Invoices**

71.    Mrs. Mernone and her team found very few supplier invoices, matching the purchase orders prepared at Freiman's direction, at the Richmond Hill Facility. Without the invoices from the suppliers, there is no way to determine whether the amounts wire transferred from Perfect Gluco to suppliers were for legitimate purchases. Indeed, the only documents that can be found at Richmond Hill are purchase orders, which were filled out by Freiman's employees at her direction. (Schmidberger Aff. ¶ 13)

> **Response :** Schmidberger could have gotten a complete inventory from the freight forwarder but has not even asked them for over a month. He is apparently satisfied that goods were properly shipped to Plaintiff. This is another example of a

question raised for the sake of raising questions. There is no evidence that the purchase orders were in any way inaccurate.

**J.**     **The Macola Program Was Not Secure**

72.     The data on the computer system at the Richmond Hill Facility could be altered remotely. Specifically, an individual could change files on a portable hard drive and export the altered data back to the Perfect Care server after it was changed. (G. Mernone Tr. 252:10-253:6) Freiman had a portable drive and, therefore, the ability to alter data on the Perfect Care server. (PX112)

> **Response :** Many people had remote access including Glenn. There  is no evidence of any kind showing that Fran changed data. Glenn, the IT expert who ran Macola for 20 years, states that he only done this once and that it is very complicated but doable. Although we now know that Glenn has the ability to do this, there was no testimony that Fran is some sort of closet genius IT expert.

73.     The Macola system is about 25 years old and is not as secure as other software programs are today. Anyone with regular or remote access to the system can delete any of the directories containing company information. (G. Mernone Tr. 193:8-24,194:4-195:13)

> **Response :** Many people had remote access including Glenn. There is no evidence of any kind showing that Fran changed data. Glenn, the IT expert who ran Macola for 20 years, states that he only done this once and that it is very complicated but doable. Although we now know that Glenn has the ability to do this, there is no testimony to suggest that Fran is some sort of closet genius IT expert.

**K.**     **The Spoliation of Electronic Evidence**

74.     As the I.T. Administrator, Glenn Mernone had the highest level of access to the entire network of the computer system at the Richmond Hill Facility. (G. Mernone Tr.

186:17-19, 247:18-20) Freiman also had the highest level of access in certain instances. (G. Mernone Tr. 247:21-248:11)

>    **Response:** Again, there is no testimony to suggest that Fran is some sort of closet genius IT expert.

75.     Glenn Mernone made zero efforts to retain information on the computer system after November 12, 2013 when he authorized the lawsuit Perfect Care brought against Gluco and a litigation hold was put in place. (G. Mernone Tr. 173:14-174:6)

>    **Response:** No allegation is made here against Fran.

76.     Glenn Mernone did not issue written instructions to the employees not to delete information from the system. (G. Mernone Tr. 174:1-3) Glenn Mernone did not overwrite any employee passwords after Kevin Mernone died. (G. Mernone Tr. 186:12-16)

>    **Response:** Again, no allegation is made here against Fran.

77.     The Richmond Hill Facility was closed on March 14, 2014 on the false pretense that a "pipe had burst" at the facility. (G. Mernone Tr. 208:17-209:8)

>    **Response :** The facility was closed at Glenn's direction who had full knowledge of the other warehouse, including the fact that the next day orders need to be shipped to another warehouse in order for orders to be filled.

78.     By no later than March 17, 2014, electronic information for Perfect Gluco and USHH had been deleted from the computer system at the Richmond Hill Facility. (G. Mernone Tr. 193:3-12,198:8-14; Ramnauth Tr. 278:11-21; Samad Aff. ¶ 16)

>    **Response:** No allegation is made here, and no evidence has been tendered, to suggest Fran was responsible for this deletion of electronic information.

79.     As the I.T. Administrator, Glenn Mernone was able to remotely access the computer system at the Richmond Hill Facility and, therefore, had the ability to delete the

data. (G. Mernone Tr. 196:9-13)

**Response:** Again, no allegation is made here, and no evidence has been tendered, to suggest Fran was responsible for this deletion of electronic information.

80.     Freiman was able to remotely access the computer system at the Richmond Hill Facility and, therefore, had the ability to delete the data. (G. Mernone Tr. 196:14-22) That access was not cut off until a few weeks after the TRO was entered. (G. Mernone Tr. 196:23-197:4)

**Response :** Many people had remote access including Glenn. There is no evidence of any kind showing that Fran changed data. Glenn, the IT expert who ran Macola for 20 years, states that he only done this once and that it is very complicated but doable. Although we now know that Glenn has the ability to do this, there is no testimony that Fran is some sort of closet genius IT expert.

81.     Milden Duran, a former Perfect Care employee, also was able to remotely access the computer system at the Richmond Hill Facility. (PX 23) That access was not cut off until July 10, 2014. (G. Mernone Tr. 197:7-13, 198:16-20) As of March 17, 2014, Milden Duran worked for Freiman at Perfect Gluco. (PX 23; Freiman Tr. 511:22-25) If Freiman had been provided Duran's user name and password, Freiman could have logged in remotely even after her own access had been cut off. (G. Mernone Tr. 202:10-12)

**Response :** This is no evidence admissible in any way to prove the truth of the matter asserted, the key word being "if". There is no evidence to suggest Fran acquired Duran's user name and password, let alone that she logged in remotely under Duran's credentials.

**82.**     Glenn Mernone conducted no investigation into who deleted the information from

the computer system; nor did he hire anyone to determine how the information was deleted or by whom. (G. Mernone Tr. 195:22-196:7) Glenn Mernone also did not know if he could determine the last time Duran, or anyone else, logged in to the system. (G. Mernone Tr. 199:7-22) Moreover, because the office employees use Freiman's log on information, Glenn Mernone claims it is not possible to determine the last time Freiman logged into the system. (G. Mernone Tr. 201:4-202:4)

**Response:** No allegation is made here against Fran and the Court should draw no adverse inferences against Fran in relation to Glenn's acts or omissions stated above.

### L.   The Complete Absence of Supervision over Freiman

83.   Kevin Mernone stopped working on a full time basis at the Richmond Hill Facility in 2009. (Ramnauth Tr. 297:24-298:1) His acute alcoholism left him incapable of managing his businesses. (J. Mernone Aff. ¶ 34)

**Response :** Joy Mernone stated in both filed Complaints that Kevin was incapacitated in 2012. Since that narrative no longer fits her case she now claims Kevin became incapacitated in 2009. The death certificate shows decades of alcohol abuse. Joy has no personal knowledge of how Kevin he ran his business and, in fact, Joy claimed multiple times in the divorce that Kevin was seeking to hide money from the businesses. Glenn, Andre and Fran all testified that Kevin's ability to run the business only changed on the day he became sick and was admitted to the hospital for the final time.

84.   By no later than October 2012, no one was supervising Freiman. Kevin Mernone had not been in the office for several years. (Schmidberger Tr. 25:15-23; Rodriguez Aff. ¶ 3; Bravo Aff. ¶ 3) Glenn Mernone completely abdicated any responsibility for supervising Freiman

even though he was a 50% owner and self-appointed officer of Perfect Care. As he repeatedly testified, "I wasn't running the office, Fran was. She was running it for all the companies and whatever was happening there was her responsibility." (G. Mernone Tr. 236:19-25)

> **Response :** Schmidberger did not commence at the company until 2014, so has no knowledge of the allegation. Rodriguez does not state when he last saw Kevin at the cited reference. Bravo only says that he never met Kevin, not that he never saw him, In short, despite Plaintiff's brazen assertions, there is no testimony about a date in 2012. Rather Kevin ceased to come in to the office as often once the divorce proceedings started preferring, instead, to work from his home office. Nothing changed from 2009 to 2012 and it is disingenuous, at best, to try to fit such a convenient narrative. One wonders why these statements are submitted by plaintiff if there really is a legitimate claim. Finally, Glenn abdicating responsibility, if true (which Fran makes no comment on), is not Fran's fault and the Court should draw no adverse inference in relation to it. That said, it was Glenn who told Fran not to let Joy in, Glenn spoke with the lawyers, Glenn decided to not to service Kevin's companies and to let them die. Glenn did however fail to present a cognizable explanation as to what happened to the companies that he was seeking to collect from. Glenn had full access to the Macola records and complete control of Perfect Care at that time.

## IV.   THE WRONGDOING UNCOVERED TO DATE

### A.   <u>The Formation of the Mirror Image Companies</u>

85.   Kevin Mernone stopped working out of the Richmond Hill Facility in or about 2009. (Ramnauth Tr. 297:24-298:1)

> **Response:** As set forth above, this does not equate to Kevin ceasing to work for the companies.

86.   Perfect Gluco and USHH (collectively, the "Mirror Image Companies") were formed in October 2012.

**Response :** At Kevin's instruction and a year before his death.

87.     In October 2012, Glenn Mernone created two new Macola companies on the computer system at the Richmond Hill Facility, one which was eventually titled Perfect Gluco and one which was eventually titled USHH. He created the two new Macola companies by duplicating the electronic information stored on Macola for Gluco and US Health. Freiman asked Glenn Mernone to duplicate the Gluco and US Health information in setting up these companies; she said that she "needed another copy of Gluco Perfect and U.S. Home & Health." (PX 112; G. Mernone Tr. 187:22-188:15, 247:1-9

**Response :** Glenn has full access to these records at all times.

88.     Glenn Mernone also set up a new Macola company directory for Perfect Care Solutions. (G. Mernone Tr. 190:9-16)

**Response:** None.

89.     Ramnauth and Samad saw that two new companies ~ Perfect Gluco and USHH - had been added to the list of Macola companies on the Richmond Hill networked computers in late October or early November 2012. (Ramnauth Tr. 274:24-275:4; Samad Aff. ¶ 4) The list of Macola companies previously had only included Perfect Care, Gluco and US Health. When Samad asked Freiman what these companies were, Freiman said only "don't worry, its nothing". (Samad Aff. ¶ 5) Samad thereafter clicked on "Perfect Gluco" and "USHH" to see what electronic information was contained on the computer system. Samad saw Gluco customer lists and open customer invoices in the Perfect Gluco company directory and US Health customer lists and open customer invoices in the USHH company directory. (Samad Aff. ¶ 6)

**Response :** Samad did not claim that there was any reason for her to have an understanding of what Perfect Gluco Products and USHH were doing on the system.

90.     Freiman instructed Ramnauth to start sending out Perfect Gluco invoices to Gluco customers and USHH invoices to US Health customers. Shortly thereafter, Freiman reversed her instruction and told Ramnauth that all of the entries on the Perfect Gluco invoices had to be removed and put on Gluco invoices and all of the entries on the USHH invoices had to be removed and put on US Health invoices. (Ramnauth Tr. 275:11 -21; Schmidberger Supp. Aff. ¶ 2)

**Response :** No allegation of any wrongdoing with regard to invoices. A hard stop date was simply presented.

B.     The Forged Gluco Checks to Perfect Gluco

91.     In or about October 2012, Freiman started signing Kevin Mernone's name on Gluco checks to Perfect Gluco. The sole signatory on this account was Kevin Mernone. (J. Mernone Aff. ¶¶ 36-38)

**Response :** The sole signatory from the bank was Kevin but the testimony established that it was company policy for Fran to sign checks and she did so for nearly all the checks since 2009 when Kevin stopped working from Richmond. Fran and Andre both testified to that. The UCC allows for a signatory to sign another persons name on a check with authorization. It is nearly impossible to speculate that Kevin did not give authority for Fran to sign checks when almost all checks were signed by Fran since 2009. Kevin also agreed in his deposition in the divorce proceeding that Fran had authority to sign checks.

92.     From October 19, 2012 through October 7, 2013, Freiman signed Kevin Mernone's name to at least 72 Gluco checks.  (PX 35; Freiman Tr. 461:3-9, 462:12-19) Although Freiman's name could have been added as an authorized signatory for Gluco, it

was not. (Freiman Tr. 544:15-17)

**Response** : Again, adverse inferences should not be imputed to Fran in relation to lax corporate governance for which she was not responsible. Moreover, as set forth above, as Fran's name did not need to be added in the manner suggested by Plaintiffs ( N.Y. UCC. LAW § 3—403(a) )there was no need to file a signature card with the bank.

93.     In or about October 2012, Freiman started making wire transfers from a Perfect Gluco bank account to the suppliers for Gluco. The Perfect Gluco wire transfers were made after Freiman deposited Gluco checks - which she signed in Kevin Mernone's name - into the Perfect Gluco bank account. Although Freiman could have been authorized to wire transfer funds out of the Gluco bank account, she was not so authorized. (Freiman Tr. 544:15-17)

**Response :** Again, adverse inferences should not be imputed to Fran in relation to Kevin's method of banking and for which Fran was not responsible.

94.     Perfect Gluco did not advance funds to Gluco suppliers; the wires were initiated after the funds were received from Gluco. (Freiman Tr. 460:16-21)

**Response :** Actually not always, plaintiffs' counsel questioned Fran about once where a wire was sent first, and Freiman could not confirm either way. No further evidence was presented as proof.

95.     Freiman told Ramnauth that she was changing the way that Gluco paid its suppliers because "Kevin was too busy" to wire transfer money to suppliers as he had done before then. (Ramnauth Tr. 297:3-23, 303:10-20) Ramnauth did not have any conversations with Kevin Mernone concerning Freiman's authority to sign checks. (Ramnauth Tr. 318:5-8)

**Response :** Ramnauth testifies about the procedure for wires prior to Fran taking over. It is apparent that Kevin was actively involved in every wire transfer, to the date of Fran taking over. There is no way that Kevin did not know about Perfect Gluco and USHH.

C.   **The Non-Payment of Gluco and US Health Suppliers**

96.   Freiman directed that printed and signed checks not be sent to suppliers, including Presto Absorbent Products ("Presto"). (Ramnauth Tr. 278:22-279:11, 280:9-281:1) Presto sued US Health for non-payment of its debt and obtained a default judgment when US Health did not respond to the lawsuit. (Ramnauth Tr. 281:2-3; PX 21)

**Response :** No evidence presented that there were sufficient funds to pay Presto. Also USHH was not running at that time, at Glenn's direction. Finally, mail was going directly to Joy at that time and so she would have seen paperwork.

D.   **The Peculiar Deliveries to or Pick Ups from Customers (Possible Kickbacks)**

97.   In early 2013, Freiman started sending Torres text messages in the middle of the night. The text messages contained orders that he was to pack up and ship out of the warehouse the following morning. Torres did not see any invoices associated with these orders, and these orders generally were delivered by truck to the same three customers — Ultra Products, BeWell and Silver Pharmacy. (Torres Aff. ¶¶ 7, 9) Freiman's text messages to Torres were sporadic at first but eventually were sent to him every night. (Torres Aff. ¶ 8)

**Response :** Freiman testified that all of these orders were billed. Customers ordered after business hours. Torres & Bravo said that delivery tickets were made for each order.

98.   On Sunday, September 5, 2013, the first day of football season, Rodriguez and another driver delivered two truckloads of products to Gerimedix in Red Hook, Brooklyn. (Rodriguez Tr. 80:12-81:3) He made several inexplicable and unexplained trips to Gerimedix, where he would deliver several cases of Gluco products (including trademarked lancets) and the person working at Gerimedix would hand him a couple boxes of diapers to take back to the Richmond Hill Facility. (Rodriguez Aff. ¶ 8)

**Response:** There is no evidence of any wrongdoing, simply a question as to what occurred.

99.     Because Gerimedix was a "drop shipment" customer, there should have been no deliveries at all to Gerimedix in Brooklyn. Gerimedix <u>only</u> was to receive invoices; its customers received the deliveries. (Ramnauth Tr. 315:14-25, 333:24-334:4; Samad Tr. 348:13-21)

**Response :** There is no evidence of any wrongdoing, simply a question as to what occurred.

100.    In January 2014, Freiman sent Rodriguez to TwinMed - a Perfect Care competitor - in Secaucus, New Jersey to pick up between six and eight pallets of diapers (SFAs and SFBs). He waited 45 minutes in his truck and, when no one came out to meet him, he went inside TwinMed. The person he spoke to at TwinMed had no idea what Rodriguez was talking about and suggested that Rodriguez call his boss. When Rodriguez called Freiman, she was furious and said "who told you to go inside". She ordered Rodriguez to immediately return to Richmond Hill, which he did. He had never been sent before to TwinMed and was never sent back to TwinMed after this incident. (Rodriguez Aff. ¶ 7)

**Response :** There is no evidence of any wrongdoing, simply a question as to what occurred.

101.    On another occasion, Freiman became angry with Rodriguez for asking her if she had a "count" for one of his pick ups. She did not answer his question. (Rodriguez Aff. ^ 10)

**Response :** There is no evidence of any wrongdoing, simply a question as to what occurred.


D.    <u>Freiman's Facilitation of Kevin Mernone's Drinking</u>

102.    Despite his longstanding dependence on alcohol, Freiman facilitated Kevin Mernone's excessive consumption by shipping alcohol to the St. Regis in Florida while he was on a several week drinking binge in April 2012. (Freiman Aff. Tf 53; Amended Complaint ¶ 62)

**Response :** There is no evidence of this claim, it is insulting, defamatory and incorrect. The Freiman affidavit explains how Kevin regularly drank while on business trips and in business meetings. There is no evidence of any "several week drinking binge". The allegation is made by Joy Mernone who lacks any personal knowledge and has not presented any evidence of this "drinking facilitation", let alone "a several week drinking binge". This allegation is made to simply besmirch Fran and further Plaintiffs' self-serving narrative, and the court should see it as such. (This is similar to the presentation of PX 108 which was presented at hearing without a single question asked and sought to depict Fran's office as being trashed.. In light of such lowbrow tactics, it again begs the question as to whether there really is a serious and legitimate claim against Defendants.)

E.    **Kevin Mernone's Hospitalization and Death**

103.    On Tuesday, October 8, 2013, Kevin Mernone entered the hospital. He was unconscious when he entered the hospital and did not regain consciousness before he passed away. Kevin Mernone was on life support and breathing only with the assistance of a respirator for the entire hospital stay. (G. Mernone Tr. 112:5-16)

**Response:** None.

1.    Freiman's Instruction Not to Deposit Gluco and US Health Checks

104.    On the same day, Samad opened the mail to collect the Perfect Care, Gluco and US Health checks from customers and prepared them for deposit at the bank. Samad gave the checks and the completed deposit ticket to Ramnauth to be taken to the bank. (Samad Aff. ¶ 7)

**Response:** None.

105.    The following day, on October 9, 2013, Samad found the completed deposit

ticket and accompanying checks in her desk drawer. When she asked Ramnauth why the checks had not been deposited, Ramnauth told her that Freiman had told him that she did not want the checks to be deposited. Freiman repeated this instruction to Samad. (Samad Aff. ¶ 8; Trial transcript of Bibi Samad, dated July 25, 2014 ("Samad Tr.") at 344:18-21, 345:4-9; Freiman Tr. 483:21-484:2)

> **Response :** In fact, Ex R. and Ex S. show that deposits were made during this time and the Samad testimony is simply incorrect and suspect (and not to mention littered with hearsay).

106.    Samad kept the undeposited checks in her desk drawer until November 7, 2013, when she handed them back - along with the October 8, 2013 dated deposit slip - to Freiman. (Samad Aff. ¶ 10; Samad Tr. 345:10-22) The deposit slip is no longer with the undeposited checks. (Samad Tr. 345:15-346:1)

> **Response :** In fact, Ex R. and Ex S. show that deposits were made after October 8, and the Samad testimony is simply incorrect and suspect (and not to mention littered with hearsay).

107.    Glenn Mernone testified that Freiman did not inform him that she had instructed the employees to hold and not deposit checks made payable to Gluco and US Health. (G. Mernone Tr. 168:10-24) When asked about the checks that had been held and not deposited, Glenn Mernone testified that "[i]t was not my concern." (G. Mernone Tr. 238:11-16)

> **Response :** Glenn Mernone does not have a credible story about why Gluco Perfect and USHH stopped operating. He does agree, however, that he wanted to let the product expire and that he did not want to turn over receivables to Joy because he wanted to collect them to pay Perfect Care. If Glenn wanted to hold receivables that

were not even collected it was much easier for him to simply say that checks should be held until an escrow account was set up.

107.    A substantial number of Gluco checks and US Health checks were never deposited in the respective bank accounts at Freiman's direction. (PX 32, PX 33) Mrs. Mernone did not become aware of the existence of these checks until after the imposition of the TRO. (J. Mernone Tr. 428:9-21)

> **Response :**  Freiman did not have authority to operate Gluco and US Health after Kevin's death. Glenn clearly did not authorize Perfect Care to provide services to Gluco and US Health after Kevin's death.

2.    Freiman's Instruction Not to Place Gluco and US Health Orders

109.    Also on October 9, 2013, Freiman instructed Samad not to place any customer orders for Gluco or US Health, an instruction Samad followed. (Samad Aff. ¶ 9)

> **Response :** As noted above, Samad's testimony is not credible and is controverted by the books and records of the company (as well as being hearsay – notably, Plaintiffs do not make reference to any Freiman testimony to cure such hearsay).  In any event, there is no specific wrong doing alleged.

3.    Freiman's Entry Into Identical Supplier Contracts

110.    Also on October 8 or October 9, 2013, Freiman, on behalf of Perfect Gluco, entered into a contract with a Gluco supplier named Sterilance Medical. The contract was backdated to October 1, 2013 (PX 82; Freiman Tr. 502:15-11), presumably to give the impression that Kevin Mernone was functioning when it was signed. The Perfect Gluco contract with Sterilance is virtually identical to the contract between Gluco and Sterilance, which was not set to expire for another five (5) months. *(Compare* PX 82 *with* PX 83; Freiman Tr. 506:16- 507:7)

**Response :** The Plaintiff makes self-serving and unsupported presumptions about this contract. It was dated by Sterilance and not Freiman. Moreover, this contract does not affect Gluco Perfect's rights in any way (Freiman Tr. 506:16)

4.    The Filing of a False Guardianship Petition Paid for with Personal Funds of Kevin Mernone

111.    On Friday, October 11, 2013, Glenn Mernone submitted a verified petition to a court to be appointed the temporary guardian over Kevin Mernone, an "alleged incapacitated person", which was granted that day.   (PX 53; G. Mernone Tr. 112:21-23, 113:6-7; 120:6-11)

**Response:** No allegation is made against Fran.

112. The court order provided Glenn Mernone with the authority to make health care decisions for his brother. (PX 53 at 4; G. Mernone Tr. 113:24-114:4) The court order also provided Glenn Mernone with the authority to take the necessary steps to continue the day-to-day business operations of Kevin Mernone's companies, which included paying the continuing financial obligations of the companies. (PX 53 at 4; G. Mernone Tr. 114:5-18) Glenn Mernone understood that the court order was limited to these powers. (G. Mernone Tr. 113:24-114:1, 19-21; 115:12-25) Glenn Mernone also understood that the court order did not permit him to dispose of Kevin Mernone's personal property. (G. Mernone Tr. 116:1-3)

**Response:** Again, no allegation is made against Fran.

112.    It was Freiman's idea to make the application to the court, and Freiman told Glenn Mernone to use the Hopkins & Kopilow law firm to prepare the application to the court. (G. Mernone Tr. 116:7-11, 23-117:2) Hopkins & Kopilow charged Glenn Mernone a $10,000.00 fee for the application. (G. Mernone Tr. 118:24-119:1) To pay for Hopkins & Kopilow, Freiman gave Glenn Mernone $10,000.00 from Kevin Mernone's personal checking account

(which was signed by Freiman in Kevin Mernone's name). (PX 55; G. Mernone Tr. 119:8-21)

>  **Response :** Glenn wanted to be guardian to keep Kevin alive as he did not trust Joy.
>  Also, while it may have been Fran's idea to make the application, which is disputed, it
>  was Glenn's decision to make the application.

113.    Glenn Mernone stated falsely in the petition that Kevin Mernone did not have a living will. *{Compare* PX 53 at 14 *with* PX 93)* Glenn Mernone made no efforts to find out whether or not Kevin Mernone had a living will before he verified the petition (G. Mernone Tr. 121:16-25) likely because he already knew it was a false statement when the petition was filed. Glenn Mernone was one of the three people that were given Kevin Mernone's health care proxy under the living will (G. Mernone Tr. 123:17-25) and had retained the same lawyer, Mark Charwat, that had prepared the living wills for Kevin and Joy Mernone. (G. Mernone Tr. 125:2-15;PX93)

>  **Response :** No allegation is made against Fran. Moreover, Glenn testified that he
>  was unaware of a living will there was nothing false about that statement. The
>  allegation "because he likely knew" is simply unsupported in the record. Simply
>  because one uses the same lawyer as another does make Glenn privy to Kevin's
>  legal discussions.

114 .The verified petition also falsely stated that Kevin Mernone had executed powers of attorney naming Freiman as his agent. These powers of attorney were never found. (PX 53 at 14; G. Mernone Tr. 126:8-16; 137:24-138:3) Freiman told Glenn Mernone that Kevin Mernone had executed the powers of attorney; Glenn Mernone did not ask Freiman why she did not retain copies of the signed powers of attorney or make any independent inquiries as to whether they existed. (G. Mernone Tr. 127:19-128:10; 138:8-23)

**Response :** This statement was believed to be true at the time is was made.

5.   Glenn Mernone's Removal of the Deceased's Safe

115.   On Sunday, October 13, 2013, Glenn Mernone went to his brother's house for the purpose of removing the safe. (G. Mernone Tr. 223:8-9) Accompanying Glenn Mernone to the house were Freiman, her husband William Gillen, an off-duty policeman and Sean Mernone, the Deceased's son from his first marriage. (J. Mernone Aff. ¶ 26; G. Mernone Tr. 221:21-222:6, 223:4-9,226:18-21,227:6-12)

**Response:** None.

116.   Before the trip to Kevin Mernone's home, both Freiman and Kevin Mernone's then girlfriend told Glenn Mernone that there were valuables in the safe. (G. Mernone Tr. 223:17-24) In the 20 years of his marriage to Joy Mernone, Kevin Mernone had kept valuables in the safe, including money, watches and a pen collection. (J. Mernone Tr. 398:18-22, 436:25-437:4)

**Response:** None.

117.   Glenn Mernone agreed to remove the safe from the Deceased's house even though he did not know whether there was anything in the safe that would be necessary to fulfill his powers as his brother's Temporary Guardian. (G. Mernone Tr. 132:21-133:4; 134:19-24) Glenn Mernone relied blindly on Freiman's statement that she needed certain items in the safe to run Kevin Mernone's companies, and it was Freiman's idea for Glenn Mernone to remove the safe. (G. Mernone Tr. 133:8-24,222:2-6,223:12-14)

**Response :** Glenn was concerned that Kevin's girlfriend, Genna, would access the safe. Glenn wanted to open the safe in private to remove a firearm he believed was in the safe. He made the decision to take the safe back, not Frieman.

118. The safe was not opened at the Deceased's home and was removed to Glenn Mernone's office at the Richmond Hill Facility. (G. Mernone Tr. 134:19-135:1) Glenn Mernone opened the safe without any witnesses present. (G. Mernone Tr. 135:3-12)

**Response :** Again, there is no evidence, nor allegation of specific wrongdoing by Fran.

6.    Glenn Mernone's *Ultra Vires* Sale of His Brother's Shares in Perfect Care

119.   Although Glenn Mernone did not have the power to dispose of his brother's personal property and Perfect Care did not have the power to sell its stockholders' shares, on Monday, October 14, 2013, Glenn Mernone authorized a transaction whereby he sold 30% of Kevin Mernone's personal shareholdings in Perfect Care to Freiman in exchange for a $90,000.00 payment. (DX M; G. Mernone Tr. 143:8-24) Freiman prepared the document reflecting the sale. (G. Mernone Tr. 144:14-15)

**Response :** Glenn testified that he has a conversation with his brother about providing Fran with a portion of the company and that is what he was doing.

120.   The $90,000.00 payment from Freiman for the shares was not received by Perfect Care. (G. Mernone Tr. 144:25-145:1; 147:18-23)

**Response :** The payment could be  in the form of unpaid loans provided to Perfect Care.

121.   This sale of the Deceased's shares in Perfect Care ultimately was reversed because Freiman's lawyer told her the transaction "wouldn't fly". (G. Mernone Tr. 143:25-144:7) Glenn Mernone assumed that the document reflecting the sale had been destroyed by Freiman; Glenn Mernone had not retained a copy. (G. Mernone Tr. 150:9-17)

**Response :** Nothing was "reversed", the testimony was simply that the transaction might not be legally binding, so it did not proceed to "close" and the loan remained outstanding.

7.     Glenn Mernone's *Ultra Vires* Appointment of Officers of Perfect Care

122.    On October 14, 2013, Glenn Mernone also appointed himself as the President of Perfect Care and Freiman as the Vice-President of Perfect Care. (DX M; G. Mernone Tr. 139:7-24; 141:2 5-143:4) These "appointments" were not necessary to continue the day-to-day business operations of Kevin Mernone's business because Freiman had been the *de facto* manager of these businesses for several years. (G. Mernone Tr. 236:19-25)

**Response :** Freiman for a time, though, had a reasonable belief of ownership in Perfect Care. The fact that Glenn did this proves that he was making decisions for the business and completely undermines Plaintiffs' submissions that Fran was running the business.

8.     Perfect Care's Bonus to Freiman

123.      On Tuesday, October 15, 2013, Glenn Mernone signed a Perfect Care check giving Freiman a $5,000.00 bonus. (PX 63; PX 58 at 225; G. Mernone Tr. at 152:21-154:13; Schmidberger Supp. Aff. ¶ 22) The check was deposited a few weeks after the date printed on the check and could have been backdated. (G. Mernone Tr. 154:21-155:18)

**Response:** See Response to ¶ 124 below.

124.    Freiman did not get a bonus in 2011 or 2012. (Ramnauth Tr. 310:4-7)

**Response :** : No evidence was presented regarding the propriety of the bonus and it could be drawn from here that Glenn was well aware of the bonus for a check that he signed on behalf of his company perfect care. In fact Perfect Care was chronically short of cash and may not have had funds to cover this check until a later date.

9.     The Phony Sale of $500,000 of Gluco Inventory

125.    Also on that day, Perfect Care sold approximately $500,000.00 of Gluco inventory to Perfect Gluco even though Perfect Care does not sell diabetic products. (PX 76; PX

84; PX 85; PX 86; G. Mernone Tr. 158:12-18, 159:5-12, 160:9-22, 161:6-162:8) Glenn Mernone testified that he was not consulted on this transaction. (G. Mernone Tr. 159:25-160:8)

> **Response :** Fran testified that Glenn was consulted on this transaction. In addition, Ramnauth testified that this was simply a paper transaction with no physical movement of goods.

126.    The transaction was reversed and credited the same day. (G. Mernone Tr. 158:23-25; PX 76) Glenn Mernone testified that he did not know why the transaction was reversed and credited. (G. Mernone Tr. 162:20-21) Instead, Perfect Gluco entered into the transactions directly with Gluco. Those transactions were not reversed and not paid for. (Ramnauth Tr. 334:12-18; PX 42; Schmidberger Aff.126)

> **Response :** Macola transactions cannot be reversed per se but can be credited back in order to show a full trail of transactions. The Perfect Gluco transactions were noted in the company books and the monetary value of goods taken was exactly the amount owed to vendors, and Fran agreed to pay the vendors.

127.    There were 20 more Perfect Care phony sales transactions to Perfect Gluco between October 15, 2013 and December 31, 2013, all of which were reversed on December 31, 2013. (PX 76; G. Mernone Tr. 162:23-163:5-164:9)

> **Response :** There was no evidence presented as to why these transaction "phony" and the fact that Plaintiffs' admit that they were "reversed" (or credited back) means it is not clear exactly what wrongdoing Plaintiffs suggest occurred in this regard.

Freiman's Felonious Deposit of $50,000.00 After Kevin Mernone's Death

128.        On October 18, 2013, two days after Kevin Mernone died, a Perfect Healthcare LLC check payable to Perfect Care in the amount of $50,000.00 was deposited in the Perfect Care Chase bank account. Freiman directed a Perfect Care employee, possibly Samad, to deposit the check after Kevin Mernone died. (PX 100; Freiman Tr. 536:3-7, 537:11-538:2) The check bounced so Perfect Care did not receive the money. (PX 100)

**Response :** Although asked multiple times, the response was always the same, there is no evidence that anyone was asked to deposit a check after Kevin died. Why are Plaintiffs making things up?

### F.      Freiman's Transfer of the Gluco and US Health Businesses to Perfect Gluco and USHH and Theft of their Inventory

129.      On October 16, 2013, the day Kevin Mernone died, Freiman told Apex, a key supplier for branded Gluco Perfect 2 test strips and meters, that Kevin Mernone had given Gluco to her. She also told Apex that she would enter into a new agreement with Apex. (PX 18; J. Mernone Aff. ¶ 54)

> **Response :** PX 18 clearly shows that Fran denies saying she owned Gluco and that she owned Perfect Care, which she had reason to believe she did, based on Exhibit M. J. Mernone affidavit simply appends the email which is hearsay. Joy des not claim to have any personal knowledge of the paragraph.

130.      Also on October 16, 2013, letters were sent out on Gluco letterhead to Gluco customers informing them "Effective October 1, 2013, we began servicing you as Perfect Gluco." The letters stated that "your contacts [at Gluco] will remain un-changed" and that there had been "no change in management, no change in staff, and no change in delivery methods." The letter was signed by Freiman as "President" of Gluco. (PX 64) The letters were prepared by Milden Duran (or possibly Liz Caro) in response to a request from Freiman. (Freiman Tr. 510:7-18, 512:1-10; Samad Aff. ¶¶ 17-19) At the time that the letters were sent

to customers, Duran was working for Perfect Gluco. (Freiman Tr. 512:1 -3)

**Response :** contrary to Plaintiffs assertion (or, perhaps, hopes), there is no signature on the letter. Fran denies seeing or drafting the letter, let along sending it out. Plaintiffs are speculating as to who prepared the letter and under whose instructions. The letter itself is hearsay and the testimony regarding a vendor that sent the letter refusing to turn over the email it was sent with is highly suspect, given that emails take seconds to search and forward. Plaintiffs could easily have issued a subpoena for the alleged email as well and did not. The testimony is also that there is no Gluco letterhead present.

131.    Also on October 16, 2013, Bravo was ordered by Freiman to deliver a full truck load of products to a warehouse in Woodside, Queens. Bravo unpacked the truck at the Woodside warehouse. Bravo signed and time stamped the delivery ticket reflecting the October 16th delivery. (PX 69; Bravo Aff. ¶¶ 6-7; Bravo Tr. 92:12-93:16)

> **Response:** This is hearsay, that Plaintiffs did not attempt to cure. Moreover, no wrongdoing is alleged.

132.    On or about October 16, 2013, the Gluco and US Health businesses were shut down. (Freiman Tr. 479:17-25; Freiman Aff. If 65; Schmidberger Tr. 11:17-12:3) Freiman told the employees of Perfect Care to stop performing services for Gluco and US Health.  (Freiman tr. . 480:20-22) Sales orders were not placed for Gluco or US Health. Checks made payable to Gluco and US Health were not deposited. (Freiman Tr. 481:1-21)

> **Response :** Glenn gave the order as noted above.

133.    Freiman told Glenn Mernone that Gluco and US Health stopped doing business because Mrs. Mernone closed the bank accounts associated with those companies. (G. Mernone Tr. 167:17-19) The Gluco bank account was not closed until November 5, 2013, when a new Gluco bank account was opened by Joy Mernone. (J. Mernone Tr. 356:5-6) The US Health

bank account was not closed until mid-December, when a new bank account for US Health was opened by Mrs. Mernone. (J. Mernone Tr. 356:7-8)

> **Response :** This cannot be true. Glenn alleges that the companies are not operating before the bank accounts were closed. In fact Glenn's testimony is "as far as I was concerned Kevin's companies were out of business when Kevin dies". Glenn then tries to claim it was all Frieman's fault, and perjuring himself as to knowledge of the formation of PCS.

134.   On October 21, 2013, Freiman implemented a "hard stop". Everything before October 21st belonged to Gluco; everything after October 21st belonged to Perfect Gluco. (Freiman Tr. 490:6-13) If a payment was received from a Gluco customer after October 21, 2013, the payment went to Perfect Gluco. (PX 108: Freiman Tr. 492:12-494:2)

> **Response:** In fact, the testimony cited shows that a separation was intended to keep Gluco Perfect funds going to Gluco. How else did checks accumulate for Gluco Perfect?

135.   By the end of October 2013, 90% of the Gluco product inventory — including branded lancets and test strips ~ had disappeared from the Richmond Hill Facility. (Torres Aff.
¶ 11)
**Response :** Torres has no access to Gluco inventory and had no way of knowing what was or was not removed and he does not deal with invoices to know what was properly recorded. Torres is simply not competent to testify to the subject matter.

136.   Freiman started issuing Perfect Gluco invoices containing Gluco products earlier than November 1, 2013, and well before Mrs. Mernone closed the Gluco bank account. (PX 13) The Perfect Gluco invoices and delivery tickets were generated on the Macola computer system at Richmond Hill. (Freiman Tr. 485:11-24) There are at least 583 Perfect Gluco

invoices reflecting the sale of branded products *(i.e.,* lancets and test strips) that had to have been stolen from the Gluco inventory at Richmond Hill. (PX 48; Schmidberger Supp. Aff. ¶ 4)

> **Response :** The testimony shows the Freiman recorded a sale of product in order to pay vendors. Nothing was "stolen" and there was a proper notation in the books and records of the companies showing the items taken. A payment was in fact made to one vendor and agreements for payment made with others.

137.    In December 2013, Sterilance requested - but Freiman did not provide - a legally binding confirmation in which Freiman was required to acknowledge that she was authorized to sell lancets bearing the Perfect logo. (Freiman Tr. 507:15-508:5) Sterilance has not delivered products since Kevin Mernone passed away. (Schmidberger Supp. Aff. ¶ 4; Freiman Tr. 501:20-24) Apex (the exclusive supplier of Perfect 2 test strips and meters) also has not delivered product since October 2013. (Freiman Tr. 501:17-19)

> **Response :** This allegation simply shows that Fran was not willing to claim that she was authorized to take additional product that was not committed merchandise. This is further proof that Fran was selling merchandise to pay vendors and did not claim to be Gluco Perfect. In fact, Apex prepared an order which Fran refused because it was not committed product and Fran would not take trademarked product past the committed orders.

G.    The Formation of Another Mirror Image Company — Perfect Care Solutions

138.    On or about November 8, 2013, Perfect Care Solutions, Inc. was formed. (Amended Complaint ¶ 17) Freiman formed the company, which is owned 50/50 by Freiman and Glenn Mernone. Although Glenn Mernone learned after the fact that the company was in existence (G. Mernone Tr. 168:25-169:22), he knew the company was going to be formed and suggested names for the new company. (G. Mernone Tr. 242:21-25)

**Response :** Glenn knew about the company and, in an apparent rush to blame Freiman for the allegations thrown at him by Plaintiffs, perjured himself before agreeing that he had been a part of the company at formation. He gave a detailed explanation as to what Perfect Care Solutions does and why Perfect Care could not do that business.(G. Mernone Tr. 243-244) This is a separate business, owned and operated with the 50% owner of Perfect Care.

139.   The bank account for Perfect Care Solutions, which is at TD Bank, was funded by a check received from Ultra, a Perfect Care customer. (PX 71; G. Mernone Tr. 170:19-172:1) At the time the Perfect Care Solutions bank account was funded, Ultra owed Perfect Care $22,986.00. (PX94; G. Mernone Tr. 172:10-20) That amount remains unpaid. (PX94)

**Response :** Glenn did not have knowledge of whether the check was properly sent to Perfect Care solutions and no evidence was presented either way. Schmidberger admitted that Ultra was a customer of both companies.

140.   After it was rented, Glenn Mernone was informed of the existence of the Valley Stream warehouse. Freiman told Glenn Mernone that the Valley Stream warehouse was being used to store products for Perfect Care Solutions. (G. Mernone Tr. 207:5-12, 244:10-20)

**Response :** Glenn does not testify as to when he became aware of the warehouse and again Plaintiffs are trying desperately to "see" facts suiting their self-serving narrative.

141.   Perfect Care Solutions had the same customers and sold the same products as Perfect Care; the idea behind Perfect Care Solutions was that it would do home deliveries in vans of the products Perfect Care sold. (G. Mernone Tr. 243:16-18, 262:7-12, 264:11-21; Schmidberger Supp. Aff. ¶ 25)

**Response :** Glenn testified that home delivery was an entirely separate new model that Perfect Care had failed at in the past for many reasons.

142.    Perfect Care Solutions did not pay for at least one van it rented in 2013, Perfect Care did. Perfect Care does not use vans; it uses trucks for its deliveries. (Schmidberger Supp. Aff. If 25; PX 63)

**Response:** Bravo admitted to using a van for diaper deliveries. (C. Bravo Tr. 85)

H.    **Mernone's and Freiman's Concerted Efforts to Conceal and Withhold Information**

143.    On November 7, 2013, Mrs. Mernone tried to access the Richmond Hill Facility for the purpose of reviewing the books and records of the companies. (J. Mernone Aff. ¶ 74; J. Mernone Tr. 411:25-412:4) She was denied access and thrown out of the Richmond Hill Facility by Freiman. Before she was thrown out of the Richmond Hill Facility on November 7th, Freiman told Mrs. Mernone that Gluco was a "defunct" company. (J. Mernone Aff. ¶ 74; J. Mernone Tr. 419:2-15)

**Response:** It was Glenn who did not authorize Joy to access the facility. (Ex. L) Glenn had authority and Fran certainly could not, and did not, overrule him. Glen is the one that denied Joy access in December.  Gluco Perfect owes Perfect Care over $2 million as is documented in the ongoing lawsuit. (Mernone Tr. 419:2-15) The Devack letters (Ex, L) shows that when Joy arrived she was erratic and frightened the staff. Gluco Perfect was in fact not operating, given the Glenn did not want Perfect Care to operate the company and Gluco Perfect owes PC over 2 million dollars as is documented in the ongoing lawsuit.

144.    Before November 7, 2013, Mrs. Mernone had been able to access the Richmond Hill Facility at will. (J. Mernone Tr. 423:22-424:12)

**Response :** This statement is false as Ms. Mernone attempted to access only once in five years, and with an attorney at her side.

145.        Freiman did not tell Mrs. Mernone during the November 7th visit that Gluco had

received checks from its customers that had not been deposited. (J. Mernone Tr. 428:9-15)

**Response :** Of more import, Mrs. Mernone did not tell Fran that she was closing the relevant bank accounts.

146.    Freiman did not tell Mrs. Mernone during the November 7th visit that US Health had received checks from its customers that had not been deposited. (J. Mernone Tr. 428:9-15)

**Response :** Fran was not authorized to speak to Joy by Glenn who was in charge.

147.    On November 8, 2013, one day after Mrs. Mernone's visit to the Richmond Hill Facility, Freiman instructed Ramnauth to shred blank Gluco invoices, delivery tickets and checks. (Ramnauth Aff. ¶ 18; Samad Tr. 352:5-353:16) Ramnauth, in turn, asked Samad, Liz Caro and Ruth Rivera to physically shred the blank Gluco invoices and delivery tickets. (Samad Aff. ¶ 11; Samad Tr. 353:8-354:13) Two dumpsters were filled with bags of shredded material. (Torres Aff. ¶ 14)

**Response :** Ramnauth testified that this was closer to the time of the Christmas Party and not the day after Joy appeared. The checks related to a closed bank account. In addition, this is simply another question raised as to why blank documents where shredded. No reason is given, and the wrongdoing sought to be alleged is left to the imagination rather than articulated.

148.    On or about the same day, Freiman convened a meeting of the employees at the Richmond Hill Facility. Freiman told the employees that Kevin Mernone had given her an interest in the company. Freiman also said that Mrs. Mernone did not know how to run the company and would attempt to close the business and liquidate it. Freiman said that anyone caught speaking to Mrs. Mernone would be fired and that going forward the building would remain locked. (Torres Aff. ¶¶ 12-13; Rodriguez Aff. ¶ 4)

**Response :** Glenn testified that it was his instruction to keep Mrs. Mernone out, see also Ex. L.

149.    On December 27, 2013, Mrs. Mernone again attempted to access the Richmond Hill Facility for the purpose of reviewing the books and records of the companies. Freiman was given advance notice that Mrs. Mernone and her team would be visiting. (J. Mernone Aff. ¶ 75-76; Schmidberger Aff. ¶ 6; J. Mernone Tr. 391:5-15) When Mrs. Mernone arrived, Ramnauth called Freiman, who was not then at the Richmond Hill Facility, to seek her advice on whether to permit Mrs. Mernone (and the people accompanying her) access to the books and records. (Schmidberger Aff. ¶ 5; J. Mernone Tr. 393:4-16) Freiman told Ramnauth not to provide Mrs. Mernone and her team access to the books and records of the companies. (Ramnauth Aff. ¶ 16; J. Mernone Tr. 393:4-25)

Response : Glenn states that he did not allow her access. Frieman simply followed Glenn's orders.

150.    Freiman called the police, who arrived before Freiman did. They asked to speak to the person who lodged the trespassing complaint. Ramnauth told the police that Freiman was not yet there. Thereafter, Freiman and Glenn Mernone separately arrived at the Richmond Hill Facility. After Freiman dressed down the police officer who said that Mrs. Mernone had a right to be at the Richmond Hill Facility, Glenn Mernone told Mrs. Mernone that she should leave, which she and her team did. (Schmidberger Aff. ¶ 6-7; G. Mernone Tr. 100:19-101:13, 210:5-19; J. Mernone Tr. 392:7-20)

Response : Glenn told Mrs. Mernone to leave. Fran was in line with directions from Glenn who stated that Joy had no right to be there. What the policeman thought and said is really irrelevant and not admissible.

151.    In January 2014, Glenn Mernone instructed Perfect Care's counsel, Mitchell Devack, Esq., to withhold <u>Gluco</u> accounts receivable information that Mrs. Mernone had been requesting. (PX 109; G. Mernone Tr. 107:2-108:3) Mrs. Mernone did not obtain Gluco

accounts receivable information until after the Court issued the temporary restraining order, which permitted her access for the first time to the books and records of Gluco, US Health and Perfect Care at the Richmond Hill Facility. (J. Mernone Tr. 357:7-9,446:5-10)

> **Response :** Glenn also instructed that checks should be held for the same reason. He wanted to collect the debt to Perfect Care.

152. On March 14, 2014, Mrs. Mernone and her team sought to access the Richmond Hill Facility pursuant to the TRO. The Richmond Hill Facility was locked up and the building could not be accessed. (Schmidberger Aff. ¶ 8)

> **Response :** Glenn testified that this was done with his consent.

153. On March 15 and 16, 2014, Mrs. Mernone and her team again sought to access the Richmond Hill Facility, this time gaining entry. Although one of the purposes of the visit was to get a "quick handle" on the finances of Gluco, US Health and Perfect Care, the team realized immediately that "it [was going to] be a difficult task just finding the accounting records for Gluco and U.S. Health." The Richmond Hill Facility was in such a disarray and there appeared to be no discernable filing system. (Schmidberger Aff. ¶ 9; PX 106)

> **Response :** Glenn was responsible for the closing the monthly accounts etc. and not Fran.

**I.  The Perfect Care Sham Lawsuit Against Gluco**

154. Perfect Care commenced a lawsuit, at Glenn Mernone's direction, against Gluco in mid-November 2013. Glenn Mernone claims in that lawsuit that he had an oral agreement with his brother, Kevin Mernone, pursuant to which Gluco would reimburse Perfect Care for certain expenses. According to that lawsuit, Kevin Mernone breached that oral agreement. (G. Mernone Tr. 174:7-12)

**Response :** Fran takes no position as this time on this issue, except to recount that the tax return, and accounts reflected this deal for years.

155.    There is no document reflecting the terms of the oral agreement. (G. Mernone Tr. 174:13-15)

**Response :** Payments were made against the monies owed. The income was claimed on Perfect Care's tax return and Gluco Perfect took the tax deduction for the expense. The lawsuit is still ongoing.

156.    Glenn Mernone did not discuss with Stuart Doloboff, the Perfect Care accountant, the amount of the expenses - the so-called "shared expenses" - that Gluco allegedly owed to Perfect Care. Only Kevin Mernone discussed the tax returns with Doloboff; Glenn Mernone did not review the tax returns, is unfamiliar with the term "shared expenses" and does not recall anything about a "shared expenses" line item on the tax returns. (G. Mernone Tr. 216:1-16) Glenn Mernone also could not recall discussing with anyone that "Perfect Care was paying taxes for a debt owed to it by Gluco Perfect" and had no discussions with his brother that "Perfect Care was paying taxes on the monies that were owed to Perfect Care by Gluco Perfect". (G. Mernone Tr. 216:25-217:6)

**Response:** None

156.    Although the complaint says that Perfect Care demanded payment from Gluco, no demand was made until after Kevin Mernone passed away. (G. Mernone Tr. 175:7-9) Other than filing suit on behalf of Perfect Care, Glenn Mernone did nothing to obtain payment from Gluco for the so-called expenses. (G. Mernone Tr. 218:8-13)

**Response:** None

157.    Although employees of Perfect Care performed services for Perfect Gluco at the same time that they were working for Perfect Care, those employees were not on the payroll

of Perfect Gluco. (Ramnauth Tr. 287:20-288:5) Indeed, Perfect Gluco - Freiman's company - had no payroll expense, just as Gluco had no payroll expense. (PX 78 at 7; Freiman Tr. 529:22-25, 530:16-18, 530:24-531:1)

**Response:** None

      J.    <u>Glenn Mernone's Interference with Freiman's Employment Termination</u>

159.   On Thursday morning, March 13, 2014, Freiman received a letter from Mrs. Mernone terminating her employment from Perfect Care, Gluco and US Health. Freiman immediately told Glenn Mernone about the termination, and Glenn Mernone told her that Mrs. Mernone could not terminate Freiman's employment from Perfect Care without his permission. (G. Mernone Tr. 204:9-18) Glenn Mernone did not consult with counsel before making that statement to Freiman. (G. Mernone Tr. 204:19-21) Freiman's statement in her affidavit "Glenn told me based on advice of counsel to stay and work" is a false statement. (G. Mernone Tr. 206:18-21)

**Response:** Glenn admitted to telling Fran to stay and work. Joy later testified that Glenn had now decided to retroactively reverse his decision sometime in June. This is simply Glenn trying to redo history. In fact a draft letter from Mitchell Devack, drafted with Glenn, shows the decision was made that Fran was not fired at this time.

160.   After she received the termination letter, Freiman suggested to Glenn Mernone that they should close the Richmond Hill Facility on March 14, 2014 because Mrs. Mernone was likely "to show up and cause a scene". (G. Mernone Tr. 209:4-15) Glenn Mernone knew that, on March 13th, Freiman had contacted a supplier — 1st Quality - to divert a shipment expected on Friday, March 14, 2014 from the Richmond Hill Facility to the Valley Stream warehouse. (G. Mernone Tr. 207:13-208:3)

**Response :** Glenn ordered that the next day deliveries occur at the Valley Stream Warehouse and he was in charge. As noted, Glenn and his attorney stated that Fran was not fired.

161.   Glenn Mernone also knew that the some of the employees were told to report to the Valley Stream warehouse on Friday, March 14, 2014. He did not know which employees because he "let Fran handle the whole situation". (G. Mernone Tr. 211:1 -9)

**Response:** Fran operated under Glenn's orders and decisions. In this case, Glenn let Fran handle something but Glenn has authority to direct Fran otherwise.

162.   Glenn Mernone testified that he was aware generally that, after Freiman's employment had been terminated by Mrs. Mernone, Perfect Care drivers moved truckloads of inventory from Richmond Hill to Valley Stream at her direction. (G. Mernone Tr. 254:4-21)

**Response :** Glenn ordered that the next day deliveries occur at the Valley Stream Warehouse and was in charge. As noted, Glenn and his attorney states that Fran was not fired.

163.   Between 55 and 60 pallets of products - roughly two-thirds of the product in the Richmond Hill Facility - were surreptitiously transferred to Freiman's Valley Stream warehouse on the evening of March 13, 2013. (Schmidberger Aff. f 23; Bravo Aff. If 10; Torres Aff. ¶ 17) There are no delivery tickets or paperwork reflecting this transfer of inventory. (Schmidberger Tr. 55:8-15; Rodriguez Tr. 81:8-20; Rodriguez Aff. ¶ 11; Bravo Tr. 95:4-12)

**Response:** As noted, This was ordered by Glenn.

K.   Freiman's and Her Agents' Disregard of the TRO

164.   On Thursday evening, March 13,2013, the Court issued a TRO.

**Response :** : Notably absent is any proof of service of the TRO on the 14th.

165.   The following morning, on March 14, 2014, Perfect Care employees (other than

the office staff) reported for work at the Valley Stream warehouse. At the warehouse that day were Rodriguez, Bravo, Terrell Oglesby, Rudy Guthrie and Cordell Davis. Torres also may have been there. (Rodriguez Aff. ¶ 14)

**Response:** None

166.    Freiman was there when the employees arrived. The First Quality truck arrived and was unloaded and re-loaded onto the Perfect Care trucks so that the Perfect Care trucks could make their deliveries. Bravo was leaving to make his runs for the day as the 1st Quality truck arrived. (Bravo Aff. ¶ 11; Bravo Tr. 94:16-20; Rodriguez Aff. ¶ 14)

**Response:** None

167.    On March 14th, the Perfect Care employees worked a full day at the Valley Stream warehouse. For example, Bravo finished his runs in the evening. (Bravo Tr. 94:23-95:3) After Rodriguez finished his route, Craig Jeffries, the warehouse manager, directed him to return to Valley Stream to pick up Rudy Guthrie's truck, another Perfect Care driver. Rodriguez drove Guthrie's truck back to Richmond Hill and then had to return to Valley Stream to pick up his own car. It was 10 pm when he arrived at Valley Stream. (Rodriguez Aff. ¶ 15)

**Response:** Drivers did not receive any instructions from Fran after the TRO.

168.    Because the various trips back and forth were so out of the ordinary, Rodriguez asked Jeffries what was going on. Jeffries told Rodriguez that Freiman "is doing this for you guys." "She has money; she does not need to put up with this s**t." Rodriguez asked Jeffries why Freiman needed to move products back and forth between the two warehouses if she owns the company. Jeffries did not respond to the question, but repeated that "she has a lot of love for you guys." (Rodriguez Aff. ¶ 16)

**Response :** This is simply pure hearsay and says nothing about Fran giving orders after the TRO. In fact, all the testimony is simply not credible. Torres claimed that he went home on his own March 13th. Rodriquez claimed they went home together.

169.    On Sunday, March 16, 2014, Jeffries placed several calls and/or texts to Perfect Care employees. He instructed them, on behalf of Freiman, to lie to Mrs. Mernone and her team when they were questioned by her. (Torres Aff. ¶ 6; Samad Aff. ¶ 14-15)

**Response :** This is simply pure hearsay and says nothing about Fran giving orders after the TRO. In fact, all the testimony is simply not credible. Torres claimed that he went home on his own March 13th. Rodriquez claimed they went together.

170.    On March 27, 2014, Mrs. Mernone's team inspected Freiman's Valley Stream warehouse for the first time. There was an enormous amount of inventory from Richmond Hill at the Valley Stream warehouse - so much that the inspection could not be completed that day. (Schmidberger Aff. ¶ 23; PX 37; PX 38)

**Response :** The "team" does not mention when they arrived, as it was in the afternoon.

171.    Not all of the inventory that had been wrongly transferred from Richmond Hill to Valley Stream on March 13th was returned to Richmond Hill two weeks later on March 27th. In addition, Freiman objected to the retrieval of certain products. (Schmidberger Aff. ¶ 23; PX 37; *see also* Torres Aff. ¶18)

**Response :** There is no allegation that items were improperly objected to by Fran. There is further no evidence of items wrongfully taken. Glenn said to fill orders from that location.

172.    From April 1, 2014 through April 14, 2014, there were 175 outgoing messages on Gluco's website, responding to incoming customer inquiries. Presumably, Freiman or Freiman's delegate(s) were responding to the inquiries. (J. Mernone Supp. Aff. ¶ 4; PX 34; *see*

*also* PX 8)

> **Response:** This is idle speculation based on double hearsay and is mischievously
>
> put in by Plaintiffs to try to create a question based on presumptions.  It is noted
>
> that Plaintiffs make no reference to any cross-examination of Fran in relation to
>
> this issue, presumably preferring to rely on double hearsay.

### L.     Perfect Gluco's Possession of Checks from Gluco Customers

173.    Between the date the TRO was put in place and May 20, 2014, Perfect Gluco and
USHH have received checks from Gluco and US Health customers. (PX 40; Freiman Tr. 533:4-
11) The vast majority of the check payers are Gluco and US Health customers. Approximately
$30,000.00 of these checks is for product shipped by Gluco and US Health <u>before</u> Freiman
closed Gluco and US Health. (Schmidberger Aff. \ 24)

> **Response :** No evidence as to breakdown as well as no evidence that any money
> was taken but simply that checks were received and not deposited.

## VI.   THE HARM DISCOVERED TO DATE

### A.     Perfect Gluco's Outstanding Debts to Gluco

174.    At Freiman's direction, amounts due from Perfect Gluco to Gluco were zeroed out
for hundreds of invoices, erasing the balances due on those invoices. In addition, for those
invoices that were not zeroed out by Freiman, Perfect Gluco has not paid the balances due (in
the amount of $27,485.50). *(See, e.g.,* PX 42; Schmidberger Aff. ¶ 26)

> **Response :** While the amount of $27,485 might be a legitimate debt in the same
> way Perfect Care owe Fran money for loans, there was no testimony or evidence to
> show that the credit entries were anything more than a paper entry as described by
> Andre Ramnouth.

### B.     Perfect Gluco's Outstanding Debts to Perfect Care

175.    At Freiman's direction, amounts due from Perfect Gluco to Perfect Care were zeroed out for dozens of invoices, erasing the balances due on those invoices. Moreover, the products sold by Perfect Care in those invoices were diabetic products and, accordingly, were not Perfect Care's products to sell. (PX 43; Schmidberger Aff. ¶ 27; *see, e.g.,* PX 86; G. Mernone Tr. 162:4-8)

**Response:** Again, no evidence that this is anything more than a paper entry.

C.    **USHH's Outstanding Debts to Perfect Care**

176.    At Freiman's direction, amounts due from USHH to Perfect Care for a dozen invoices were substantially reduced by crediting USHH in roughly the amount of two-thirds of each invoice. For those invoices that were not zeroed out by Freiman, USHH had not paid the balances due (in the amount of $100,775.01). (PX 44; Schmidberger Aff. ¶ 28)

**Response:** Perfect care owed money to USHH for loans and may have paid some back in this way.

D.    **Perfect Care's Outstanding Debts to US Health**

177.    Perfect Care acquired $741,647.17 of product from US Health between April 2012 and September 2013, which it has not paid for. (Schmidberger Aff. ¶ 17; PX 59)

**Response :** Not relevant to Fran and no position taken at this time.

178.    Perfect Care also owes US Health for "split checks". A split check is required when a customer pays, for example, Perfect Care and US Health for invoices issued by both companies in a single check. In a number of instances, customers made checks payable to Perfect Care for invoices also issued by US Health. In those instances, Perfect Care was then required to cut a check to US Health, which it has not done. (Schmidberger Supp. Aff. ¶ 20; *see,* e.g., PX61)

**Response :** Not relevant to Fran and no position taken at this time.

E.        **Perfect Care's Outstanding Debts to Gluco**

179.    Perfect Care owes Gluco for "split checks". As with US Health, Perfect Care has not cut a check to Gluco for the split checks. (Schmidberger Supp. Aff. ¶ 20; *see, e.g.,* (PX 61)

**Response :** Not relevant to Fran and no position taken at this time.

F.        **The Depletion of the Gluco Bank Account Balance**

180.    While Kevin Mernone was lying unconscious in the hospital, Freiman depleted the Gluco bank account balance. On October 11, 2013, the daily ending balance was $98,411.81; on October 16, 2013, the daily ending balance was $17,874.82. (Schmidberger Supp.Aff. ¶ l3)

**Response :** Fails to mention that Fran is not alleged to have taken any money but to have transferred money to Kevin's companies to cover company obligations.

181.    The depletion is significant because Freiman was engaging in online transfers from Kevin Mernone's personal account to the Gluco account. Instead of taking the money directly from Kevin Mernone's personal account, on October 9, 2013, Freiman transferred $20,000.00 from the personal account to the Gluco account. On October 11, 2013, Freiman transferred another $5,000.00 from the personal account to the Gluco account. On October 15, 2013, Freiman transferred another $1,800.00 from the personal account to the Gluco account. (Schmidberger Supp. Aff. ¶ 13; PX 52; PX 54; PX 12)

**Response :** Importantly, Fran is not alleged to have taken any money, but to have transferred money to Kevin's companies which was done to cover company obligations and Kevin's obligations.

G.        **The Depletion of the US Health Bank Account Balance**

182.   Once Freiman decided to stop paying Presto in May 2013, substantial sums of US Health funds were diverted to Perfect Care. In August 2013, there were two significant online transfers from US Health to Perfect Care. In September 2013, there were three significant online transfers from US Health to Perfect Care. In October 2013, there were three significant online transfers from US Health to Perfect Care. (Schmidberger Supp. Aff. ¶ 18; PX 57)

> **Response :** US Health owed money to Perfect Care. Importantly, Fran is not alleged to have taken any money, but to have transferred money to Kevin's companies which was done to cover company obligations and Kevin's obligations.

### H.   Supplier-Related Harm

183.   Gluco wrote a check to Perfect Gluco in the amount of $37,500.00 to reduce the amounts due to Apex for purchase order 1658 in the amount of $155,897.50. There is no evidence that Perfect Gluco wired that money to the supplier, Apex. Indeed, though Freiman testified that DX I reflects every wire transfer she prepared *{see* Freiman Aff. ¶ 51), there is no wire transfer or transfers to Apex for purchase order 1658. (PX 35 at 6; PX 52; DX F; DX H; DX I, Freiman Tr. 462:23-466:2, 468:10-14; Schmidberger Aff ¶ 16) Perfect Gluco kept that money for itself.

**Response :** There is no evidence that Gluco kept that money to itself. As noted, this was most likely paid to a supplier called BT, in an amount that it typically sent to BT, and the entry improperly coded in Macola.

184.   Gluco wrote a check to Perfect Gluco in the amount of $59,100.00 to pay off the amounts due to Biotest for purchase orders 1635, 1645 and 1650 in the amount of $59,100.00. There is no evidence that Perfect Gluco wired that money to a supplier. Indeed,

though Freiman testified that DX I reflects every wire transfer that she prepared (Freiman Aff. ¶ 51), there is no wire transfer or transfers for purchase orders 1635, 1645 and 1650. (PX 35 at 4; PX 104 at 9; DX F, DX I, Freiman Tr. 469:23-471:14, 473:8-11) Perfect Gluco kept that money for itself.

**Response :** There is no evidence that Gluco kept that money to itself. All the evidence pointes to Fran using the funds to pay overseas suppliers. There was no testimony at all at the hearing regarding this alleged taking and Schmidberger, the individual who allegedly reviewed the books and records of the company, does not refer to this claim in his affidavit or testimony.

185.   Gluco remains liable to its suppliers, including Biotest, Sterilance, and Apex, on Gluco purchase orders. (Freiman Tr. 478:13-15; PX 17; PX 46; PX 47; PX 50) Freiman also has paid $74,825 to Biotest since Kevin Mernone died. Biotest has delivered product to Perfect Gluco. The product that was delivered was Gluco "committed" product. (Freiman Tr. 478:19-479:5) Freiman had difficulty recalling whether any of the Perfect Gluco payment of $74,825 reduced in any respect Gluco's financial obligations to pay Biotest. (Freiman Tr. 479:6-16)

**Response :**  Fran was not provided with relevant documents to review.

186.   Perfect Gluco continues to order products from the Gluco suppliers, including Biotest, Sterilance and Apex. Indeed, Perfect Gluco has payment agreements with suppliers. (PX 49; Freiman Tr. 499:22-500:9)

**Response :** This is a shameless and gross distorting of the testimony. The payment agreements with suppliers that Plaintiffs now appear to accept were for merchandise committed to prior to Kevin's death. There is no evidence of continued ordering and this statement is simply untrue but apparently made to further Plaintiff's self-serving narrative of events.

187.   Perfect Gluco has received products from Biotest since Kevin Mernone died. There is no evidence that the payments Perfect Gluco made to Biotest after Kevin Mernone died were used to offset the amounts owed to Biotest by Gluco. (Freiman Tr. 478:21-479:16)

**Response :** The transcript simply shows that Fran could not, offhand, recall what portion of the number went to offset amounts owed. It does not show that no portion was made to Biotest to offset amounts owed by Gluco.

188.   At Freiman's direction, after May 2013, US Health stopped paying the amounts due to its primary supplier Presto. (Schmidberger Supp. Aff. ¶ 18; PX 57; Ramnauth Tr. 278:22 279:11, 280:9-281:1)   Presto obtained a default judgment in the amount of $346,597.34 (plus interest) against US Health. (PX 21) Mrs. Mernone had no knowledge of the lawsuit before the default judgment was entered. (J. Mernone Tr. 426:2-13)

**Response :** Mrs. Mernone changed the address for US Health. She received notices. Fran attempted to give her documents, she refused to accept them. Glenn would have been in charge of providing the notices along with other documents provided to Mrs. Mernone.

## I.   **Customer-Related Harm**

189.   Freiman continues to solicit customers of Gluco and US Health, claiming that they are her customers and not customers of the various businesses. (Freiman Aff. ¶¶ 79-81; Freiman Tr. 513:20-22, 514:17-23)

**Response :** This is another gross misrepresentation of the transcripts. There is no mention of any activity after the TRO (Frieman Tr. 513 – 14) or any contact after the TRO. Fran is articulating her position that the customers should be hers as she is under no non-compete or non-disclosure agreements.  Again, the Plaintiffs

resort to the lowbrow tactics in an attempt to prove a case that simply is not present.

190.   The Gluco Companies and Perfect Care cultivated their customers at their own expense and assisted Freiman and the other sales representatives in nurturing those relationship throughout their respective tenures at the companies. (Freiman Tr. 514:17-20; PX 105) As Freiman acknowledged in an affidavit she submitted on behalf of Perfect Care and Gluco, the companies have a "legitimate interest in protecting its client base to the extent of the types of products sold to its clients." (PX 105 at 7, 8)

**Response :** This is, again, another gross misrepresentation of the transcripts. Fran actually told the court in response to the court's questioning, that she brought her own customers to Perfect Care, that she attended trade shows at her own expense. Aside from Ari Landau, there were no signed employment agreements. Fran could service her customers wherever she wanted. Fran was advised by counsel to drop the lawsuit against Landau even though there were signed agreements in that case. The statement was proven untrue. Kevin did not require a non-compete from Fran, even though he insisted on having one with Landau.

191.   Perfect Care and Gluco invested heavily in terms of salary, commission, time and other resources in Freiman's cultivation of relationships with clients. (Freiman Tr. 512:24, 518:4-5, 10-13, 16-17,528:16)

**Response :** And again, this is another gross misrepresentation of the transcripts which say nothing of the sort. "Other resources" is a fabrication. Plaintiffs simply have no grounds to stand on and are making things up.

192.   Freiman is not seeking to be paid by Ultra, a current customers of Perfect Care Solutions, for debts that it incurred while it was a customer of Perfect Care. (PX 94)

**Response :**  There is no evidence of any sort to back up this statement. Ultra is not a current customer of Perfect Care.

193.  Perfect Gluco has taken funds that customers have paid for invoices originating from Gluco and US Health. (PX 45) It is impossible to know whether those funds have been deposited by Perfect Gluco given the information produced to date. Gluco, US Health and Perfect Care are not in possession of the checks or funds. (Schmidberger Tr. 52:24-55:5; Schmidberger Aff. ¶ 3; PX 45; PX 108; PX 14; PX 40)

**Response :**  Plaintiff subpoenaed all bank records. In fact, the check scans turned over to Plaintiffs are for multiple months of checks showing that these checks are still not deposited. At the hearing, counsel was made aware that some check are in Plaintiffs' office and some have not yet been opened. There is no way of knowing how many checks for Perfect Gluco are in Gluco Perfect's possession, which is why we have discovery.

194 Freiman also directed that Gluco customer checks not be deposited and US Health customer checks not be deposited. (Samad Aff. ¶ 8; Samad Tr. 344:18-21, 345:4-9; Freiman Tr. 483:21-484:2; PX 32; PX 33)

**Response :**  As noted above, this testimony is proven false by Plaintiffs records, exhibit R and Exhibit S that show deposits after Kevin entered the hospital. Glenn directed that checks should not be deposited as he wanted to set up an escrow account for the check to cover the debt to Perfect Care. In early November there was no longer a Gluco bank account to deposit checks as Joy had closed the Gluco bank account.

J.   Stolen Inventory

195.  After Kevin Mernone died, and without requesting permission from anyone,

Perfect Gluco took $324,000.00 of inventory from the Richmond Hill warehouse and moved it to a temporary warehouse, that Freiman had rented for two weeks. (Freiman Tr. 496:8-13, 498:2-15) Freiman did not clear the payable obligations from Gluco's or US Health's books and records that corresponded to the stolen inventory. (PX 50; Schmidberger Supp. Aff. ¶ 9) Instead, to conceal her theft of the inventory, Freiman put a bogus payable obligation on the accounts payable report for Perfect Gluco. (PX 49) By her own admission, she only has paid $20,000.00 against the Gluco payable obligation since she took the $324,000.00 in inventory from Richmond Hill. (Freiman Tr. 499:22-500:3) The $20,000.00 Perfect Gluco payment was to Sterilance, Gluco's sole supplier of branded lancets, which has not shipped product to Perfect Gluco since Kevin Mernone died. (Freiman Tr. 501:20-22; Schmidberger Aff. ¶¶ 4-5) Apex, Gluco's sole supplier of Perfect 2 test strips and meters, also has not shipped product to Perfect Gluco since Kevin Mernone's death. (Freiman Tr. 501:17-19; Schmidberger Supp. Aff. ¶¶ 4, 6)

> **Response :** The sequence within ¶190 does not make sense when broken down. Fran could not clear payable obligations since that is subject to third parties approval. The only thing she could do was record the amount taken and make arrangements to make payments, which she did. There is nothing "bogus" about leaving a trail for the merchandise taken, it is basic record keeping (of course, we note the irony here of Plaintiffs trying to make its case based on both proper record keeping (as here) and an absence of record keeping (elsewhere)). The fact that Fran made a payment shows her intention to pay back suppliers. She also refused to take more goods than were committed to. Due to the payment terms of customers of Perfect Gluco, funds were only received after the TRO, funds which could have been used to pay suppliers had plaintiffs not claimed a "bogus" theft of millions of dollars.

196.    Because Freiman contested the removal of certain inventory from the Valley Stream warehouse during the inspection on March 27, 2014, inventory belonging to the companies was left behind. (Schmidberger Aff. ¶ 23) For example, substantial amounts of underpad inventory never returned to the Richmond Hill Facility. (Torres Aff. ¶ 18) As well, two weeks elapsed between the date of the wrongful taking of the inventory and its partial return to the Richmond Hill Facility.

**Response :** There is  no evidence that the underpad inventory was requested by, or that it belonged to, Plaintiffs. Glenn, the 50% owner of perfect testified that he was aware of and did not disapprove of the transfers. There was no wrongful taking as this was approved by Glenn.

K.    <u>Misappropriated Confidential Information</u>

197.    The Gluco Companies and Perfect Care possess valuable and confidential information and trade secrets, including pricing information, sales reports, marketing strategies and technical information about current and proposed products. (PX 105 at 6-7) Freiman had access to and at all times helped develop some of this sensitive and confidential information. (Freiman Tr. 524:23-525:6)

**Response :** This is another gross misrepresentation of the transcripts. Fran actually told the court in response to the court's questioning, that she brought her own customers to Perfect Care and that she attended trade shows at her own expense. Aside from Ari Landau, there were no signed non-compete agreements. Fran could service her customers wherever she wanted. Fran was advised by counsel to drop the lawsuit against Landau, even though there were signed agreements in that case. The statement in PX 105 was proven untrue. Kevin did

not require a non-compete agreement with Fran even though he insisted on having one with Landau.

198.    Sales representatives signed documents acknowledging the existence of this confidential information and trade secrets. Fran was a sales representative and, further, managed the sales representatives. (PX 105 at 24)

    **Response :** But only if this were true! Fran signed no such document. In any event, see Response to ¶ 197.

199.    While Freiman had a supervisory role over the sales representatives, she aggressively enforced non-solicitation provisions and provisions protecting the confidentiality of the Perfect Care and Gluco information and trade secrets. (PX 105) She retreats from this aggressive stance only now that she is the one violating such provisions and is attempting to improperly use such information and trade secrets.

    **Response:** More wishful thinking from the Plaintiffs! There is no evidence of Fran violating any "provisions" and improperly using trade secrets. In any event, see Response to ¶ 197.

**L.**    **Freiman's Failure to Pay Taxes**

200.    Freiman failed to file US Health's third quarter 2013 Quarterly Combined Withholding, Wage Reporting and Unemployment Insurance Return with the New York Department of Taxation and Finance. (PX 26; J. Mernone Aff. ¶ 66)

    **Response :** There was no bank account as Joy had closed the accounts, and Fran has no authority to operate the companies and pay the expense.

**201.**    Freiman also failed to file tax returns in New Jersey, which has issued a notice of delinquency to Gluco for the period ending December 2013. (PX 27; J. Mernone Aff. ¶ 67)

    **Response :** There was no bank account as Joy had closed the accounts, and Fran had no

authority to operate the companies.

Plaintiff have failed to address any hardship, or reason why Ms Freiman should be enjoined from working in the industry. The claims for injunctive relief all appear to be based in trademark. Although Defendants believe the burden of proof has not been met by Plaintiffs in light of testimony regarding the authority to set up and operate Gluco Perfect, Plaintiff contention seemingly direct the court not to allow continued use the Gluco Perfect and USHH names, not to restrain the companies from operating under a new name that will not be confusing with Plaintiffs name, and certainly does not ask this court to restrain Mr. Freiman from earning a livelihood in this industry where she has spend most of her career. There is no support for restraining bank accounts and IRA accounts.  Changing the company name and clearly stating a lack of affiliation between the parties will address all of Plaintiffs alleged harms. Plaintiffs falsely claim that Defendants have somehow "indicated an intent to move forward and unlawfully compete". This statement is unsupported and false. There is no need to Perfect Gluco and USHH to unlawfully compete in any way, and no evidence of this statement was presented at hearing. Perfect Care solutions is similarly a separate entity with no confusion concerns, that operates in the distinct home delivery market and is owned 50% by Glenn Mernone who helped choose the company name. Plaintiffs have not showed any admissible evidence of intent to mislead the public. There was no legal or factual foundation for the statement that Kevin Mernone "groomed" Ms. Freiman, or that there are confidential secrets that belong to the company and are known to Ms. Freiman. It appears the company that previously allowed a sales representative (Landau) with a signed non-compete agreement to move on, is now trying to prevent Ms. Freiman from moving on even though it is uncontested that there is no non-compete agreement in place.

The factual content in the "Conclusion of law" section of plaintiff submission, is either unsupported by the plaintiffs "Proposed Conclusions of Fact" or has been addressed above.

Unsupported allegations and Hearsay testimony appear in the affidavits of all witnesses including; (ii) Joy Mernone unsupported allegations in affidavit ¶¶18, 29, 30, 35, 40, 48, 52 and hearsay at ¶48, hearsay exhibits include at least 4, 12 through 20, 22 through 28, 34, 34 (ii) John Schmidberger hearsay at ¶15, and Exhibit 41, the supplemental affidavit of John Schmidberger hearsay at ¶¶2,3,4,9,12,26,27 and exhibit 54 (iii) Bibi Samad hearsay at ¶¶3,5,8, 9 through 14, 18 through 21, and hearsay exhibits 64, 65 (iv) Cliff Bravo affidavit hearsay at ¶¶4,8,10,12 (v) Alex Rodriguez affidavit hearsay at ¶¶4 through 11, 14 through 16 (vi) Torres affidavit hearsay at ¶¶ 6 through 8, 10, 12 through 16.

Defendants ask that this Honorable Court not be swayed by all newly discovery "questions" and allow the case to continue to progress without the drastic preliminary relief requested by Plaintiffs.

Accordingly, Defendants Freiman, Gillen, Perfect Gluco and USHH respectfully request the TRO not be converted into preliminary injunction and that the bond is used to compensate Defendants as justice requires.

Respectfully submitted,

Dated:  New York, NY
        August 15, 2014

By: /s/Michael Steinmetz

Michael M. Steinmetz Esq.
Garson, Segal, Steinmetz, Fladgate LLP
164 West 25th St. 11R
New York, NY 10001
(P) 212-380-3623
(F) 347-537-4540