UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------X

GLUCO PERFECT, LLC, U.S. HEALTH & HOME
CARE, INC., JOY MERNONE, *individually
and in her capacity as Executor of the
Estate of Kevin R. Mernone and
derivatively on behalf of Perfect
Care, Inc.*, and PERFECT CARE, INC.,

**MEMORANDUM & ORDER**
14-CV-1678 (KAM)(RER)

               Plaintiffs,

   -against-

PERFECT GLUCO PRODUCTS, INC., USHH
PRODUCTS, INC., FRANCINE FREIMAN,
WILLIAM J. GILLEN, GLENN MERNONE, and
PERFECT CARE SOLUTIONS, INC.,

               Defendants.

------------------------------------X

**MATSUMOTO, United States District Judge:**

     Based on the submissions of the parties and the
affidavits, evidence and testimony presented during a hearing
held on July 24 and 25, 2014, and pursuant to Federal Rule of
Civil Procedure 65, the court sets forth herein its Findings of
Fact and Conclusions of Law as follows and enters a preliminary
injunction against defendants PERFECT GLUCO PRODUCTS, INC., USHH
PRODUCTS, INC., FRANCINE FREIMAN, WILLIAM J. GILLEN, and PERFECT
CARE SOLUTIONS, INC.

### BACKGROUND

     On March 13, 2013, plaintiffs Gluco Perfect, LLC
("Gluco"), U.S. Health & Home Care, Inc. ("U.S. Health"), Joy

Mernone, individually and in her capacity as Executor of the
Estate of Kevin R. Mernone and derivatively on behalf of Perfect
Care, Inc., and Perfect Care, Inc. filed this suit and moved *ex
parte* for entry of a temporary restraining order ("TRO") against
defendants Perfect Gluco Products, Inc. ("Perfect Gluco"), USHH
Products, Inc. ("USHH"), Francine Freiman, William Gillen
(collectively, the "Freiman defendants"), and Andre Ramnauth.
(ECF No. 1.)  The plaintiffs established good cause as to why
notice should not be required.  On the same day, the court
entered a TRO and an order to show cause ("OTSC") as to why a
preliminary injunction should not be granted, and set an order
to show cause hearing for March 18, 2014.  (ECF No. 4.)  The
court held telephonic conferences with the parties on March 14
and March 17 regarding the details of and defendants' compliance
with the TRO and OTSC.  The parties and Glenn Mernone appeared
for the hearing on March 18.  Following the hearing, at
approximately 6:05 p.m. on March 18, the court extended the TRO.
(ECF No. 25.)  On March 21, 2014, plaintiff Gluco posted a
$50,000 bond in compliance with Federal Rule of Civil Procedure
65(c).  Glenn Mernone, who was then a self-described "interested
party," appeared through counsel for all of the above
conferences and was served with a copy of the OTSC and TRO.

(*See* G. Mernone Ltr. dated Mar. 14, 2014, at 2 n.1 (indicating that Mr. Mernone was served with the OTSC on March 14, 2014).)

At the request of the parties, the TRO was continued and a preliminary injunction hearing was initially scheduled for April 10, 2014, but, due to a change in the Freiman defendants' counsel and certain discovery disputes, the parties requested that the hearing date be adjourned to June 20, 2014. (*See* Minute Entry dated March 25, 2014; Order dated Apr. 15, 2014.) The parties consented to the continuation of the TRO until after the rescheduled hearing date. (*Id.*)

The parties jointly requested a further adjournment of the preliminary injunction hearing date on June 17, 2014 and again consented to the continuation of the TRO until the hearing date. (*See* Joint Ltr. dated June 17, 2014, ECF No. 58; Gluco Perfect Ltr. dated June 19, 2014.) The court scheduled the hearing for July 24, 2014. (Order dated June 19, 2014.) The parties subsequently consented to the TRO's extension until the court reached a decision on the merits of plaintiffs' motion for a preliminary injunction. (*See* Tr. 4.)[1]

On June 6, 2014, prior to the preliminary injunction hearing but after the entry of the TRO, plaintiffs filed an Amended Complaint, adding Glenn Mernone and Perfect Care

---

[1] "Tr." refers to the transcript of the preliminary injunction hearing, held on July 24 and July 25, 2014.

Solutions, Inc. ("Perfect Care Solutions") as defendants. (Am. Compl., ECF No. 53.) The extended TRO issue on March 18, 2014 included restraints against the Freiman defendants using or infringing plaintiffs' trademarks or trade names or any other similar names or marks and was thus applicable to Perfect Care Solutions. (TRO ¶ 7.)

A preliminary injunction hearing was held on July 24 and July 25, 2014. The parties presented direct testimony by affidavit and engaged in cross-examination in the courtroom. Plaintiffs presented the following witnesses: Joy Mernone, John Schmidberger, Bibi Samad, Cliff Bravo, Alex Rodriguez, and Jose Torres. The Freiman defendants presented the testimony of Ms. Freiman. Then-defendant Ramnauth also offered his own testimony. Glenn Mernone also appeared and testified pursuant to a subpoena issued by plaintiffs, although he did not submit an affidavit.

Following the hearing, plaintiffs dismissed Ramnauth as a defendant. (Stipulation of Dismissal, ECF No. 73.) The parties also submitted post-hearing briefing. (*See* Freiman Defs. Proposed Findings of Fact, ECF No. 76; Pls. Proposed Findings of Fact, ECF No. 77; G. Mernone Proposed Findings of Fact, ECF No. 78; Freiman Defs. Opp. to Pls. Submission, ECF No. 79; Pls. Opp. to G. Mernone Submission, ECF No. 80; Pls. Opp. to

Freiman Defs. Submission, ECF No. 81; G. Mernone Reply, ECF No.
82; Pls. Reply, ECF No. 84; G. Mernone Sur-Reply, ECF No. 85.)

## FINDINGS OF FACT

The court makes the following findings of fact based
on the parties' submissions and testimony and evidence presented
at the preliminary injunction hearing.  In hearing evidence on a
motion for preliminary injunction, the "ordinary rules of
evidence do not apply."  *Sunham Home Fashions, LLC v. Pem-Am.,
Inc.*, No. 02-CV-6284, 2002 WL 31834477, at *9 (S.D.N.Y. Dec. 17,
2002); *see also Zeneca Inc. v. Eli Lilly & Co.*, No. 99-CV-1452,
1999 WL 509471, at *4 (S.D.N.Y. 19, 2009) (same).  Specifically,
hearsay evidence may be considered on a motion for a preliminary
injunction.  *Mullings v. City of New York*, 626 F.3d 47, 52 (2d
Cir. 2010) (holding, as a matter of first impression, that trial
courts may consider hearsay in evaluating a motion for a
preliminary injunction).  Nonetheless, during a preliminary
injunction hearing, the court may consider whether evidence is
hearsay in order to determine the weight it should be given.
*See id.* ("The admissibility of hearsay under the Federal Rule of
Evidence goes to weight, not preclusion, at the preliminary
injunction stage."); *Zeneca*, 1999 WL 509471, at *2 ("The Court
has . . . applied the Federal Rules of Evidence in determining
the weight to be accorded the evidence that was introduced [at

5

the preliminary injunction hearing].") Moreover, this court has considered whether the exclusion at trial of inadmissible hearsay evidence will affect plaintiffs' likelihood of success on the merits.

The court will first discuss its findings of fact regarding the individuals and corporate entities relevant to this action, as well as the structure and operation of those entities' operations prior to Kevin Mernone's death. Then, the court will set forth chronologically its findings regarding the actions of the defendants, prior to, at the time of, and subsequent to Kevin Mernone's death, including after the entry of the TRO in this case.

## I.  The Corporate Entities

### a. Gluco Perfect LLC and U.S. Health & Home Care, Inc. ("the plaintiff companies" or "plaintiff entities")

1.      On March 17 2005, Kevin Mernone, now deceased, formed New York limited liability company U.S. Health & Home Care, Inc. ("U.S. Health"). (Mar. 12, 2014 Affidavit of Joy Mernone ("J. Mernone Aff.") ¶ 2; Pls. Ex. 3.)[2] Kevin Mernone was U.S. Health's sole shareholder and its president and director. (*Id.*) Since Kevin Mernone died on October 16, 2013 of conditions related to chronic alcohol abuse, Joy Mernone became the 100% owner of U.S. Health, and Gluco Perfect. (Pls. Ex. 31;

---

[2] "Pls. Ex." refers to exhibits entered into evidence by plaintiffs.

J. Mernone Tr. 427-28; J. Mernone Aff. ¶¶ 21-24.)[3]  U.S. Health

is headquartered and operates at 89-27 126th Street, Richmond

Hill, New York ("the Richmond Hill facility" or "Richmond

Hill").  (J. Mernone Aff. ¶ 17.)  U.S. Health sells incontinence

products within the United States and internationally, to

various customers, including nursing homes.  (*Id.* ¶¶ 13, 16.)

2.      U.S. Health has used the trade name "U.S. Health

& Home Care" since its formation, and has spent time and money

marketing and protecting its trade name.  (*Id.* ¶ 14.)

3.      Defendant Francine Freiman ("Ms. Freiman") was a

salaried employee of U.S. Health and managed the day-to-day

operations of the company, prior to Kevin Mernone's death.

(July 17, 2014 Affidavit of Francine Freiman ("Freiman Aff.")

¶ 22; Glenn Mernone ("G. Mernone") Tr. 132.)  Ms. Freiman

receive a salary, as well as commissions, from U.S. Health, but

did not have an employment contract with U.S. Health.  (Freiman

Tr. 518.)

4.      On January 2, 2006, Kevin Mernone formed a second

New York limited liability company, Gluco Perfect LLC ("Gluco")

and was its sole owner.  (J. Mernone Aff. ¶ 1; Pls. Ex. 1.)

Like U.S. Health, Gluco is headquartered and operates at the

---

[3] Although Kevin and Joy Mernone were involved in divorce proceedings, the divorce was not finalized at the time of Mr. Mernone's death on October 16, 2013.  (J. Mernone Aff. ¶¶ 22, 24.)

Richmond Hill facility.  (J. Mernone Aff. ¶ 17.)  Gluco sells
diabetic products and blood glucose monitoring products.  (Pls.
Ex. 105 ¶ 6.)

      5.     Gluco Perfect has three trademarks for "medical
diagnostic test strips for the use in the field of glucose level
monitoring" and other products that are registered with the
United States Patent and Trademark Office, all of which remain
valid: on January 17, 2006, it registered "Gluco Perfect;" on
August 20, 2013, it registered "Perfect;" and on January 24,
2007, it registered "Perfect 2."  (J. Mernone Aff. ¶¶ 7-9; Pl.
Exs. 5-7.)  Gluco orders its products from suppliers and sells
its products bearing its trademarks and trade name on the
products and packaging.  (J. Mernone Aff. ¶ 10.)  Gluco also
registered and maintains an internet domain name,
www.glucoperfect.com.  (J. Mernone Aff.
¶ 11; Pls. Ex. 8.)  Gluco has been using its trade name since
its formation and has spent time and money protecting and
maintaining its trade name.  (J. Mernone Aff. ¶¶ 6, 14.)  Its
products are also sold nationally and internationally and are
available through online retailers, such as Amazon and Walmart,
and the company is identifiable to suppliers, customers and the
public by its trademarked products.  (*Id.* ¶¶ 11, 12, 15.)  Since

Kevin Mernone's death, Joy Mernone became the sole owner of Gluco. (*Id.* ¶ 1; Pls. Exs. 2, 4.)

6.      Defendant Freiman was an independent salesperson for Gluco, receiving a commission on sales from the company, and ran the company's day-to-day operations prior to Kevin Mernone's death. (Freiman Aff. ¶ 22; Freiman Tr. 324; G. Mernone Tr. 132.) Ms. Freiman also became Vice-President of Gluco Perfect at some point during her tenure at the company. (Freiman Aff. ¶ 24; J. Mernone Aff. ¶ 20.) She did not have an employment contract with Gluco or U.S. Health.

**b. Perfect Care, Inc.**

7.      Perfect Care, Inc. ("Perfect Care") is a corporation inherited and purchased by Kevin and defendant Glenn Mernone, Kevin's brother, from their father. Prior to his death, Kevin Mernone owned 50% of the company, and Glenn Mernone owned 50%. (Freiman Aff. ¶ 6; G. Mernone Tr. 100; Deposition of Kevin Mernone ("Kevin Mernone Dep.") at 20, annexed as Ex. 2 to Freiman Aff. in Opp'n to OTSC (ECF No. 17).) Joy Mernone is now 50% owner of Perfect Care with Glenn Mernone.[4] (J. Mernone Aff. ¶ 4; *see also* Pls. Ex. 4.)

---

[4] Although formerly jointly owned by Glenn and Kevin Mernone, one month after Kevin's death, Perfect Care commenced a state court action in November of 2013 against Gluco for the alleged breach of an oral agreement between the two entities. (G. Mernone Tr. 174.) There is no evidence in the record that Perfect Care authorized the retention of counsel and commencement of the state court action.

8.     Like Gluco and U.S. Health, Perfect Care is located at the Richmond Hill facility, and it is in the business of selling incontinence and personal care products. (J. Mernone Aff. ¶ 17; Pls. Ex. 105 ¶ 5.)

9.     Defendant Freiman joined Perfect Care in 1997 and managed the day-to-day operations of the company but was not subject to an employment contract. (*See* J. Mernone Aff. ¶ 20.)

10.     Since 2007, Glenn Mernone's primary role at the company has been to manage its information technology operations, although he also signs Perfect Care checks for both payroll and accounts receivable. (G. Mernone Tr. 117, 202.)

### a. Perfect Gluco and USHH ("the Freiman companies")

11.     In October of 2012, Ms. Freiman formed two companies with virtually identical and business operations names as the plaintiff companies. On October 10, 2012, Perfect Gluco Products, LLC ("Perfect Gluco") was formed, and, on October 17, 2012, USHH Products, Inc. ("USHH") was formed (hereinafter, Perfect Gluco and USHH will be referred to, collectively, as the "the Freiman companies").[5] (Pl. Exs. 10-11.)

---

[5] Ms. Freiman has testified that she formed Perfect Gluco and USHH at Kevin Mernone's direction. (*See* Freiman Aff. ¶¶ 17-18.) She has presented no corroborating evidence to support this claim other than her own statements about what the now-deceased Kevin Mernone's purportedly authorized. Plaintiffs assert Ms. Freiman's testimony about her conversations with the deceased Kevin Mernone should not be considered because it is inadmissible hearsay. (*See* Pls. Proposed Findings of Fact 55-56.) Plaintiffs argue in particular that, in addition to not being covered by any hearsay exception,

12.     Ms. Freiman is the 100% owner of both companies and operated the companies out of the same Richmond Hill facility as the plaintiff companies, until the TRO was issued. (Freiman Aff. ¶¶ 5, 17; J. Mernone Aff. ¶¶ 30-33; *see also* June 17, 2014 Affidavit of Bibi Samad ("Samad Aff.") ¶¶ 4-5; Pls. Exs. 13-14; July 16, 2014 Supplemental Affidavit of John Schmidberger ("Schmidberger Supp. Aff.") ¶ 2; Andre Ramnauth ("Ramnauth") Tr. 275.)

13.     Ms. Freiman's husband, William Gillen, a defendant in this case, is a registered agent for Perfect Gluco. (Pls. Ex. 10.)

**a. Perfect Care Solutions, Inc.**

14.     In November of 2013, Ms. Freiman formed a third company, again with a virtually identical name as a plaintiff company, Perfect Care Solutions, Inc. ("Perfect Care Solutions"), a New York corporation.  (G. Mernone Tr. 169, 190.) Perfect Care Solutions is owned 50% by Glenn Mernone and 50% by Freiman.  (Freiman Aff. ¶ 84; G. Mernone Tr. 169.)  Although Freiman and Glenn Mernone discussed forming a company together

---

the testimony at issue would be barred at trial by New York Civil Practice Law and Rules § 4519, also known as the Dead Man's Statute.  (*Id.*)  The court cannot find authority for the proposition that such testimony must be stricken from the record on a motion for a preliminary injunction; however, the court gives such testimony no weight because this testimony would be inadmissible at trial, and consequently does not diminish the likelihood of plaintiffs' success at trial on the merits.

and possible names for it, Mr. Mernone was not aware that the company had been formed or what his interest was until after the fact. (G. Mernone Tr. 169-70, 242-43.) Glenn Mernone never saw the corporate documents of Perfect Care Solutions, or any of its books or records. (*Id.* at 169-70, 242, 262.) Perfect Care Solutions also operated out of the Richmond Hill facility and engaged in home deliveries of and sold the same products as Perfect Care. (*Id.* at 262, 264-66; *see also* Freiman Aff. ¶ 84.)

15.     There is no credible admissible evidence in the record that the plaintiff entities authorized Ms. Freiman to form and use names similar to the plaintiff entities, to use their trademarks or trade names, or to use the Richmond Hill facilities to operate competing businesses.

### a. General Operations at the Richmond Hill Facility

Based on evidence presented at the hearing about the general business practices of all of the companies at issue in this case at the Richmond Hill facility and elsewhere, the court finds the following.

### i. Computer and I.T. Practices

16.     The plaintiff companies at Richmond Hill did not use a company email. Instead employees used their personal emails to conduct business of the companies. (G. Mernone Tr. 184-85.)

17.     The computer accounting system used at Richmond
Hill is called "Macola." (Schmidberger Tr. 44; G. Mernone Tr.
187.)  Each company at the Richmond Hill facility had a separate
directory in Macola.  (G. Mernone Tr. 192.)

18.     When Glenn Mernone created directories for the
Freiman companies in October or November of 2012, Glenn Mernone
initially copied the directories for Gluco and U.S. Health
without deleting or purging data, and the copied directories
were later renamed Perfect Gluco and USHH, respectively.  (*Id.*
at 188; Pls. Ex. 112; *see also* Samad Aff. ¶¶ 4-6.)

19.     Glenn Mernone testified that, in light of the
Macola system's age, it was not very secure.  (G. Mernone Tr.
193.)  Multiple employees shared Ms. Freiman's Macola password.
(*Id.* at 201.)  Specifically, it would be possible for anyone
with access to Macola (whether in the facility or remotely) to
delete information from it.  (*Id.* at 193-95.)  Mr. Mernone
acknowledged, however, that remote deletion of data would be
"very complicated."  (*Id.* at 252-53.)

20.     In addition, the Macola system allowed the
backdating of checks without a record.  (Ramnauth Tr. 277;
Schmidberger Supp. Aff. ¶ 12; G. Mernone Tr. 128-131, 155; Pls.
Exs. 52, 58, at 225.)  Once a check is printed, Macola reflects

13

a payment even if the check is not sent out and cashed. (Ramnauth Tr. 281, 320-21; Schmidberger Aff. ¶ 19.)

21.     Although Macola could be used to track inventory, the inventory record on the computer system is inaccurate. (Schmidberger Tr. 44.)  Prior to Joy Mernone's inspection of the Richmond Hill warehouse in the spring of 2014, a physical check of the inventory at that warehouse had not been performed since approximately 2000.  (Ramnauth Tr. 284-85; *see also* Torres Aff. ¶ 6.)  The 2014 inspection of the Richmond Hill warehouse, after Ms. Mernone gained court-ordered access, revealed that the Macola records and physical inventory did not match.  (Ramnauth Tr. 285-86.)

22.     The evidence demonstrated that the companies' general ledger was subject to manipulation.  The ledger was not closed on a monthly basis.  (Ramnauth Tr. 277-78; *see also* Schmidberger Supp. Aff. ¶ 16.)  As a result, Mr. Ramnauth, at Ms. Freiman's direction, was able to change the classification of what had been loans to Perfect Care from U.S. Health and Perfect Gluco to accounts receivable.  (Ramnauth Tr. 306-07.)

23.     The extent of electronic evidence that could have been evaluated in this case has been limited because no controls were put in place in order to preserve electronic information. (G. Mernone Tr. 173-74.)

### i. Check-Writing Practices

24.     It is difficult to track the checks issued by the plaintiff entities for several reasons.  First, the Macola accounting system at Richmond Hill permits checks to be backdated, and it is impossible to determine whether or not backdating has in fact occurred.  (Ramnauth Tr. 277; Schmidberger Supp. Aff. ¶ 12.)  Second, while the Macola system registered that payments had been made as soon as a check was printed, checks were often printed and signed but not sent out at Ms. Freiman's direction.  (Ramnauth Tr. 279-80; Schmidberger Supp. Aff. ¶ 19.)  For example, seven checks totaling $264,653.50 from U.S. Health, payable to a supplier called Presto Absorbent Products, were signed but not sent to Presto.  Presto sued U.S. Health for payment and obtained a default judgment against the company.  (Pls. Ex. 21; *see also* Ramnauth Tr. 279; Schmidberger Supp. Aff. ¶ 19; Pls. Ex. 60.)

25.     Kevin Mernone was the sole signatory on Gluco Perfect's account.  (J. Mernone Aff. ¶ 36.)

26.     Beginning in October of 2012, shortly after she formed Perfect Gluco and USHH, Ms. Freiman began signing Kevin Mernone's name to Gluco checks, including a total of 72 Gluco checks totaling $2,560,180.79, between October 2012 and October 2013, made payable to, and deposited into an account held by

Perfect Gluco. (*Id.* ¶¶ 36-38; Pls. Ex. 35; Freiman Tr. 462.) Although Ms. Freiman avers that Mr. Mernone authorized her to sign these checks (Freiman Aff. ¶¶ 41, 43.), she has presented no evidence to indicate that this was the case, and, therefore, the court does not credit her assertion.

### i. Wiring of Funds Through the Freiman Companies

27.     Beginning in the last quarter of 2012, Ms. Freiman began wiring money from the Perfect Gluco bank account to Gluco suppliers located abroad. (Freiman Tr. 458; Ramnauth Tr. 297; *see also* Freiman Defs. Ex. F.) Ms. Freiman wired money from Perfect Gluco to the suppliers, and arranged for checks from Gluco to reimburse Perfect Gluco. (Freiman Aff. ¶¶ 48-50.) Ms. Freiman told Mr. Ramnauth that she was sending the wire on Kevin Mernone's behalf because Mr. Mernone was "too busy." (Ramnauth Tr. 297.)

28.     Mr. Schmidberger was unable to verify the validity of the wire transfers because few supplier invoices corresponding to Gluco's purchase orders were kept at the Richmond Hill facility. (Schmidberger Aff. ¶ 13.)

29.     The Freiman companies received at least two checks from the plaintiff entities, purportedly in order to pay suppliers, but did not forward those checks to suppliers. First, Gluco wrote Perfect Gluco a $37,500 check to pay a Gluco

16

supplier, Apex, but there is no evidence that the amount was
paid to Apex.  (*See* Freiman Tr. 462-66, 468; Schmidberger Aff.
¶ 16; *see also* Pls. Ex. 35, at 6; Freiman Defs. Ex. F.)  Second,
Gluco wrote Perfect Gluco a $59,100 check to pay another
supplier, Biotest, but there is also no record of these funds
being paid to Biotest.  (*Compare* Pls. Ex. 35, at 4 *with* Freiman
Defs. Ex. I.)

### i. Loans Between the Companies

30.     Ms. Freiman testified that, after Perfect Gluco
was formed by Ms. Freiman in October 2012, Perfect Gluco began
loaning Perfect Care funds.  (Ramnauth Tr. 305-07.)

31.     No written loan agreements, corporate
authorizations, or other documentation underlying the loans were
presented at the hearing.  (Schmidberger Tr. 37-38).  Instead,
Ms. Freiman made these loans to Perfect Care on her own
initiative.  (G. Mernone Tr. 232; Ramnauth Tr. 335.)  The court
places negligible weight on Ms. Freiman's testimony that her
newly created Perfect Gluco company loaned funds to the
plaintiff entities which had long been in operation.

32.     Glenn Mernone investigated the loans made by
Perfect Gluco to Perfect Care in 2013 and found that they had
all been paid back; however, the status of loans from other time
periods is unclear.  (G. Mernone Tr. 229.)

### i. Personal Expenses

33.     Perfect Care employees at times billed personal expenses to the company and later reimbursed Perfect Care. (*See, e.g.*, Ramnauth Tr. 78-79.)

34.     Ms. Freiman also engaged in this practice by using Perfect Care credit cards.  She labeled all expenses as "sales promotion" and testified that she paid back personal expenses at her discretion, but provided no evidence of a check, cash receipt or payroll deduction supporting the repayment. (*Id.* at 331, 333.)  Thus, the court does not credit Ms. Freiman's testimony that she repaid personal charges on the Perfect Care credit cards.

35.     Kevin and Glenn Mernone similarly expensed personal items without providing receipts and reimbursed Perfect Care as they deemed appropriate.  (*Id.* at 336-37.)

## II.  October 8- October 16, 2013: Kevin Mernone's Hospitalization and Death

36.     On October 8, 2013, Kevin Mernone was admitted unconscious to the hospital.  (G. Mernone Tr. 112.)  On October 16, 2013, he passed away from cardiopulmonary arrest, acute and chronic liver disease and an extended period of alcohol abuse.[6]

---

[6] Plaintiffs assert that Ms. Freiman facilitated Mr. Mernone's excessive alcohol consumption.  (Pls. Proposed Findings of Fact ¶ 102; *see also* Am. Compl. ¶ 62.)  The court finds, however, that there is no evidence in the record to support this contention.

(J. Mernone Tr. 427; Pls. Ex. 31.)  During his entire
hospitalization, Mr. Mernone was unconscious and on life
support. (G. Mernone Tr. 112.)

37.    During the time of Kevin Mernone's
hospitalization, Freiman and Glenn Mernone took a number of
actions affecting the operations of both the plaintiff entities
and the Freiman companies.  These actions are recounted in
chronological order.

38.    On October 7, 2013, the day before Kevin Mernone
was admitted to the hospital, twenty-one Gluco Perfect checks
were printed, as compared to thirty-two checks printed in the
entire month before.  (Schmidberger Supp. Aff. ¶ 12; *see also*
Pls. Ex. 52.)

39.    Although Glenn Mernone did not have authorization
to sign Gluco checks until he was appointed as Kevin Mernone's
temporary guardian on October 11, he signed one of the October 7
checks.  (*Id.*; G. Mernone Tr. 130.)  Glenn Mernone testified
that it was likely that the check was not signed on the day it
was dated and that he believed that Ms. Freiman had asked him to
sign the check sometime between October 11 and October 23, 2013,
when the check was processed by the bank.  (G. Mernone Tr. 130-
31; *see also* Pls. Ex. 52.)

40.     There is also contradictory testimony in the record about whether or not customer checks made out to Gluco and U.S. Health were held, rather than deposited, at Freiman's direction during the time Kevin Mernone was in the hospital. Bibi Samad, an employee of Perfect Care, testified that both Freiman and Ramnauth, acting on Freiman's instructions, told her to hold, rather than deposit, checks during this period and that she did so between October 9, 2014 and November 7, 2013. (Samad Aff. ¶¶ 7-8; Samad Tr. 344-45.) Freiman similarly recalls Perfect Care holding checks at the direction of the company's attorney during this period. (Freiman Tr. 483.) However, Ramnauth has no recollection of ever holding checks, and ledgers for Gluco Perfect and U.S. Health submitted by the Freiman defendants show deposits being made into those accounts until approximately October 23, 2013. (Ramnauth Tr. 324; Freiman Tr. 545-46; Freiman Defs. Ex. R, at 18; Ex. S, at 43.) Accordingly, the court finds that at least some of the checks payable to Gluco and U.S. Health were held during Kevin Mernone's hospitalization.

41.     There were significant transfers from Kevin Mernone's personal account and the Gluco account during Mr. Mernone's hospitalization. Between October 11 and October 16, 2013, the Gluco bank account's balance decreased significantly,

from $98,411.81 to $17,874.82. (Schmidberger Supp. Aff. ¶ 13.)
Ms. Freiman also transferred money from Kevin Mernone's personal
account to the Gluco account in the following amounts: $20,000
on October 9; $5,000 on October 11; and $1,800 on October 15.
(*Id.*)

42.     On October 9, 2013, Freiman told Samad to cease
placing customer orders on behalf of Gluco and U.S. Health.
(Samad Aff. ¶ 9.)

43.     On approximately the same day, Freiman, acting on
behalf of Perfect Gluco, entered into a contract with Sterilance
Medical, which also supplied products to Gluco.[7] (Freiman Tr.
502-03; Pls. Ex. 82.) The Perfect Gluco-Sterilance contract
appears to be nearly identical to March 7, 2011 contract Kevin
Mernone entered into with Sterilance on behalf of Gluco. (Pls.
Exs. 82, 83.) The Gluco-Sterilance contract was still valid at
the time Freiman entered into the Perfect Gluco-Sterilance
contract, both of which involve the same products. (Pls. Ex.
83.)

44.     On October 11, 2013, while his brother was
hospitalized, Glenn Mernone petitioned to be appointed the
temporary guardian of Kevin Mernone, at the suggestion of Ms.

---

[7] The Perfect Gluco-Sterilance contract is dated October 1, 2013; however,
Freiman testified that Sterilance inserted that date and that she signed the
contract on October 8 or 9. (Freiman Tr. 503.)

Freiman.[8]  (Pls. Ex. 53; G. Mernone Tr. 112-13, 116-17, 120.)  On

the same day, a Nassau County court granted the petition.  (Pls.

Ex. 53.)  The legal fees for making this application were paid

for from Kevin Mernone's personal checking account, using a

check signed by Ms. Freiman in Kevin Mernone's name.  (G.

Mernone Tr. 119; Pls. Ex. 55.)   The temporary guardianship

permitted Glenn Mernone to make health care decisions on behalf

of his brother and to ensure that his brother's businesses

continued to operate, but did not authorize him to dispose of

Kevin Mernone's property.  (Pls. Ex. 53; see also G. Mernone Tr.

114-16.)

     45.    As part of the temporary guardianship petition,

Glenn Mernone certified that Kevin Mernone had no living will,

which was not accurate.  (Pls. Ex. 53, at 14; Pls. Ex. 93.)

Kevin Mernone had a living will that names Joy Mernone as Kevin

Mernone's health care proxy.  (Pls. Ex. 93.)  Although Glenn

Mernone made no effort to determine whether his brother had a

living will and had previously retained the same lawyer to draft

Glenn's will that had drafted Kevin Mernone's living will, there

is no evidence in the record that Glenn in fact knew about his

brother's will.  (See G. Mernone Tr. 125.)

---

[8] Although Freiman disputes that the guardianship application was her idea,
she points to no testimony or other evidence to the contrary.  (See
Defendants Freiman, Gillen, Perfect Gluco and USHH's Response to Plaintiff's
Proposed Findings of Fact and Conclusions of Law ("Defs. Resp.") ¶ 112.)

46.     The temporary guardianship petition states that
Kevin Mernone executed a power of attorney naming Ms. Freiman
his agent and that Glenn Mernone knew this information because
"Ms. Francine Freiman told me she was told by [Kevin Mernone]
that he signed the power of attorney but she has never actually
seen an executed copy." (Pls. Ex. 53, at 15.) Glenn Mernone
admitted that he does not have knowledge about whether a power
of attorney signed by Kevin Mernone and naming Ms. Freiman as
his agent exists and was unsure about whether his statement was
true at the time he made it. (G. Mernone Tr. 127-28.) A power
of attorney signed by Kevin Mernone and naming Ms. Freiman as
his agent was not presented at the hearing.

47.     On October 13, 2014, Glenn Mernone, Ms. Freiman,
Mr. Gillen, and Sean Mernone, Kevin Mernone's child from his
first marriage, traveled to Kevin Mernone's home in Oyster Bay,
New York. (G. Mernone Tr. 221; *see also* J. Mernone Aff. ¶ 26;
Freiman Aff. ¶ 64.) Glenn Mernone testified that he went to
Kevin's home in order to remove a safe because Ms. Freiman had
told him that she needed documents from the safe. (G. Mernone
Tr. 133, 221-22.) Glenn Mernone also testified that both
Kevin's girlfriend and Ms. Freiman had told him that there were
valuables in the safe, and Joy Mernone testified that the last
time she had observed the contents of the safe, in April of

23

2009, it contained money, valuable pens and watches, as well as personal documents. (*Id.* at 223-24; J. Mernone Aff. ¶ 27; J. Mernone Tr. 398-399.)

48.     Glenn Mernone and others removed the safe to the Richmond Hill facility, where it was opened by a locksmith. (G. Mernone Tr. 134-35.) According to Glenn Mernone, there were only documents in the safe, which were examined by Ms. Freiman and Sean Mernone. (*Id.*) Glenn Mernone testified that Ms. Freiman took some paperwork from the safe; however, it is not clear what those documents were. (*Id.* at 227.)

49.     The following day, October 14, 2013, Glenn Mernone attempted to make several changes in the structure of Perfect Care. He signed a document, drafted by Ms. Freiman, purporting to sell 30% of Kevin Mernone's shares to Ms. Freiman for $90,000, to appoint himself President of Perfect Care, and to appoint Ms. Freiman Vice-President of Perfect Care. (G. Mernone Tr. 144; Freiman Defs. Ex. M.) The sale ultimately did not take place because Ms. Freiman consulted an attorney, who advised that the agreement would not be enforceable. (G. Mernone Tr. 144.) In addition, Perfect Care did not receive the

$90,000 from Ms. Freiman for the Perfect Care shares.[9]   (*Id.* at 144-45.)

50.    On October 15, Glenn Mernone issued a $5,000 Perfect Care check to Ms. Freiman as a bonus.  (G. Mernone Tr. 155-56; Pls. Ex 58, at 225, Ex. 63 at 1.)

51.    Also on October 15, Perfect Care sold almost $500,000 worth of Gluco's inventory to Perfect Gluco, but the transaction was subsequently reversed.  (G. Mernone Tr. 158-59; Pl. Exs. 76, 86; *see also* Ramnauth Tr. 307-08.)  Glenn Mernone testified that he was not consulted about this transaction (G. Mernone Tr. 160), but Ms. Freiman attributes the making, and later reversing of the transaction, to Glenn, who was apparently being advised by counsel (Freiman Aff. ¶ 72).[10]

52.    Between October 15 and December 31, 2013, twenty additional sales of inventory by Perfect Care to Perfect Gluco occurred, but they were all reversed on December 31.  (G. Mernone Tr. 162-63; Pls. Ex. 76.)

---

[9] Although Ms. Freiman suggests that the $90,000 "payment could [have] be[en] in the form of unpaid loans provided to Perfect Care," there is no evidence in the record to support her assertion.  (Defs. Resp. ¶ 120.)  Consequently, the court does not consider Ms. Freiman's speculative and unsupported suggestion.  Moreover, Glenn Mernone testified that a $90,000 check issued by Freiman to Perfect Care in August of 2013 as a loan was unrelated and later paid back.  (G. Mernone Tr. 148-49; Pl. Ex. 110.)

[10] Freiman's statement regarding this transaction is difficult to understand because she asserts both that "Glenn, upon advice of counsel, first directed that that particular inventory be sold from Perfect Gluco to Perfect Care," and that ultimately the transaction was reversed and "ownership of the shipment [returned] to Perfect Care."  (Freiman Aff. ¶ 72.)  The court is unable to find further testimony by Ms. Freiman or other evidence on this subject in the record, however.

53.     The Freiman defendants do not dispute and the court finds that there is evidence of a recorded unpaid debt of $27,485.50 owed by Perfect Gluco to Gluco.  (*See* Schmidberger Aff. ¶¶ 26-27; *see also* Freiman Defs. Resp. ¶ 174 (stating that the $27,485.50 "might be a legitimate debt") and ¶ 175 (stating that this is a "paper entry").)  Nor do the Freiman defendants dispute that certain debts owed by USHH to Perfect Care were either reduced or zeroed out on dozens of invoices by or at the direction of Ms. Freiman.  The court rejects the Freiman defendants' unsupported assertion that these invoices were reduced or zeroed out to account for loans USHH made to Perfect Care.  The remaining invoices reflect that USHH has not paid Perfect Care the outstanding balance of $100,775.01.  (*See* Freiman Defs. Opp. ¶ 176; *see also* Schmidberger Aff. ¶ 28; Pls. Ex. 44.)

54.     Plaintiffs have presented credible evidence that, on October 16, 2013, the day of Kevin Mernone's death, Ms. Freiman took a number of steps to appropriate business that formerly belonged to the plaintiff companies into her companies by unlawfully using plaintiffs' trademarks.

55.     On October 16, 2013, a letter on what appears to be Gluco Perfect's letterhead, was sent to Gluco customers.  It was signed by "Fran Freiman, President" and states, "Effective

October 1, 2013, we began servicing you as Perfect Gluco. The company will continue to operate from [a] new location as listed below, but . . . [t]here has been no change in management, [and] no change in staff." (Pls. Ex. 64.) Although Ms. Freiman testified that she had no knowledge of this letter and that it was likely prepared by her employees Liz Caro or Milden Duran (Freiman Tr. 510-12), the court finds it incredible that such a letter would be sent to customers or suppliers by Ms. Freiman's employees without her knowledge. Because testimony was not presented by Caro or Duran, neither their credibility nor interests could be determined.

56.     On October 16, 2013, a representative of Apex, a supplier of "Gluco Perfect 2" meters and test strips, emailed Kevin Mernone the following: "Fran told me you have given the company to her." (Pls. Ex. 18.) Apex's email also indicates that Apex and Ms. Freiman were entering into a new agreement.[11] (*Id.; see also* J. Mernone Aff. ¶ 54.)

---

[11] Ms. Freiman does not dispute that she made the aforementioned representations to Apex; however, she states that the "company" discussed in Apex's email was Perfect Care (and not the other two plaintiff companies, U.S. Health and Gluco Perfect), and that she had reason to believe Perfect Care was her company based on Glenn Mernone's purported transfer of some of Kevin Mernone's shares in Perfect Care. (*See* Defs. Resp. ¶ 129.) Ms. Freiman's explanation for the email's content is not credible. Defendant Freiman presents no basis for her assertion that Perfect Care was the company referred to in the email from Apex (or that Perfect Care was the primary entity doing business with Apex). Moreover, even had Ms. Freiman received 30% of Kevin Mernone's shares in Perfect Care, evidence of which is to the contrary, that fact would not be a basis to assert her ownership of Perfect Care.

### III. Business Practices of Plaintiff Entities Following Kevin Mernone's Death

#### a. Prior to the Court's Entry of the Temporary Restraining Order

57.     Following Kevin Mernone's death on October 16, 2013, Ms. Freiman caused Perfect Care to cease servicing Gluco and U.S. Health.  For example, by October 21, 2013, Ms. Freiman attempted to put in place a "hard stop;" that is, any business that would have been conducted by Gluco would be conducted by Perfect Gluco after that date.  (Freiman Tr. 490.)  Ms. Freiman testified that she made it clear to Gluco customers that she would not accept payment for Gluco's receivables.  (*Id.*)  Further, Ms. Freiman told Perfect Care staff to stop servicing the plaintiff companies and not to deposit checks made payable to Gluco or U.S. Health.  (Freiman Tr. 480-81.)

58.     Conflicting testimony was presented at the hearing as to why the operations of the plaintiff companies ceased.  Ms. Freiman testified that Glenn Mernone instructed her to no longer perform services on behalf of the plaintiff companies and that the checks payable to the plaintiff companies could not be deposited because the plaintiff companies' bank accounts were closed.  (*Id.* at 481-82.)  Glenn Mernone, on the other hand, testified that Ms. Freiman had informed him that Joy Mernone had closed the plaintiff companies' bank accounts and,

28

thus, those companies' operations could not continue.  (G.

Mernone Tr. 167-68.)  He was also unaware that the plaintiff

companies' checks were not deposited.[12]  (*Id.* at 168.)  Joy

Mernone did not close Gluco's bank account until November 5,

2013, and U.S. Health's bank account was not closed until mid-

December, 2013.  (J. Mernone Tr. 356.)  Accordingly, the court

finds that neither Ms. Freiman nor Glenn Mernone testified

credibly that checks belonging to the plaintiff companies were

not deposited as of mid-October 2013 because the accounts had

been closed.

        59.     The uncontroverted hearing testimony and exhibits

establish that, prior to October 21, 2013, Gluco customers sent

checks to Gluco for Gluco products, but the checks were made

payable to Perfect Gluco.  (Schmidberger Tr. 53.)  Mr.

Schmidberger identified $117,485.69 in such checks during his

review.  (Pls. Ex. 45, at 1.)  Some of these checks were

deposited into Perfect Gluco's account and others were held and

not deposited.  (Schmidberger Tr. 56.)  Mr. Schmidberger

similarly identified checks totaling $85,334.32 from U.S. Health

customers that were made out to USHH instead.  (Pls. Ex. 45, at

56.)  It is unclear which, if any, of these checks were

---

[12] Certain taxes owed by Gluco and U.S. Health were also not paid in the third
quarter of 2013.  (J. Mernone Aff. ¶¶ 66-67; Pls. Exs. 26-27.)  Based on the
record evidence, the bank accounts of Gluco and U.S. Health were open to pay
these obligations, respectively, until November 5 and mid-December 2013.

deposited in USHH's account. (Schmidberger Tr. 58-59.) Thus, the Freiman defendants' unauthorized use of plaintiffs' trademarks and trade names resulted in payments to plaintiffs being diverted to the Freiman defendants.

60.    Perfect Gluco began selling Gluco products on Ms. Freiman's own initiative, prior to the closure of the Gluco bank account in November 2013. At some point after Kevin Mernone's death, Freiman directed Perfect Gluco to physically transfer approximately $324,000 worth of Gluco inventory from the Richmond Hill facility into a temporary warehouse that Ms. Freiman caused to be rented in Woodside, Queens. (Freiman Tr. 496, 498; *see also* June 17, 2014 Affidavit of Cliff Bravo ("Bravo Aff.") ¶¶ 6-7 (describing a delivery Bravo made of a truckload of products to the Woodside warehouse); Pls. Ex. 69.) There is no evidence in the record that the plaintiff corporations, Joy Mernone or anyone else authorized Ms. Freiman to acquire plaintiffs' inventory. (Freiman Tr. 497; Pls. Ex. 49.)

61.    Ms. Freiman began issuing Perfect Gluco invoices to Gluco customers on November 1, 2013 or before. (Freiman Tr. 485.) Mr. Schmidberger, who was hired as Perfect Care's controller in March of 2014, identified over five hundred Perfect Gluco invoices for the sale of Gluco branded and

30

trademarked products. (Schmidberger Supp. Aff. ¶ 8; Pls. Ex. 48.) Mr. Schmidberger further identified these products as items without authorization taken from the plaintiffs' Richmond Hill facility. (Schmidberger Supp. Aff. ¶¶ 4-7.)

62.    Ms. Freiman testified that she paid $20,000 to Sterilance on behalf of Gluco, and testified that she has payment agreements with the other vendors who supplied the Gluco products (Freiman Tr. 499-500); however, neither the payment nor the payment agreements were proffered at the hearing, and Sterilance continues to hold Gluco, rather than Perfect Gluco, liable for the cost of the products. (Schmidberger Aff. ¶ 9; Pls. Ex. 50; *see also* Freiman Tr. 500.) Nor has Ms. Freiman provided any corroboration for her assertion that these transactions were properly accounted for or made solely to ensure that Gluco was not in debt.[13] Accordingly, the court does not credit Ms. Freiman's purported reason for appropriating and selling Gluco's inventory. Nor does the court credit Ms.

---

[13] While defendant Freiman maintains in her post-hearing briefing that Perfect Gluco's sale of Gluco products was undertaken in order to pay Gluco's vendors, she offers no supporting evidence. For example, she states without citation that "[e]verything was accounted for in the books of the respective companies to the aforementioned transactions, was done on advice of counsel, and nothing was 'surreptitious' or otherwise done to be hidden from the Plaintiff companies." (Defs. Proposed Findings of Fact ¶ 82.) Similarly, Freiman objects to plaintiffs' proposed findings of fact by stating, without any citation to corroborating evidence, that "[t]he testimony shows that the Freiman [*sic*] recorded a sale of product in order to pay vendors. Nothing was 'stolen' and there was a proper notation in the books and records of the companies showing the items taken." (Defs. Resp. ¶ 136.)

Freiman's testimony that she or her corporations paid Sterilance or other vendors who provided plaintiffs with products.

63.     On November 7, 2013, Joy Mernone attempted to enter the Richmond Hill facility but was told by Freiman that she was not permitted to do so and that Gluco was defunct.  (J. Mernone Aff. ¶ 74.)  Ms. Mernone had not previously been prevented from entering the facility.  (J. Mernone Tr. 423-24.) Ms. Freiman testified that she was acting on Glenn Mernone's orders to bar Joy Mernone from the Richmond Hill facility, and Glenn Mernone confirmed that he did not authorize anyone at the facility to allow Ms. Mernone to enter.  (Freiman Aff. ¶ 90; Freiman Tr. 482; G. Mernone Tr. 245-46; Def. Ex. L.)

64.     Ms. Mernone was not told that there were uncashed checks at the Richmond Hill facility payable to the plaintiff companies because, according to Ms. Freiman, Perfect Care employees were forbidden to speak to Ms. Mernone.  (Freiman Tr. 482.)

65.     The following day, on November 8, 2013, Ms. Freiman formed Perfect Care Solutions, Inc.  The company's bank account was funded by a check from a company called Ultra which had been made out to Perfect Care and not Perfect Care Solutions.  (G. Mernone Tr. 171-72; Pls. Ex. 71.)  Ultra owed

32

Perfect Care more than $22,000 at the time the check was written. (G. Mernone Tr. 172; Pls. Ex. 94.)

66.     Also on November 8, 2013, Ms. Freiman ordered Andre Ramnauth to shred blank Gluco invoices, checks and delivery tickets. (Samad Tr. 352-54.) Employees Samad, Liz Caro, and Ruth Rivera shredded the papers at Mr. Ramnauth's instruction. (Ramnauth Aff. ¶ 18; Samad Tr. 353-54.)

67.     Ms. Freiman called a staff meeting on November 8 and informed employees that Kevin Mernone passed away, that the Richmond Hill building needed to be locked down, that Kevin had signed "the company" to her and Glenn Mernone, and that Joy Mernone would fire everyone and liquidate the business because she was a housewife. (June 17, 2014 Affidavit of Jose Torres ("Torres Aff.") ¶ 12; June 17, 2014 Affidavit of Alex Rodriguez ("Rodriguez Aff.") ¶ 4.) Ms. Freiman further advised Perfect Care employees that they could be fired if they spoke to Ms. Mernone. (Torres Aff. ¶ 13.)

68.     On December 27, 2013, Ms. Mernone again attempted to enter the Richmond Hill facility, after giving advance notice to Ms. Freiman. (J. Mernone Aff. ¶ 75-76.) Ms. Freiman was not on the premises, but instructed Mr. Ramnauth, who was present, not to allow Ms. Mernone inside. (Schmidberger Aff. ¶¶ 6-7; J. Mernone Tr. 393-94.) The police were called and arrived at

Richmond Hill shortly before Ms. Freiman and Glenn Mernone.
(*Id.* ¶ 7; G. Mernone Tr. 100-01.)  Mr. Mernone did not allow Ms.
Mernone entry.  (G. Mernone Tr. 100.)

   69.  In January 2014, Glenn Mernone instructed Perfect
Care's attorney not to turn over information regarding Gluco's
accounts receivable to Ms. Mernone because he feared that Gluco
would not pay its debt to Perfect Care.  (G. Mernone Tr. 106-
07.)

   **b. March 13, 2014, onward: Following the Entry of the
    OTSC and TRO**

   70.  As previously discussed, the court entered an
OTSC and TRO in this case at approximately 4:30 p.m. on March
13, 2014, and modified the TRO on March 18, 2014 after
conferences and a hearing.

   71.  On March 13, 2014, Joy Mernone terminated Ms.
Freiman's employment at Perfect Care; however, Glenn Mernone did
not consent to Ms. Freiman being terminated.[14]  (G. Mernone Tr.
204.)

   72.  Also on March 13, 2014, approximately two-thirds
of plaintiffs' products stored at the Richmond Hill warehouse,
or fifty-five pallets of products, were transferred at Ms.
Freiman's direction to the warehouse Ms. Freiman had rented in

---

[14] Mr. Mernone does not now contest Ms. Freiman's termination.  (*See* G.
Mernone Proposed Findings of Fact 1.)

34

Valley Stream. Employee Cliff Bravo was directed by Freiman to drive two truckloads of products from plaintiffs' Richmond Hill facility to Ms. Freiman's Valley Stream facility. (Bravo Aff. ¶ 10; Schmidberger Aff. ¶ 23; Torres Aff. ¶ 17.) Delivery tickets and other paperwork were not created to document the transfer. (Bravo Tr. 95; Rodriguez Tr. 81; Schmidberger Tr. 55.)[15]

73.     On March 14, 2014, Ms. Mernone and several others attempted to enter in the Richmond Hill facility. (Schmidberger Aff. ¶ 8.) The facility was locked and no one was able to access the building. (*Id.*) Mr. Mernone testified that he closed the facility in consultation with Ms. Freiman because he believe that Ms. Mernone would "show up and cause a scene." (G. Mernone Tr. 209.)

74.     The same day, March 14, some Perfect Care employees were ordered to report to the Valley Stream warehouse rented by Ms. Freiman instead of Richmond Hill. (G. Mernone Tr. 211.) Ms. Freiman was present at the Valley Stream warehouse that morning. (Rodriguez Aff. ¶ 14.) Employees worked all day at the Valley Stream warehouse loading and unloading products on and off trucks, and making deliveries. (*Id.*; Bravo Tr. 94; Bravo Aff. ¶ 11.)

---

[15] Ms. Freiman does not appear to dispute that these products were moved from Richmond Hill to Valley Stream; however, she states, without providing any evidence, that Glenn Mernone ordered the transfer. There is no evidence in the record to support this assertion.

75.     On March 15 and March 16, 2014, Ms. Mernone was able to enter the Richmond Hill building and examine the books and records of the plaintiff companies and Perfect Care; however, the companies' documents were disorganized and any filing system difficult to discern.  (*Id.* ¶ 9.)

76.     Employee Samad credibly testified that Craig Jeffries, the Richmond Hill warehouse manager, was instructed by Ms. Freiman to tell Ms. Samad that she should not speak with Ms. Mernone when Ms. Mernone inspected the Richmond Hill facility. (Samad Aff. ¶¶ 14-15.)  Mr. Jeffries texted employee Jose Torres on the evening of Sunday, March 16, 2014, that "Mrs. Mernone and her people would be coming into the office on Monday.  Just tell her the truth that you do not know anything about Gluco." (Torres Aff. ¶ 16.)

77.     Ms. Mernone and her employees found checks at the facility made out to Gluco and U.S. Health that had not been deposited, and that could no longer be deposited because of the age of the checks.  (J. Mernone Aff. ¶ 3.; Pls. Exs. 32-33.) Ms. Mernone learned about these checks following the entry of the TRO.  (J. Mernone Tr. 428.)

78.     On March 17, 2014, the Freiman companies' directories were deleted from Macola.  (G. Mernone Tr. 193, 198; Ramnauth Tr. 278; Samad Aff. ¶ 16.)  Mr. Mernone testified that

someone with remote access to the Macola system could have deleted the directories. (G. Mernone Tr. 195-96.) Persons with remote access to the system in or about March 17, 2014 included Glenn Mernone, Ms. Freiman, and Ms. Freiman's employee Milden Duran. (*Id.* at 195-97.) Mr. Mernone did not investigate the deletion or learn who deleted the Macola directories. (*Id.* at 195-96.)

79.     On Monday, March 17, 2014, when Mr. Torres returned to the Richmond Hill facility, he noticed that two-thirds of the products, or approximately sixty pallets, including diapers and underpads, were missing. Although some of the products were returned several weeks later from the Valley Stream warehouse, thousands of underpads were never returned. (Torres Aff. ¶¶ 17-18.)

80.     Ms. Mernone first inspected the Valley Stream warehouse on March 27, 2014 and discovered a large amount of inventory. (Schmidberger Aff. ¶ 23; Pls. Exs. 37-38.) Where Ms. Freiman did not object, some inventory from Valley Stream was returned to the Richmond Hill warehouse. (*Id.;* Torres Aff. ¶ 18.)

81.     It appears that someone sent 175 outgoing messages from Gluco's website to inquiring customers between April 1, 2014 and April 14, 2014. Ms. Mernone did not send

these messages, but it is unclear who did.   (J. Mernone Supp.
Aff. ¶ 4; Pls. Ex. 34.)

        82.     Between March 13 and May 20, 2014, the Freiman
companies received checks from the plaintiff companies'
customers.  (Freiman Tr. 532-33; Pls. Ex. 40.)  Mr. Schmidberger
identified customer checks totaling $30,000 for product the
plaintiff companies shipped to customers before the plaintiff
companies' bank accounts were closed.  (Schmidberger ¶ 24.)

**CONCLUSIONS OF LAW**

**I.   Applicability of the Preliminary Injunction to Defendant
     Glenn Mernone**

        Glenn Mernone and the plaintiffs dispute the extent to
which the preliminary injunction applies to Glenn Mernone.  As
previously discussed, Mr. Mernone was added as a defendant in
plaintiffs' Amended Complaint, following the entry of the TRO.
Counsel for Mr. Mernone contends that Mr. Mernone was never the
subject of the TRO in this case.  (*See* G. Mernone Proposed
Findings of Fact; G. Mernone Reply; G. Mernone Sur-Reply).
Plaintiffs argue that Mr. Mernone has actively participated in
the TRO and preliminary injunction proceedings, first as an
interested party and then as a defendant, throughout the case.

        Although Glenn Mernone has assertively participated in
the case from its inception, the TRO, which plaintiffs now seek
to convert into a preliminary injunction, restrains the Freiman

38

defendants and not Glenn Mernone, and plaintiffs did not amend their motion for preliminary injunctive relief to include Mr. Mernone. Moreover, the restraints set forth in the TRO that plaintiffs seek to extend in the preliminary injunction apply to the Freiman defendants and not to Glenn Mernone. Accordingly, it is premature for the court to evaluate the likelihood of success of claims against Glenn Mernone, although, with proper notice to Mr. Mernone, the court will do so. Where facts established at the hearing involved or implicated Glenn Mernone, however, the court has discussed evidence regarding Glenn Mernone in this opinion because Mr. Mernone had the opportunity to challenge the evidence presented and because those facts are essential to understanding the evidence presented by the parties and the court's findings of fact and conclusions of law.

## II. Preliminary Injunction Standard

In order to obtain a preliminary injunction, the moving party must show (1) that it will suffer irreparable harm in the absence of an injunction, and (2) either (a) a likelihood of success on the merits; or (b) sufficiently serious questions going to the merits that make them fair grounds for litigation and a balance of hardships tipping decisively in the movant's favor. *See Green Party v. N.Y. State Bd. of Elections*, 389 F.3d 411, 418 (2d Cir. 2004); *Sunward Elec., Inc. v. McDonald*, 362

39

F.3d 17, 24 (2d Cir. 2004); *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 33 (2d Cir. 1995).

The court will first address its conclusion that plaintiffs have made an adequate showing that they will suffer irreparable harm in the absence of an injunction and then explain its conclusion that plaintiffs are likely to succeed on the merits of their claims.

## III. Irreparable Harm

"The irreparable harm requirement is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Grout Shield Distribs., LLC v. Elio E. Salvo, Inc.*, 824 F. Supp. 2d 389, 402 (E.D.N.Y. 2011) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) (per curiam)). Irreparable harm is defined as "harm to the plaintiff's legal interests that could not be remedied after a final adjudication," such as when "the loss is difficult to replace or measure, or where plaintiffs should not be expected to suffer the loss." *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012); *see also Tom Doherty Assocs., Inc.*, 60 F.3d at 37 (defining irreparable harm as "an injury that is not remote or speculative but actual and imminent and for which a monetary award cannot be adequate compensation." (internal quotation marks omitted)).

"[L]oss of reputation, good will, and business opportunities" may constitute irreparable harm. *Rex Med.*, 754 F. Supp. 2d at 621 (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004)). Specifically, in cases involving trademarks and trade names, irreparable harm "exists . . . when the party seeking the injunction shows that it will lose control over the reputation of its trademark [or trade name] . . . because loss of control over one's reputation is neither calculable nor precisely compensable." *Grout Shield*, 824 F. Supp. 2d at 402 (quoting *New York City Triathlon LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 305, 343 (S.D.N.Y. 2010) (internal quotation marks omitted)).

Applying the foregoing standards, the court finds that plaintiffs have demonstrated that they have suffered and will continue to suffer irreparable harm in the absence of injunctive relief. Specifically, the court finds that that plaintiffs have suffered and/or are in imminent danger of suffering continued immediate and irreparable injury, loss, or damage based on the Freiman defendants' malfeasance and misfeasance in the absence of an injunction based on plaintiffs' showing of the defendants' unauthorized use of the plaintiffs' marks and names; the diversion, misappropriation and taking of plaintiffs' assets, funds, inventory and accounts receivables from plaintiffs,

plaintiffs' customers and suppliers through the use of
misleading and inaccurate representations regarding the
ownership and name changes of plaintiffs; the unauthorized
writing of checks and transferring of funds from and through
plaintiffs' accounts; the failure of Francine Freiman as a
servant, operations manager and purported vice-president of the
plaintiffs to perform her responsibilities in a manner
consistent with her duties as a servant and/or fiduciary of the
plaintiffs; all of which have caused injury, loss and damage to
plaintiffs' businesses and has caused customer confusion and the
loss and threatened loss of  plaintiffs' reputation, customers,
suppliers, goodwill, and financial viability, and the loss of
control over plaintiffs' trademarks and trade names.

        The evidence in the record establishes that the
Freiman defendants' use of business names similar to the
trademarked names and trade names owned by the plaintiff
companies, and the Freiman defendants' other acts of misconduct
have confused customers and suppliers, caused plaintiffs the
loss of inventory, funds and receivables, customers and
accounts, business income, suppliers and business reputation and
opportunities formerly available to them, and the loss of
control over its marks and names.  For example, Gluco customers
issued more than $117,000 in checks to Perfect Gluco to honor

their obligations to Gluco, demonstrating customer confusion, caused, *inter alia*, by Ms. Freiman's direction to Gluco customers to issue checks to Perfect Gluco, and her false representations that the plaintiff entities would now conduct business using the names of the defendant entities. (*See* Pls. Ex. 45, at 1; Pls. Ex. 48 (Perfect Gluco invoices issued for Gluco products); *see also* Pls. Ex. 64 (Defendant Freiman's letter to suppliers that Perfect Gluco would be serving Gluco Perfect's accounts).) Some of these checks from plaintiffs' customers were deposited directly into Perfect Gluco's accounts, while others were held at the direction of Ms. Freiman, making it impossible for the plaintiff companies to deposit them. (*See* Schmidberger Tr. 56.)

Ms. Freiman began issuing Perfect Gluco invoices for the sale of Gluco products to Gluco's customers, some of whom were directed by Ms. Freiman to issue checks to Perfect Gluco. Gluco suppliers were not paid by Ms. Freiman and continue to hold Gluco, rather than Perfect Gluco, responsible for the payment of inventory directed to Perfect Gluco. (*See* Schmidberger Aff. ¶ 9; Pls. Ex. 50.)

In addition, another supplier, Apex, wrote to Kevin Mernone around the time of Mr. Mernone's death expressing his belief, based on Ms. Freiman's misrepresentations, that Ms.

Freiman owned Gluco and would be in charge of Gluco's operations going forward. (Pls. Ex. 18.) Moreover, Ms. Freiman or her agents directed certain Gluco customers and/or suppliers that the same business and management would operate using the name Perfect Gluco. (*See* Pls. Ex. 64.) These instances of actual confusion about the ownership of the plaintiff entities and overall irreparable harm to the reputation, goodwill, and business of the plaintiff companies were the result of misconduct by the Freiman defendants and warrant injunctive relief.

Further, although some of the harm to the plaintiff entities is monetary – for example, the unauthorized diversion of payments, withdrawals and transfers of plaintiffs' funds – it is difficult to measure all of the monetary losses precisely due, in part, to manipulation of the Macola system and the failure to maintain accurate and orderly records. The unreliability of the Macola system, both in terms of tracking inventory and checks issued, as well as Ms. Freiman's ability to manipulate that system by changing entries in it, makes evaluating the precise losses to plaintiffs extremely difficult. Moreover, it may well be impossible to quantify with precision the losses plaintiffs suffered based on the damage caused to their relationships with suppliers and customers, good will and

reputation. *See Register.com*, 356 F.3d at (upholding the district court's grant of a preliminary injunction in a contract enforcement case because it was "impossible to estimate with any precision the amount of the monetary loss which has resulted and which would result in the future from the loss of [plaintiff's] relationships with customers and co-brand partners"); *Tecnimed SRL v. Kidz-Med, Inc.*, 763 F. Supp. 2d 395, 410-11 (S.D.N.Y. 2011) (quoting *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999)) (holding that injunctive relief was appropriate because "it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come.").

Accordingly, plaintiffs have demonstrated irreparable harm.

## IV. Likelihood of Success on the Merits

A party need only show that the "probability of . . . prevailing [on the merits] is better than fifty percent" to demonstrate a likelihood of success on the merits." *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988) (internal quotations and citations omitted). In the Amended Complaint, plaintiffs bring the following causes of action against the Freiman defendants: trade name and trademark infringement in violation of Sections

45

32 and 43 of the Lanham Act (First Claim for Relief); unfair competition, in violation of Section 43 of the Lanham Act (Second Claim for Relief); use of a name with intent to deceive in violation of New York General Business Law § 133 (Third Claim for Relief); unfair competition, trade name and trademark infringement, and misappropriation under New York common law (Fourth Claim for Relief); breach of fiduciary duty (on behalf of Gluco Perfect and U.S. Health and derivatively on behalf of Perfect Care against Freiman) (Sixth Claim for Relief); a claim under the faithless servant doctrine (Twelfth Claim for Relief); conversion (on behalf of Joy Mernone as the Executor of the Estate of Kevin Mernone against Freiman, Gillen and Glenn Mernone) (Thirteenth Claim for Relief); and conversion (on behalf of Gluco Perfect and U.S. Health against Perfect Gluco, USHH and Freiman) (Fourteenth Claim for Relief). The court concludes, based on the record before it, that plaintiffs have established a likelihood of success as to each of these causes of action.

     **a. Trade Name and Trademark Infringement and Unfair Competition Claims Under the Lanham Act and New York Common Law (Amended Complaint Claims for Relief One Through Four)**

In the Amended Complaint, plaintiffs allege that the Freiman defendants and Freiman companies infringed the trade name and trademark of the plaintiff companies in violation of

the Lanham Act (First Claim for Relief); engaged in unfair competition in violation of the Lanham Act (Second Claim for Relief); used the names of the plaintiff companies with intent to deceive in violation of New York General Business Law § 133 (Third Claim for Relief); and engaged in unfair competition, trade name and trademark infringement and misappropriation under New York common law (Fourth Claim for Relief.  For the reasons that follow, plaintiffs have established a likelihood of success on the merits of these four claims.

### i. Legal Standards

Plaintiffs' federal trademark and trade name infringement claims, as well as their federal unfair competition claim, are governed by the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a).  Title 15 U.S.C. § 1114(1) prohibits the "use in commerce [of] any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods . . . [where] such use is likely to cause confusion, or to cause mistake, or to deceive."  Similarly, § 1125(a) imposes civil liability on "[a]ny person, who . . . uses in commerce any word, term, name, symbol, or device . . . false or misleading description [or representation] of fact, which" "is likely to cause confusion, or to cause mistake, or to deceive as to the

affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods . . . by another person."

In order to prevail on these claims, plaintiffs must demonstrate that 1) the trademark, trade name or trade dress is valid and legally entitled to protection,[16] and 2) defendants' unlicensed use of the same or similar trademark, trade name, or trade dress is likely to create confusion concerning the origin of the goods or services. *See Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003); *see also Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 410-11, 410 n.7 (S.D.N.Y. 2006) (noting that the legal standard under both §§ 1114(1) and 1125(a) is the same).

The Second Circuit has articulated eight factors ("the *Polaroid* factors") for courts to consider when determining whether it is likely a defendant's mark will cause confusion:

> (1) [T]he strength of the plaintiff's mark; (2) the similarity of the plaintiff's and defendant's marks; (3) the competitive proximity of the products or services; (4) the likelihood that the defendant will 'bridge the gap' and offer a product or service similar to the plaintiff's; (5) actual confusion between the products or services; (6) good faith on the defendant's part; (7) the quality of the

---

[16] A trade name, as defined by the Lanham Act, is "'any name used by a person to identify his or her business'" and is protected under the Lanham Act based upon the same criteria applied for 'trademarks.'" *deVere Grp. GmbH v. Opinion Corp.*, 877 F. Supp. 2d 67, 69 n.2 (E.D.N.Y. 2012) (quoting 15 U.S.C. § 1127; other citation omitted).

defendant's products or services; and (8) the
sophistication of buyers.

*New York City Triathalon*, 704 F. Supp. 2d at 314 (quoting

*Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d

Cir. 1961)).

In addition to the federal claims, plaintiffs also
bring analogous claims for unfair competition, trade name and
trademark infringement and misappropriation under New York
common law.  The standards for trademark and trade name
infringement under New York law are identical to those under the
Lanham Act.  *See ESPN, Inc. v. Quicksilver, Inc.*, 586 F. Supp.
2d 219, 230 (S.D.N.Y. 2008) (collecting cases).  Unfair
competition claims under New York common law also mirror those
under federal law, but the state claim also requires a showing
of bad faith.  *See, e.g.*, *LaChapelle v. Fenty*, 812 F. Supp. 2d
434, 444 (S.D.N.Y. 2011); *see also Lorillard Tobacco Co. v.
Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448, 456 (S.D.N.Y. 2005)
("It is well-established that the elements necessary to prevail
on causes of action for trademark infringement and unfair
competition under New York common law mirror the Lanham Act
claims. . . . However, unlike its federal counterpart, a viable
common law claim for unfair competition requires an additional
showing of bad faith." (internal citations and quotation marks
omitted)).  Under New York law, "[b]ad faith is presumed where

the defendant intentionally copied the plaintiff[']s mark."
*C=Holdings B.V. v. Asiarim Corp.*, 92 F. Supp. 2d 223, 244
(S.D.N.Y. 2013) (citing *Nike, Inc. v. Top Brand Co., Ltd.*, No.
00-CV-8179, 2005 WL 1654859, at *7-8 (S.D.N.Y. July 13, 2005)).

Finally, plaintiffs allege that the Freiman defendants
violated New York General Business Law § 133.  This law
prohibits people and corporations from using trade names or
symbols "which may deceive or mislead the public."  N.Y. Gen.
Bus. Law § 133.  Federal courts apply the Lanham Act's unfair
competition standard to analyze Section 133 claims.  *See*
*FragranceNet.com, Inc. v. FragranceX.com, Inc.*, 493 F. Supp. 2d
545, 548 n.4 (E.D.N.Y. 2007); *Rush Indus., Inc. v. Garnier LLC*,
496 F. Supp. 2d 220, 230 (E.D.N.Y. 2007).

### ii. Application

Plaintiffs have established a likelihood of success on
all of their claims.  There is no dispute with plaintiffs'
evidence establishing that valid trademarks exist for "Gluco
Perfect," "Perfect" and "Perfect 2." (J. Mernone Aff. ¶¶ 7-9;
Pl. Exs. 5-7.)  Defendants do not dispute that the plaintiff
companies have operated since the mid-1990s and are known and
recognized by customers by their company names, specifically,
Gluco Perfect, LLC, U.S. Health & Home Care, Inc., and Perfect
Care, Inc.  (*Id.* ¶¶ 11, 14-15.)  Accordingly, the court finds

that the plaintiff companies have valid trademarks and trade names entitled to protection.

The court also finds that there is a likelihood of, if not actual, confusion based on the similarity between the plaintiffs' companies' names and marks and those of the Freiman companies, which use the same names and initials as the plaintiffs'. The first *Polaroid* factor, the strength of the plaintiffs' marks and names, weighs in favor of the court's conclusion that plaintiffs are likely to succeed on the merits of their infringement and unfair competition claims under the Lanham Act. As previously discussed, there is no dispute that customers and suppliers have identified the plaintiff companies by their trademarks and trade names since their inception. The second factor, the obvious similarity of plaintiffs' and the Freiman companies' marks, self-evidently weighs in favor of plaintiffs. Defendant Perfect Gluco is the inverse of plaintiffs' company Gluco Perfect, and defendant USHH is the abbreviation of plaintiff U.S. Health & Home, Inc. Defendant Perfect Care Solutions, Inc. is virtually identical to plaintiff Perfect Care, Inc.

The third, fourth, and seventh factors, regarding the competitive proximity and similarity of the products and customers of the plaintiff companies and Freiman companies,

again weigh in favor of plaintiffs. The evidence at the preliminary injunction hearing established that the products sold by the Freiman companies to plaintiffs' customers and others were the same as those sold by the plaintiff companies and that most of plaintiffs' products sold by the Freiman defendants displayed plaintiffs' trade names, trade dress and trademarks. Moreover, the Freiman companies entered into a contract with Sterilance, a Gluco supplier, that was nearly identical to that between Sterilance and Gluco. (Freiman Tr. 502-03; Pls. Ex. 82.) Without authority from the plaintiff companies, Perfect Gluco transferred approximately $324,000 worth of plaintiffs' inventory from plaintiffs' Richmond Hill facility into the Freiman defendants' Woodside warehouse after Kevin Mernone's death. (Freiman Tr. 496, 498; *see also* June 17, 2014 Affidavit of Cliff Bravo ("Bravo Aff.") ¶ 6-7 (describing a delivery Bravo made of a truckload of products to the Woodside warehouse); Pls. Ex. 69.) The plaintiff companies' customers and those of the Freiman companies also appear to be the same; the Macola directory for defendant Perfect Gluco was a copy of plaintiff Gluco Perfect's directory, and the Macola directory for USHH was a copy of U.S. Health & Home's. (G. Mernone Tr. 188; *see also* Samad Aff. ¶¶ 4-6.)

In addition, the fifth and sixth *Polaroid* factors regarding actual confusion and the good faith of the defendants warrant findings in favor of plaintiffs. It is clear there was actual confusion among plaintiffs' customers and suppliers between the Freiman companies and the plaintiff companies, as detailed above in the court's irreparable harm analysis. The defendant companies not only use the same names as the plaintiff companies, they also operated out of the same location, using the phone numbers, emails and address, and transacted in the same products using plaintiffs' trademarks and trade names. Moreover, there is no credible evidence that Ms. Freiman acted in good faith in using the names Perfect Gluco, USHH, and Perfect Care Solutions. For the reasons already stated, the court cannot credit Ms. Freiman's assertion that these companies were created at the instruction or with the consent of Kevin Mernone. Other of Ms. Freiman's actions evidence bad faith, including, but not limited to, the holding of customer checks, appropriation of inventory from plaintiffs' warehouse, and the unauthorized depletion of plaintiffs' funds. As previously discussed, a letter, apparently from Freiman or her agents informed Gluco customers that, although there would be no change in management or practices, Perfect Gluco would take over Gluco's business. (Pls. Ex. 64.) The court does not find

credible Ms. Freiman's assertion that she had no knowledge of this letter, and finds that the letter is evidence of Ms. Freiman's attempt to misappropriate and deceive plaintiffs' customers.

Finally, the eighth *Polaroid* factor, weighs slightly in favor of plaintiffs. "Generally, the more sophisticated and careful the average consumer of a product is, the less likely it is that similarities in trade dress or trade marks will result in confusion concerning the source of sponsorship of the product." *Grout Shield*, 824 F. Supp. 2d at 418 (quoting *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1046 (2d Cir. 1992)).

The court has little information about the degree of sophistication and care of the purchasers of plaintiffs' products, other than that USHH products are generally purchased by commercial facilities, while plaintiffs' products are available through large online retailers. (J. Mernone Aff. ¶¶ 12-13.) Consequently, it is difficult for the court to assess the sophistication of the relevant consumers in this case. Nonetheless, this factor counsels finding in favor of plaintiffs because of the actual confusion that has occurred and the obvious similarity between the names of the plaintiff companies and the Freiman companies. *See Morningside Grp. Ltd. v.*

54

*Morningside Capital Grp., L.L.C.*, 182 F.3d 133, 143 (2d Cir. 1999) ("It is clear in all events that when, as here, there is a high degree of similarity between the parties' services and marks, the sophistication of the buyers cannot be relied on to prevent confusion." (internal quotation marks and citation omitted)).

The court concludes that all eight factors for assessing the likelihood of confusion under the Second Circuit's *Polaroid* analysis have been satisfied.

Based on the foregoing, plaintiffs are likely to succeed on their trademark and trade name infringement claims, as well as their unfair competition claims, pursuant to the Lanham Act.  For the same reasons, plaintiffs are likely to prevail on their New York claims for trademark and trade name infringement.  In light of the strong evidence suggesting that Ms. Freiman acted in bad faith, it is also likely plaintiffs will prevail on the merits of their New York unfair competition claim.  Finally, again for the same reasons discussed above, plaintiffs are likely to succeed on their claim pursuant to New York General Business Law § 133.

### b. Breach of Fiduciary Duty and Faithless Servant Claims (Claims for Relief Six and Seven)

Pursuant to New York law, plaintiffs bring breach of fiduciary duty and faithless servant claims against defendant

Freiman.  For the reasons stated below, the court finds that plaintiffs are likely to succeed on these claims.

### i. Legal Standards

In order to succeed on a claim of breach of fiduciary duty, a plaintiff must show that "breach by a fiduciary of a duty owed to plaintiff; defendant's knowing participation in the breach; and damages." *Pension Comm. Of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 591 F. Supp. 2d 586, 589-90 (S.D.N.Y. 2008) (quoting *SCS Commc'ns, Inc. v. Herrick Co.*, 360 F.3d 329, 342 (2d Cir. 2004)).  A fiduciary relationship may be found when, as between Ms. Freiman and the plaintiff entities, "one [person] is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Flickinger v. Harold C. Brown & Co.,* 947 F.2d 595, 599 (2d Cir. 1991) (quoting *Mandelblatt v. Devon Stores, Inc.,* 521 N.Y.S.2d 672, 676 (N.Y. App. Div. 1st Dep't 1987)).

Generally, as was the case between Kevin Mernone and the plaintiff entities on the one hand, and Ms. Freiman on the other, this court and New York courts "focus on whether one person has reposed trust or confidence in another who thereby gains a resulting superiority or influence over the first." *Thermal Imaging, Inc. v. Sandgrain Sec., Inc.,* 158 F. Supp. 2d 335, 343 (S.D.N.Y. 2001) (internal citations omitted).

Under New York law, the employer-employee relationship is fiduciary, as existed between plaintiff U.S. Health & Home, plaintiff Perfect Care, Inc. and defendant Freiman. *Fairfield Fin. Mortg. Grp., Inc. v. Luca*, 584 F. Supp. 2d 479, 485 (E.D.N.Y. 2008) (quoting *New York v. Joseph L. Balkan, Inc.*, 656 F. Supp. 536, 548 (E.D.N.Y. 1987) and collecting other cases). An independent contractor may also be considered a fiduciary where the definition of a fiduciary is met, as the court finds as between plaintiff Gluco Perfect and defendant Freiman. *J.P. Morgan Chase Bank, N.A. v. IDW Grp, LLC*, No. 08-CV-9116, 2009 WL 321222, at *11 (S.D.N.Y. Feb. 9, 2009) (citing *Grand Heritage Mgmt., LLC v. Murphy*, No. 06-CV-5977, 2007 WL 3355380, at *7 n.15 (S.D.N.Y. Nov. 7, 2007); *Pergament v. Roach*, 838 N.Y.S.2d 591, 593 (2d Dep't 2007)).

The focus of the fiduciary duty analysis is not whether an employee violated an employment contract, however, but rather the employee's duty of "'undivided and undiluted loyalty,' barring self-dealing, use of confidential information, and other conflicts of interest." *Gortat v. Capala Bros.*, 585 F. Supp. 2d 372, 377 (E.D.N.Y. 2008) (quoting *Birnbaum v. Birnbaum*, 73 N.Y.2d 461, 466 (1989)). Under this standard, defendant Freiman has violated her fiduciary duty to the plaintiffs.

New York's faithless servant doctrine also requires the breach of a duty by an employee.  There are two standards under New York law for determining whether an employee is a faithless servant, and thus must forfeit his or her compensation, *see Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 200 (2d Cir. 2003): 1) where an employee's "misconduct and unfaithfulness . . . substantially violate[] the contract of service," and 2) where an agent acts "adversely to his employer in any part of [a] transaction, or omit[s] to disclose any interest which would naturally influence his conduct in dealing with the subject of [his] employment."  *Carco Grp., Inc. v. Maconachy*, 383 Fed. Appx. 73, 76 (2d Cir. 2010) (internal citations omitted; alterations in the original).

### ii. Application

Plaintiffs are likely to succeed on both their breach of fiduciary duty and faithless servant claims against Freiman. Freiman was responsible for running the day-to-day operations of the plaintiff entities, and Kevin and Glenn Mernone placed significant trust in her.  (*See* G. Mernone Tr. 132.)  She also held the position of Vice-President for Gluco Perfect.  (Freiman Aff. ¶ 24; J. Mernone Aff. ¶ 20.)  Although Ms. Freiman was not bound by an employment contract with the plaintiff companies,

defendants do not dispute that she owed a fiduciary duty and duty of loyalty to the plaintiff companies.

As detailed in the court's findings of fact, Ms. Freiman, on multiple occasions and in multiple ways, violated her duty to plaintiffs and acted adversely to plaintiffs by setting up companies using virtually identical names and engaging in the sale of plaintiffs' products using plaintiffs' facilities, employees, phone lines, accounting systems, customer directories and equipment. Ms. Freiman also represented to plaintiffs' suppliers, customers and employees that she had obtained complete or partial ownership in and/or control of the plaintiff companies. Additionally, Ms. Freiman unilaterally appropriated plaintiffs' inventory and sold it using her own companies' invoices and directing plaintiffs' customers to pay her companies. Furthermore, Ms. Freiman directed plaintiffs' employees under her supervision to hold rather than deposit checks from plaintiffs' customers, and failed to pay plaintiffs' suppliers and taxes, all of which caused significant harm to plaintiffs.

Plaintiffs are likely to be able to prove at least some of their damages, supporting a claim of breach of fiduciary duty. There is, for example, evidence that Ms. Freiman took approximately $324,000 worth of plaintiffs' inventory and no

evidence that she has paid for that inventory. (*See* Freiman Tr. 497; Pls. Ex. 49.)

Accordingly, the court finds that plaintiffs are likely to succeed on the merits of their fiduciary duty and faithless servant claims against Ms. Freiman.

### c. Conversion (Claims for Relief Thirteen and Fourteen)

Finally, plaintiffs also seek to hold Ms. Freiman liable for conversion, both as to the property of Kevin Mernone's estate and the property of the plaintiff companies.

### i. Legal Standard

A claim of conversion under New York law is defined as "the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403-04 (2d Cir. 2006) (quoting *Vigilant Ins. Co. of Am. V. Hous. Auth.*, 87 N.Y.2d 36, 44 (1995)).

### ii. Application

Plaintiffs are likely to succeed on their claim that Ms. Freiman converted the property and assets of the plaintiff companies' and Kevin Mernone. Plaintiffs have presented unrebutted evidence that Ms. Freiman transferred a total of $26,180 from Kevin Mernone's personal account into the Gluco account and then depleted the Gluco account by more than

$80,000.  (*See* Schmidberger Supp. Aff. ¶ 13.)  Ms. Freiman has not presented credible evidence that she was authorized to take the funds nor has she accounted for these funds.  Plaintiffs have also established that Ms. Freiman appropriated the funds and inventory of the plaintiff companies.  As previously discussed, Ms. Freiman transferred $324,000 worth of plaintiffs' products from plaintiffs' Richmond Hill facility to her Valley Stream warehouse, and no evidence has been presented that the plaintiff companies have been paid for this inventory.  Plaintiffs have, therefore, established a likelihood of success on the merits of their conversion claim.

## CONCLUSION

Pursuant to the foregoing findings of fact and conclusions of law, the court finds that (1) plaintiffs will suffer irreparable harm in the absence of injunctive relief, and (2) plaintiffs are likely to succeed on the merits of their First, Second, Third and Fourth claims against defendants Perfect Gluco Products, Inc., USHH Products, Inc., Perfect Care Solutions, Inc., Francine Freiman, and William Gillen for trade name infringement, trademark infringement, unfair competition, use of plaintiffs' names with intent to deceive, and misappropriation under the Lanham Act, New York Business Law, and New York common law; their Sixth and Twelfth claims against

defendant Freiman for breach of fiduciary duty and their claim under the faithless servant doctrine; their Thirteenth claim against defendants Freiman and Gillen for conversion; and their Fourteenth claim for conversion against defendants Perfect Gluco, USHH and Freiman.  In light of plaintiffs establishing their likelihood of success on the merits, the court need not set forth its analysis of the balance of hardships, which, in any event, weigh heavily in favor of plaintiffs, given the strong evidence of harm that plaintiffs have suffered at the hands of the Freiman defendants prior to the TRO.  Accordingly, preliminary injunctive relief is appropriate in this case.

THEREFORE, UPON THE COURT'S FINDING that injunctive relief is necessary to prevent further immediate and irreparable harm to plaintiffs pending the conclusion of a trial on the merits, IT IS ORDERED that defendants PERFECT GLUCO PRODUCTS, INC., USHH PRODUCTS, INC., FRANCINE FREIMAN, WILLIAM J. GILLEN, and PERFECT CARE SOLUTIONS, INC. are restrained from:

(1)  engaging in any business through, or conducting any transactions with, the plaintiff entities;

(2)  engaging in any business, including any purchases or sales, with respect or relating to any products originally procured by plaintiffs or produced by plaintiffs' suppliers or vendors;

(3)   representing by any means whatsoever, whether directly
      or indirectly, that the foregoing defendants, or any
      products or services offered by the foregoing
      defendants, or any activities undertaken by the
      foregoing defendants, are in any way associated with
      or related in any way with plaintiffs, or any
      products or services offered by plaintiffs;

(4)   representing by any means whatsoever, whether directly
      or indirectly, that the foregoing defendants own in
      whole or in part, manage, operate or participate in
      the management or operation of the plaintiffs or any
      entities associated with plaintiffs;

(5)   representing by any means whatsoever, whether directly
      or indirectly, that the foregoing defendants acquired
      or were given business(es) or products by plaintiffs
      or Kevin Mernone;

(6)   representing by any means whatsoever, whether directly
      or indirectly, that any of the plaintiff entities have
      changed their names or have otherwise ceased
      operations, including by the forwarding of any
      telephone calls made to the plaintiff entities to the
      business and personal telephone of defendant Freiman;
      and defendant Freiman shall, to the extent she has not

already done so, forthwith remove all forwarding of calls to plaintiffs' telephone numbers and cause the return all of plaintiffs' phone numbers to the location of plaintiffs' businesses;

(7)  using the names or otherwise infringing upon the trade names or trademarks of any of the plaintiff entities, including Gluco Perfect, U.S. Health & Home Care and Perfect Care, and including or any other similar names, initials or marks;

(8)  using the names Perfect Gluco, USHH or Perfect Care Solutions, or any other similar names or marks, or initials of the plaintiff companies;

(9)  soliciting any clients or customers of plaintiffs and soliciting any suppliers or vendors of plaintiffs; however, defendants may seek modifications of such conditions following discussions and the exchanges of documents between the parties;

(10) transferring any assets or business interests to or from plaintiffs;

(11) engaging in any transactions whatsoever in any bank or other financial account(s) owned by or associated with defendants Perfect Gluco, USHH, or Perfect Care Solutions;

(12) engaging in any transactions whatsoever in any bank or other financial account(s) owned by or associated with plaintiffs Gluco Perfect, U.S. Health & Home Care, or Perfect Care;

(13) using the plaintiffs' accounting systems, computer systems, emails, telephone numbers, fax numbers, accounts of any nature, addresses, equipment facilities, assets and personnel; and it is further

ORDERED that defendants Freiman and Gillen are not restrained from accessing their personal bank accounts provided the accounts and balances have been disclosed to plaintiffs, absent a sufficient showing by plaintiffs;

ORDERED that plaintiffs' security shall remain in place to pay the costs and damages if Ms. Freiman is found to be wrongfully enjoined or restrained;

ORDERED that this Order is deemed to be served on all parties via electronic filing on the ECF system on October 3, 2014; and it is further

ORDERED that the parties shall submit a joint

statement by ECF as to how they intend to proceed no later than October 10, 2014.

**SO ORDERED.**

Dated:     October 3, 2014
           Brooklyn, New York

                              _____/s/_____
                              Hon. Kiyo A. Matsumoto
                              United States District Judge